ROBYN B. SOKOL, SBN 159506
**BRUTZKUS GUBNER**
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile: (818) 827-9099
Email:        rsokol@bg.law

Counsel for Debtor

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

In re:

RAMLA USA, INC.,

                                    Debtor.

Case No.  2:17-bk-24318 BR

Chapter 11

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER:**

**(1) AUTHORIZING THE SALE OF THE GYORO GYORO IZAKAYA JAPONAISE LOCATED IN PALM SPRINGS, CALIFORNIA;**

**(2)  APPROVING OVERBID PROCEDURES;**

**(3) FINDING THAT BUYER IS ENTITLED TO A GOOD FAITH DETERMINATION PURSUANT TO 11 U.S.C. § 363(m); AND**

**(4) AUTHORING THE ASSUMPTION  AND ASSIGNMENT OF THE UNEXPIRED NON-RESIDENTIAL REAL PROPERTY LEASE PURSUANT TO 11 U.S.C. § 365 AS PART OF THE SALE; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF YUJI UENO IN SUPPORT THEREOF**

Hearing:
Date:   July 18, 2018
Time:  10:00 a.m.
Place:  Courtroom 1668
            U.S. Bankruptcy Court
            255 E. Temple Street
            Los Angeles, CA 90012

1964655

1  **TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE,**

2  **THE TWENTY LARGEST UNSECURED CREDITORS, THE OFFICE OF THE UNITED**

3  **STATES TRUSTEE, SALVADOR ZAVALA, JR., SALVADOR ZAVALA CORTES,**

4  **ALFREDO OROZCO FRANCO, BRANDENBURG-OASIS PLAZA, LLC, A CALIFORNIA**

5  **LIMITED LIABILITY COMPANY AND ALL OTHER INTERESTED PARTIES:**

6        Ramla USA, Inc., the debtor (the "**Debtor**") in the above captioned bankruptcy case

7  identified as *In re Ramla USA, Inc.*, Bankruptcy Case Number 2:17-bk-24318-BR (the "**Bankruptcy**

8  **Case**"), hereby moves this Court (the "**Motion**") for an order authorizing the sale of the operating

9  restaurant and business known as Gyoro Gyoro Izakaya Japonaise located at 105 S. Palm Canyon

10 Drive, Palm Springs, CA 92262 which is a fully equipped functional and operational restaurant with

11 a liquor license and leasehold interest ("**Palm Springs Restaurant**") which will be assumed and

12 assigned to the buyer ("**Sale**").  The proposed Sale is in accordance with the terms of the "*Debtor's*

13 *First Amended Chapter 11 Plan of Reorganization*" [Docket No. 141] as modified by the "*Debtor's*

14 *First Non-Material Modification To the Debtor's First Amended Chapter 11 Plan of*

15 *Reorganization*" [Docket No. 154] (collectively, "**Plan**") which was confirmed by order of this

16 Court on March 28, 2018.

17       The Debtor seeks to sell the Palm Springs Restaurant to Salvador Zavala, Jr., Salvador

18 Zavala Cortes, and Alfredo Orozco Franco ("**Buyer**").  The Buyer will purchase the Palm Springs

19 Restaurant for $200,000 ("**Purchase Price**").  The Buyer has offered to purchase the Palm Springs

20 Restaurant and assume the leasehold interest for cash of $100,000 and a three year note secured by

21 the Palm Springs Restaurant in the amount of $100,000.   There are no contingencies.  The terms of

22 the sale are set forth in the Asset Purchase Agreement attached hereto as **Exhibit 1** and incorporated

23 herein by this reference ("**APA**").   The Sale includes the assumption of the unexpired non-

24 residential real property lease between the Debtor and Brandenburg-Oasis Plaza, LLC, a California

25 limited liability company ("**Brandenburg**") entered into on or about October 11, 2012 for certain

26 premises located at 105 S. Palm Canyon Drive, Palm Springs, CA 92262 (the "**Lease**") and the

27 assignment of the Lease to the Buyer.  Brandenburg has been provided a copy of this Motion.  The

28 Debtor is current on the Lease.  A true and correct copy of the Lease is attached to the annexed

Main Document    Page 3 of 134

1    Declaration of Yuji Ueno ("**Ueno Decl.**") as **Exhibit 2** and incorporated herein by this reference.

2    The Plan provides for the Sale with the sale proceeds to be placed in the GUC Distribution

3    Fund.[1]  Docket No. 154, p. 20.  The Debtor seeks approval of the Sale to the Buyer or a successful

4    overbidder free and clear of all liens, claims, interests and encumbrances, with such liens, claims,

5    interests, and encumbrances to attach to the Sale proceeds.  The Debtor additionally seeks approval

6    of overbid procedures, and requests that the Court determine that the Buyer or any successful

7    overbidder is entitled to a good faith determination pursuant to 11 U.S.C. § 363(m).

8    This Motion is brought pursuant to sections 363 and 365 of Title 11 of the United States

9    Code (beginning at 11 U.S.C. § 101, *et seq.*, the "**Bankruptcy Code**"), Rules 2002, 6004 and 6006

10   of the Federal Rules of Bankruptcy Procedure ("**Rules**"), and Rules 6004-1 and 9013-1 of the Local

11   Bankruptcy Rules of the Central District of California (**L.B.R.**) on the grounds that the Sale of the

12   Palm Springs Restaurant is (i) within the Debtor's sound business judgment; and (ii) in the best

13   interest of the Estate and its creditors; and (iv) is an important component to the Debtor's successful

14   reorganization in this Bankruptcy Case as the Plan provides for the Sale.

15   The Motion is based on the attached Memorandum of Points and Authorities, the

16   concurrently-filed Declaration of Yuji Ueno, Chief Executive Officer for the Debtor and

17   representative for the Reorganized Debtor, the concurrently-filed notice of Motion, the arguments of

18   counsel, and such other admissible evidence as is properly brought before this Court at or before the

19   hearing on this Motion.

20   **PLEASE TAKE NOTICE** that, pursuant to L.B.R. 9013-1(f), any opposition to the Motion

21   must be filed and served at least fourteen (14) days prior to the hearing on the Motion.  Any

22   opposition or other response to the Motion must be a "complete written statement of all reasons in

23   opposition thereto or in support, declarations and copies of all evidence on which the responding

24   party intends to rely, and any responding memorandum of points and authorities."  L.B.R. 9013-1(f).

25   Pursuant to L.B.R. 9013-1(h), a failure to timely file and serve responsive documents to the Motion

26   may be deemed to be consent to the relief requested herein.

27

28

---

[1] All initial capitalized terms not otherwise defined herein shall have the meaning ascribed to them in
the Plan.

1964655

1    **WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

2    (1)    Granting the Motion in its entirety;

3    (2)    Approving the Sale to the Buyer or the successful overbidder and finding the

4    Purchase Price is fair and reasonable and that the Sale is in the best interests of the Estate and

5    Allowed Claimants under the Plan;

6    (3)    Authorizing the Sale to the Buyer on an **AS-IS, WHERE-IS** basis, without any

7    representations or warranties by the Debtor or Reorganized Debtor;

8    (4)    Approving the proposed overbid procedures;

9    (5)    Approving the form and manner of notice provided by the Debtor;

10    (6)    Authorizing the Debtor and Reorganized Debtor to execute any and all documents

11    that may be necessary or convenient to consummate the Sale;

12    (7)    Authorizing the Sale free and clear of liens, interests, and encumbrances pursuant to

13    11 U.S.C. § 363(b) and (f), with such liens, claims, interests, and encumbrances to attach to the Sale

14    proceeds with the same priority and rights of enforcement as previously existed;

15    (8)    Finding the Buyer or the successful overbidder is a good-faith purchaser of the Palm

16    Springs Restaurant pursuant to 11 U.S.C. § 363(m) and entitled to all benefits and protections

17    provided thereby;

18    (9)    Authorizing the assumption of the Lease by the Debtor and the assignment of the

19    Lease to the Buyer or the successful overbidder.

20    (10)    Directing that the sale proceeds be wired from escrow to Brutzkus Gubner to be

21    placed in the GUC Distribution Fund as follows:

22

23    Please remit funds to Bank:                Grandpoint Bank
                                                 16861 Ventura Blvd.
24                                               Encino, CA 91436
                                                 (818) 501-2265
25    ABA Routing Number:                        122244566

26    Account Name:                              Brutzkus Gubner Rozansky Seror Weber LLP
                                                 Client Trust Settlement Account
27                                               21650 Oxnard St., Ste. 500
                                                 Woodland Hills, CA 91367
28                                               (818) 827-9000
      Account Number:                            4121349

1964655

3

(11)    Directing that payments on the Note will be placed in the GUC Distribution Fund maintained at Brutzkus Gubner and shall be made payable to Brutzkus Gubner Trust Account and mailed as follows:   Robyn B. Sokol, Brutzkus Gubner, 21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367.

(12)    Waiving the 14-day stay imposed by F.R.B.P. 6004(h); and

(13)    Granting such other and further relief as this Court deems just and proper under the circumstances.


DATED:  June 19, 2018                    **BRUTZKUS GUBNER**


                                        /s/ Robyn B. Sokol
                            By:_____
                                ROBYN B. SOKOL
                                Counsel for Debtor

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

By the Motion, the Debtor proposes to sell the Palm Springs Restaurant for a purchase price of $200,000, payable in $100,000 cash and a 3 year note for $100,000 bearing interests of 6% per annum pursuant to the terms of the APA.  **Exhibit 1**.  The Motion proposes a sale of the Palm Springs Restaurant subject to overbid and pursuant to the overbid procedures set forth herein.  The Debtor requests that the Court find that the Buyer or successful overbidder is a good faith purchaser within the meaning of 11 U.S.C. § 363(m) and entitled to the protections thereof.  The Sale also provides for the assumption of the Palm Springs Restaurant Lease and the assignment of the Palm Springs Restaurant Lease to the Buyer. The Plan provides for the proposed Sale.

Specifically, the Plan provides for the liquidation of the Palm Springs Restaurant as a going concern and that any sale is subject to Bankruptcy Court approval and the sale order will provide for the assumption and assignment of the Lease.  Docket No. 134, p. 20.

The Sale proposed herein will provide the highest and best price for the Palm Springs Restaurant and as a result the maximum benefit to creditors of the Debtor.  The Plan provides that all proceeds from the sale of the Palm Springs Restaurant shall be placed in the GUC Distribution Fund to be distributed to Allowed Claimants in Classes 3 and 4 in accordance with the Plan.  As discussed more fully below, the Purchase Price provides the best return to Creditors.  Thus, the Debtor submits that this proposed Sale is in the best interest of the Estate because the consideration for the Sale is reasonable, and the Estate will benefit as a result of the Sale.

**II.    FACTUAL BACKGROUND**

On November 20, 2017, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Through the Effective Date, April 13, 2018, the Debtor operated its business and managed its affairs as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in the Debtor's Chapter 11 case as of the filing of this Sale Motion.  On the Effective Date, in accordance with the Plan, all assets of the Debtor except the Liquidated Assets, which include the Palm Springs Restaurant, vested in the Reorganized Debtor.   The Plan provides that the Liquidated Assets (which include the Palm

1  Springs Restaurant) will be sold for the benefit of Allowed Claimants in Classes 3 and 4.

2         Prior to the Effective Date, the Debtor owned and operated traditional Japanese/Izakaya-style

3  restaurants.  By Bankruptcy Court *Order Confirming Debtor's First Amended Plan of*

4  *Reorganization* entered on March 29, 2018 [Docket No. 160] the Plan was confirmed.   The Plan

5  provides for the sale of the Palm Springs Restaurant as proposed herein.   On or about March 8, 2018

6  this Court authorized the employment of Restaurant Realty Company ("**Restaurant Realty**") as its

7  business broker to market and sell Palm Springs Restaurant and the Debtor's central kitchen located

8  at 2300 Central Avenue Units A&B, in Irwindale, California  ("**Central Kitchen**").   Docket No.

9  146.  Thereafter, Restaurant Realty commenced aggressively marketing both the Central Kitchen and

10  the Palm Springs Restaurant.   The Central Kitchen was will be sold pursuant to this Court's order

11  entered on June 13, 2018.

12         In June 2018, Restaurant Realty presented the Debtor with an offer to purchase the Palm

13  Springs Restaurant for $200,000.   The Debtor accepted the offer.  Ueno Decl. and **Exhibit 1**.

14         In accordance with the Plan, the Debtor and the Reorganized Debtor now seek Court

15  approval of the Sale.

16  **III.    TERMS OF PROPOSED SALE**

17         The Debtor has received an offer from the Buyer to purchase the Palm Springs Restaurant for

18  $200,000.  The Debtor and the Buyer have negotiated a sale of the Palm Springs Restaurant as set

19  forth in the APA, attached hereto as **Exhibit 1.**

20         **A.     Terms of Sale**

21         The salient terms of the proposed sale are as follows:

22         1.     Sale Price:  The Debtor proposes to sell the Palm Springs Restaurant, subject to Court

23  approval, for $200,000.  The Purchase Price shall be funded by cash of $100,000, $20,000 to be

24  deposited into escrow upon the signing of escrow instructions and $80,000 to be deposited by the

25  Buyer within 3 business days before the closing date of the sale and a note for the benefit of the

26  Debtor secured by the Palm Spring Restaurant in the amount of $100,000 to be paid over 3 years

27  with interest of 6% per year.   The monthly note payments will total $3,042.19 and will commence

28

1  one month from the close of escrow.  *See* **Exhibit 1**.   The note payments will be directed to the

2  Brutzkus Gubner Trust Account to be deposited into the GUC Distribution Fund.

3          2.      <u>Contingencies</u>:  The sale is contingent upon the transfer or issuance of any necessary

4  permits and licenses.

5          3.      <u>Sale Subject to Overbid</u>:  The proposed Sale to the Buyer is subject to overbid,

6  according to the terms proposed herein.

7          4.      <u>No Representations or Warranties</u>: The Debtor is selling the Palm Springs Restaurant

8  to the Buyer on an **AS-IS, WHERE-IS** basis, without any representations or warranties by the

9  Debtor or Reorganized Debtor.

10          5.      <u>Bankruptcy Court Jurisdiction</u>:  The United States Bankruptcy Court for the Central

11  District of California shall have exclusive jurisdiction to interpret and enforce over any case or

12  controversy arising from the Sale.

13          **B.      Proposed Overbid Procedures**

14          While the Debtor is prepared to consummate the Sale to the Buyer pursuant to the terms of

15  the Purchase Agreement, it is obliged to seek the maximum price for the Palm Springs Restaurant.

16  Accordingly, the Debtor requests that the Court authorize it to implement an overbid procedure

17  regarding the Sale on the following terms (the "**Bid Procedures**"):

18          1.      <u>Present at Hearing</u>:  The Buyer and each Qualified Bidder (as defined below), must

19  be either physically present at the hearing on the Motion or represented by an individual or

20  individuals who is/are physically present at the hearing and have the authority to participate in the

21  overbid process;

22          2.      <u>Notice of Overbid</u>:  Any party wishing to participate in the overbid process must

23  notify the Debtor in writing directed to Robyn Sokol by email addressed to rsokol@bg.law of

24  his/her/its intention to do so no later than close of business two (2) calendar days before the date of

25  the hearing on the Motion;

26          3.      <u>Earnest Money Deposit</u>:  To be a qualified overbidder ("**Qualified Bidder**"), each

27  party participating in the bidding must remit to the Debtor's counsel, at or prior to the hearing on the

28  Motion, payment in the form of a cashier's check (no other form of payment shall be accepted) made

1964655

1  payable to "Chicago Title" (payment made payable to any other party may, in the sole discretion of

2  the Debtor, be deemed inadequate and rejected) in a deposit amount of **$20,000** ("**Overbid**

3  **Deposit**") and proof of available liquid funds in the amount of **$180,000**.  **The Debtor is not**

4  **required to accept anything other than cash from Qualified Bidders.**

5      4.   <u>Initial Overbid</u>:  The initial overbid for the Palm Springs Restaurant shall be

6  **$10,000.00**, with subsequent overbids being made in minimum increments of **$5,000.00**;

7      5.   <u>Successful Overbidder Subject to Terms of Escrow Instructions</u>.  In the event that the

8  Buyer is not the successful bidder for the Palm Springs Restaurant, the successful bidder

9  ("**Successful Bidder**") shall then become the buyer under the same terms and conditions as set forth

10  in the Escrow Instructions (with the exception of the price to be paid for the Palm Springs

11  Restaurant).  Under these circumstances, the Escrow Instructions with the Buyer will no longer be

12  effective and the Buyer will be entitled to a full refund of the $20,000.

13  **IV.**   **DISCUSSION**

14      **A.**   <u>**The Court Should Authorize the Sale**</u>

15      The Debtor submits that the Sale is in the best interest of the Estate and should be approved.

16  Section 363 of the Bankruptcy Code authorizes the Debtor to sell estate property, following notice

17  and a hearing, on terms that are fair and reasonable and the result of an arms-length transaction.

18  Specifically, Section 363(b)(1) states in pertinent part that: "The trustee, after notice and a hearing,

19  may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11

20  U.S.C. § 363(b)(1); *see also* 11 U.S.C. § 1107(a) (giving a debtor in possession the same powers as a

21  trustee).  Additionally, the Plan provides for the Sale.

22      In determining whether the sale of assets outside of the ordinary course of business should be

23  approved, bankruptcy courts generally consider: (1) whether a sufficient business reason exists for

24  the sale; and (2) whether the proposed sale is in the best interest of the estate, which in turn consists

25  of the following factors: (a) that terms of the sale are fair and reasonable; (b) that the proposed sale

26  has been adequately marketed; (c) that the proposed sale terms have been properly negotiated and

27  proposed in good faith; and (d) that the purchaser is involved in an arms-length transaction with the

28  seller.  *See In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991) ("In

1  approving any sale outside the ordinary course of business, the court must not only articulate a

2  sufficient business reason for the sale, it must further find it is in the best interest of the estate, *i.e.*, it

3  is fair and reasonable, that it has been given adequate marketing, that it has been negotiated and

4  proposed in good faith, and that it is an 'arms-length' transaction."); *Matter of Phoenix Steel Corp.*,

5  82 B.R. 334, 335-56 (Bankr. D. Del. 1987) (In determining whether a proposed sale of equipment is

6  proper under § 363, courts should consider whether the proposed sale is fair and equitable, whether

7  there was a good business reason for completing the sale, and whether the transaction is proposed in

8  good faith.); *In re Alves*, 52 B.R. 353, 355 (Bankr. D.R.I. 1985) (whether to approve a sale under

9  § 363 depends upon the integrity of sale and the best interest of bankruptcy estate).

10         In the instant case, the Debtor has satisfied all of the applicable elements discussed above

11  concerning the proposed Sale, and the Debtor has sound reasons for the Sale, specifically, to

12  maximize return to the Estate by liquidation of the Palm Springs Restaurant for the highest and best

13  price.  The Debtor submits that the Purchase Price for the Palm Springs Restaurant offered by the

14  Buyer is fair and reasonable and that the Palm Springs Restaurant was adequately marketed.  Based

15  upon the Debtor's review of comparable sales, the Debtor believes that the Purchase Price is a

16  reasonable offer given the current market conditions.  In addition, the proposed overbid procedures

17  and auction process are specifically designed to ensure that the highest price possible is obtained for

18  this asset.  Given that there are no secured liens asserted against the Palm Springs Restaurant, the

19  Debtor submits that the proposed Sale will provide the Estate with a significant benefit.  In

20  accordance with the Plan, all proceeds from the Sale will be placed in the GUC Distribution Fund to

21  be disbursed to Holders of Allowed General Unsecured Claims and Allowed Employee Claims.

22  Furthermore, the Plan provides for the Sale as described herein.

23         **B.      The Court Should Authorize the Proposed Sale Free and Clear of All Liens,**

24                  **Interests, and Encumbrances Pursuant to 11 U.S.C. § 363(f)**

25         Pursuant to 11 U.S.C. § 363(f), the Debtor may sell the Palm Springs Restaurant including

26  any and all equipment, furniture and fixtures, licenses, associated with the Palm Springs Restaurant

27  free and clear of liens, interests, claims, and encumbrances, with such liens, interests, claims, and

28  encumbrances to attach to the Sale proceeds, with the same priority and rights of enforcement as

9

1    previously existed.

2       As discussed above, the Debtor is not aware of any liens, interests, claims or encumbrances

3    asserted against the Palm Springs Restaurant or any of the assets located at the Palm Springs

4    Restaurant.  Thus, the Debtor submits the Court may authorize the Sale free and clear of all liens,

5    interests, claims, and encumbrances pursuant to 11 U.S.C. § 363(f).

6       **c.**    **The Court Should Find that the Buyer is a Good Faith Purchaser**

7       Additionally, pursuant to 11 U.S.C. § 363(m), the Court should make a finding that the Buyer

8    is a good faith purchaser.  A purchaser of property is protected from the effects of reversal on appeal

9    of the authorization to sell or lease as long as the Court finds that the purchaser acted in good faith

10   and the appellant fails to obtain a stay of the sale.  *See* 11 U.S.C. § 363(m).  Although the

11   Bankruptcy Code does not define "good faith," courts have provided guidance as to the appropriate

12   factors to consider.  *See In re Pine Coast Enterprise, Ltd.*, 147 B.R. 30, 33 (Bankr. N.D. Ill. 1992)

13   ("The requirement that a purchaser act in good faith speaks to the integrity of its conduct in the

14   course of the sale proceeding."); *Kham and Nate's Shoes No. 2 v. First Bank*, 908 F.2d 1351, 1355

15   (7th Cir. 1990) (The purpose of § 363(m) is to disable courts from backtracking on promises with

16   respect to bankruptcy sales in the absence of bad faith).  In *T.C. Investors v. Joseph (In re M Capital*

17   *Corp.)*, 290 B.R. 743 (B.A.P. 9th Cir. 2003), the Bankruptcy Appellate Panel held that a bankruptcy

18   court may not make a finding of good faith in the absence of evidence, but may make such a finding

19   if appropriate evidence is presented.  *T.C. Investors*, 290 B.R. at 746–47.

20      In the instant case, the Debtor requests that the Court make a finding that the Buyer is a good

21   faith purchaser within the meaning of Section 363(m).  The Debtor has no relation to the Buyer or

22   the Buyer's broker, and did not know the Buyer prior to its involvement in this Bankruptcy Case.

23   The Debtor has reviewed its internal records and the claims register in this Bankruptcy Case.  Based

24   on this review, the Debtor has determined that neither the Buyer nor the Buyer's broker are creditors

25   of this Estate.  The Debtor submits that the Sale was negotiated at arms-length, and the proposed

26   Purchase Price is fair consideration for the Palm Springs Restaurant.  The property was marketed

27   through Restaurant Realty and the Buyer was located through such marketing efforts.  As such, a

28   finding of good faith within the meaning of Section 363(m) is appropriate.

1964655

d.    **The Court Should Authorize the Assumption and Assignment of the Palm Springs Restaurant Lease**

Except in certain situations not relevant here, section 365(a) of the Bankruptcy Code authorizes a debtor in possession, "subject to the Court's approval… [to] assume or reject any executory contract or unexpired lease of the debtor."  A debtor in possession may assume or reject executory contracts for the benefit of the estate.  *In re Pomona Valley Med. Grp., Inc.*, 476 F.3d 665, 669 (9th Cir. 2007);  *In re Locke*, 180 B.R. 245, 251 (Bankr. C.D. Cal. 1995); *In re Klein Sleep Products, Inc.*, 78 F.3d 18, 25 (2d Cir. 1996).  In reviewing a debtor in possession's decision to assume or reject an executory contract or unexpired non-residential real property lease, a bankruptcy court should apply the "business judgment test" to determine whether it would be beneficial to the Estate to assume it.  *In re Pomona Valley Med. Grp., Inc.*, 476 F.3d 665, 669 (9th Cir. 2007); *In re G.I. Indus., Inc.*, 204 F.3d 1276, 1282 (9th Cir. 2000); *NLRB v. Bildisco*, 682 F.2d 72, 79 (3d Cir. 1982).

An executory contract or unexpired lease must be assumed before it may be assigned. *In re Quintex Entertainment, Inc.*, 950 F.2d 1492 (9th Cir. 1991), *see, also,* 11 U.S.C. § 365(f)(2). The Court's approval of lease assumption of contracts is governed by the debtor in possession's business judgment. *See, e.g.*, *In re Huang*, 23 B.R. 798, 800-01 (9th Cir. 1982).  Accordingly, courts approve the assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject was "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *In re Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).  Indeed, to impose more exacting scrutiny would slow a debtor's reorganization, thereby increasing its cost and undermining the "Bankruptcy Code's provisions for private control" of the estate's administration. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

Moreover, a debtor may assign an executory contract or unexpired lease if (i) the contract was assumed in accordance with the terms of section 365(b) of the Bankruptcy Code, and (ii) adequate assurance of future performance is provided. 11 U.S.C. § 365(f)(2).  Here, the Debtor submits that the assumption and assignment is appropriate because the lease amounts are current

1964655

1  (thus there is no prerequisite cure amount pursuant to 11 U.S.C. § 363 (b)(1)).   Additionally, the

2  Buyer has the financial wherewithal to satisfy the monthly lease payments.

3       The Plan provides for the Debtor to assume the Palm Springs Restaurant Lease and assign

4  the Palm Springs Restaurant Lease to the Buyer after Confirmation.   The Sale which includes the

5  assumption and assignment of the Palm Springs Restaurant Lease is contemplated by the Plan and

6  was already determined to satisfy the business judgment test.   The Sale will provide approximately

7  $180,000 to the Debtor which will be placed in the GUC Distribution Fund for the benefit of Class 3

8  and Class 4 Allowed Claimants under the Plan.

9       Brandenburg was provided notice of the assumption and assignment when it was served with

10  the Plan and the Disclosure Statement as well as this Motion.   Accordingly, the Debtor submits that

11  assumption and assignment of the Palm Springs Restaurant Lease is in the best interests of the

12  Estate.

13  **I.    NOTICE**

14       The Debtor submits that adequate notice of the proposed Sale has been given.   Concurrently

15  with the filing hereof, notice on the Court-approved form F 6004-2 was submitted to the Court's

16  clerk for publication on the Court's website pursuant to Local Bankruptcy Rule 6004-1(f).  Notice of

17  the Sale was also posted on the Danning, Gill, Diamond, & Kollitz LLP website.  Notice of this Sale

18  Motion has been provided to the Office of the United States Trustee and all other interested parties

19  pursuant to Federal Rule of Bankruptcy Procedure 2002(a).

20  **II.    CONCLUSION**

21       Based on the foregoing, the Debtor respectfully requests that the Court enter an order:

22       (1)    Granting the Motion in its entirety;

23       (2)    Approving the Sale to the Buyer or the successful overbidder and finding that the

24  Purchase Price is fair and reasonable and that the Sale is in the best interests of the Allowed

25  Claimants under the Plan;

26       (3)    Authorizing the Sale to the Buyer on an **AS-IS, WHERE-IS** basis, without any

27  representations or warranties by the Debtor or Reorganized Debtor;

28       (4)    Approving the proposed overbid procedures;

12

1    (5)    Approving the form and manner of notice provided by the Debtor;

2    (6)    Authorizing the Debtor and Reorganized Debtor to execute any and all documents

3    that may be necessary or convenient to consummate the Sale;

4    (7)    Authorizing the Sale free and clear of liens, interests, and encumbrances pursuant to

5    11 U.S.C. § 363(b) and (f), with such liens, claims, interests, and encumbrances to attach to the Sale

6    proceeds with the same priority and rights of enforcement as previously existed;

7    (8)    Finding that the Buyer or the successful overbidder is a good-faith purchaser of the

8    Palm Springs Restaurant pursuant to 11 U.S.C. § 363(m) and entitled to all benefits and protections

9    provided thereby;

10    (9)    Authorizing the assumption of the Palm Springs Restaurant Lease by the Debtor and

11    the Assignment of the Palm Springs Restaurant Lease to the Buyer or the successful overbidder.

12    (10)    Directing that the sale proceeds be wired from escrow to Brutzkus Gubner to be

13    placed in the GUC Distribution Fund as follows:

14

15    Please remit funds to Bank:            Grandpoint Bank
                                              16861 Ventura Blvd.

16                                            Encino, CA 91436
                                              (818) 501-2265

17    ABA Routing Number:                     122244566

18    Account Name:                           Brutzkus Gubner Rozansky Seror Weber LLP
                                              Client Trust Settlement Account

19                                            21650 Oxnard St., Ste. 500
                                              Woodland Hills, CA 91367

20                                            (818) 827-9000

21    Account Number:                         4121349

22    (11)    Directing that payments on the Note will be placed in the GUC Distribution Fund

23    maintained at Brutzkus Gubner and shall be made payable to Brutzkus Gubner Trust Account and

24    mailed as follows:   Robyn B. Sokol, Brutzkus Gubner, 21650 Oxnard Street, Suite 500, Woodland

25    Hills, CA 91367.

26    ///

27    ///

28    ///

1964655

1        (12)    Waiving the 14-day stay imposed by F.R.B.P. 6004(h); and

2        (13)    Granting such other and further relief as this Court deems just and proper under the

3    circumstances.

4

5    DATED:  June 19, 2018            **BRUTZKUS GUBNER**

6
                      /s/ Robyn B. Sokol

7                 By:_____

8                    ROBYN B. SOKOL
                Counsel for Debtor

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF YUJI UENO

I, Yuji Ueno, declare as follows under penalty of perjury:

1.    I was the Chief Executive Officer of debtor and debtor-in-possession Ramla USA

Inc., a California corporation.  I now serve as a consultant to Ramla USA, Inc., the reorganized

debtor ("Reorganized Debtor") and I am assisting the Reorganized Debtor with the transition to new

corporate management.  I have personal knowledge of the facts contained herein, or have gained

such knowledge from my review of records I normally maintain in the ordinary course of business of

the Debtor, and if called as a witness, I could and would competently testify to these facts under

oath.

2.    I submit this declaration in support of the Motion to which it is annexed.  Unless

otherwise defined, all capitalized terms shall have the same meaning as in the Motion.

3.    On November 20, 2017, the Debtor filed a voluntary petition for relief under Chapter

11 of the Bankruptcy Code.  The Debtor operated its business and managed its affairs as a debtor in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code through the Effective

Date.  No trustee, examiner, or committee has been appointed in the Debtor's Chapter 11 case as of

the filing of this Motion.

4.    Prior to Confirmation, the Debtor owned and operated traditional Japanese/Izakaya-

style restaurants.  On the Effective Date, in accordance with the Plan, all assets of the Debtor except

the Liquidated Assets (which include the Palm Springs Restaurant) vested in the Reorganized

Debtor.

5.    By Bankruptcy Court *Order Confirming Debtor's First Amended Plan of

Reorganization* entered on March 29, 2018 [Docket No. 160] the Plan was confirmed.   The Plan

provides for the sale of the Palm Springs Restaurant as proposed herein.   On or about March 8,

2018, this Court authorized the employment of Restaurant Realty as its business broker to market

and sell the Debtor's operating restaurant in Palm Springs, Gyoro Gyoro Izakaya Japonaise, located

at 105 South Palm Canyon Drive and the Palm Springs Restaurant.  Docket No.  146.  Thereafter,

Restaurant Realty commenced aggressively marketing the Palm Springs Restaurant.

1964655

6.    On or about June 2018, Restaurant Realty presented me with an offer from the Buyer for the purchase of the Palm Springs Restaurant.   A true and correct copy of the APA is attached hereto as **Exhibit 1** and incorporated herein by this reference.   A counter offer was presented to the Buyer through Restaurant Realty.  **Exhibit 1.**  I on behalf of the Debtor executed the APA and all addendums thereto.

7.   The salient terms of the proposed sale are as follows:

     a.   <u>Sale Price</u>:  $200,000.  The Purchase Price shall be funded by cash of $100,000, $20,000 to be deposited into escrow upon the signing of escrow instructions and $80,000 to be deposited by the Buyer within 3 business days before the closing date of the sale and a note secured by the Palm Spring Restaurant in the amount of $100,000 to be paid over 3 years with interest of 6% per year.  The monthly note payments will total $3,042.19 and will commence one month from the close of escrow. *See* **Exhibit 1**.   The note payments will be directed to the Brutzkus Gubner Trust Account to be deposited into the GUC Distribution Fund.

     b.   <u>Contingencies</u>:  The sale is contingent upon the transfer or issuance of any necessary permits and licenses.

     c.   <u>Sale Subject to Overbid</u>:  The proposed Sale to the Buyer is subject to overbid, according to the terms proposed herein.

     d.   <u>No Representations or Warranties</u>: The Debtor is selling the Palm Springs Restaurant to the Buyer on an **AS-IS, WHERE-IS** basis, without any representations or warranties by the Debtor or Reorganized.

     e.   <u>Bankruptcy Court Jurisdiction</u>:  The United States Bankruptcy Court for the Central District of California shall have exclusive jurisdiction to interpret and enforce over any case or controversy arising from the Sale.

8.    Based upon my review and analysis of the claims filed in this Bankruptcy Case and the Debtor's books and records, I am informed and believe that there are no secured liens asserted against the Palm Springs Restaurant and any and all equipment, furniture and fixtures located at and used by the Palm Springs Restaurant.

9.      The Debtor has no relation to the Buyer or the Buyer's broker, and did not know the Buyer prior receiving the offer to purchase.  The Debtor has reviewed its internal records and the claims register in this Bankruptcy Case.  Based on this review, the Debtor has determined that neither the Buyer nor the Buyer's broker are creditors of this Estate.  The Debtor submits that the Sale was negotiated at arms-length, and the proposed Purchase Price is fair consideration for the Palm Springs Restaurant.  The property was marketed through Restaurant Realty and the Buyer was located through such marketing efforts.

10.      It is my business judgment that the Purchase Price for the Palm Springs Restaurant offered by the Buyer is fair and reasonable and that the sale of the Palm Springs Restaurant was adequately marketed.  Based on my knowledge of the industry, the current market, and my conversations with Restaurant Realty, the brokers employed to market and sell the Palm Springs Restaurant, the Purchase Price is fair and reasonable.  In accordance with the Plan, all proceeds from the Sale will be placed in the GUC Distribution Fund to be disbursed to Holders of Allowed General Unsecured Claims and Allowed Employee Claims.

11.      The Sale includes the assumption of the unexpired non-residential real property lease between the Debtor and Brandenburg entered into on or about October 11, 2012 for certain premises located at 105 S. Palm Canyon Drive, Palm Springs, CA 92262, the Palm Springs Restaurant Lease, and the assignment of the Palm Springs Restaurant Lease to the Buyer.  The Debtor and the Reorganized Debtor are current on the Palm Springs Restaurant Lease.  A true and correct copy of the Palm Springs Restaurant Lease and all addendums thereto is attached hereto and incorporated herein by this reference as **Exhibit 2**.  The monthly rent for the Palm Springs Restaurant Lease is currently $21,641.  The Palm Springs Restaurant Lease provides for yearly rent increases through 2022 and six options to extend the lease for 5 years per option.  **Exhibit 2**.

///

///

///

///

///

1964655

1        12.    In accordance with the Plan, the Sale includes the assumption of the Palm Springs

2    Restaurant Lease and the assignment of the Palm Springs Restaurant Lease to the Buyer.

3        I declare under penalty of perjury that the foregoing is true and correct and executed this 25th

4    day of June 2018, at Monrovia, California.

5

6                                                  Yuji Ueno

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1064655

| Bkr | Date |
|---|---|
| CLJ | 6/12/18 |

**California Association of Business Brokers**

Professional Service since 1987

This form has been provided by the California Association of Business Brokers for the exclusive use of its members.
A list of current members is available at www.cabb.org

## Asset Purchase Agreement

INTRODUCTION: This is an offer and an agreement to buy and sell business assets, dated 6/12/18

1. DEFINITIONS: The following definitions and designations shall apply regardless of number or gender:

BUSINESS Gyoro Gyoro Izakaya Japonaise

Address 105 S. Palm Canyon Drive, Palm Springs, CA 92262

BUYER S. Zavala Jr.,S.Z. Cortes, Alfredo O. Franco      SELLER Ramla USA, Inc.

SIGNING: Signing of this Agreement by both Buyer and Seller.

CLOSING: Transfer of ownership of business assets from Seller to Buyer.

COP: Change of possession of business assets from Seller to Buyer.

DAYS: Calendar days.

*[handwritten: SALVADOR ZAVALA JR. ALFREDO OROZCO FRANCO SALVADOR ZAVALA CORTES]*

INVENTORY: Current raw material, work in process, saleable finished goods and consumable supplies valued at lower of cost or market. Work in process and finished goods shall be valued at the actual cost of material and direct labor incurred by Seller.

ASSETS: Assets of the Business include, but are not limited to, Inventory, equipment, trade fixtures, leasehold, leasehold improvements, contract rights, business records (with Seller retaining a reasonable right of inspection), software and software licenses, transferable governmental licenses and permits, other licenses, franchises, goodwill, covenant not to compete, trade secrets, patents, intellectual property, trade name, customer lists, marketing materials, telephone and fax numbers, web sites, URL's, email addresses, sales order backlog and smallwares and remaining saleable food and beverage. Assets being sold shall not include bank accounts, deposits, cash, accounts receivable (unless specified in paragraph 4), financial records (but Buyer shall have a right to make copies prior to Closing), or name and menu.

2. SALE OF BUSINESS ASSETS: Seller agrees to sell to Buyer and Buyer agrees to buy from Seller the Assets for the price and on the terms and conditions set forth below.

3. CONSIDERATION: The Consideration shall be $ 200,000     paid or credited as follows:

   a. $    10,000   as a deposit by Buyer upon signing this Agreement and included as part of the down payment. Broker is authorized to:
       □ hold deposit check uncashed until escrow instructions are signed, or
       ☒ deposit check into escrow trust account or broker trust account upon acceptance of offer.

   b. $    10,000   additional cash deposited in escrow upon signing of escrow instructions.

   c. $    80,000   additional cash deposited in escrow   3   days before Closing.

   d. $    0   additional down payment provided from third party financing as described in paragraph 5.d.

   e. $    100,000   Total down payment   □ See attached addendum for details of the down payment.
     (a + b + c + d)

   f. $    0   assumption of specified liabilities, as detailed in attached addendum. If the actual balance differs at Closing, the □ Seller note, or □ down payment, shall be adjusted accordingly.

   g. $    100,000   approximate balance of a non-negotiable Seller note payable in equal monthly installments, including   6 % per annum interest computed from COP, so as to fully amortize over   36   months (i.e., $3,042.19   per month), with payments to begin one month from COP. Note shall be secured by a security agreement on the Assets, contain a right to prepay without penalty and be assumable with Seller's consent, which shall not be unreasonably withheld. Seller note shall be subordinated to any third-party financing described in 5.d. If Buyer is a corporation or other entity, its owners shall personally guarantee this note.
     □ See attached addendum for details of the Seller note.

   h. $    200,000   Total
     (e + f + g)

*[signature lines: Buyer, Buyer, Seller, Seller]*

**EXHIBIT "1"**      19

Business Gyoro Gyoro Izakaya Japonaise _____ Buyer S. Zavala Jr.,S Z. Cortes, Alfredo O. Franco  Date 6/12/18 _____

4.  INVENTORY AND ACCOUNTS RECEIVABLE:

☐ The Consideration shall include inventory of $ n/a _____ and collectable accounts receivable of
$ n/a _____. If the actual amount of inventory and accounts receivable at COP is less than the total of these
figures, the Consideration and down payment and Seller note shall be decreased accordingly, and if the actual amount is more than
these figures, then the Consideration and Seller note shall be increased accordingly. If the amount has increased and
there is not a Seller note, Buyer shall execute a promissory note to Seller, payable in equal monthly installments,
including _____ n/a % per annum interest computed from COP, so as to fully amortize over _____ n/a
months, with payments to begin one month from COP. This note shall otherwise contain the same provisions as the
note described in 3.g. above, or

☐ At Closing, the Consideration and ☒ cash down payment or ☐ Seller note, shall be increased by the cost of inventory.

Notwithstanding the above, the Inventory shall not exceed $ n/a _____ (and Buyer can reject any part of the
inventory over that amount) or be less than $ n/a _____ The Inventory count shall be made on COP ☐ by Buyer
and Seller, or ☐ by an independent inventory service with the fees to be divided equally between Buyer and Seller.

5   CONDITIONS. This Agreement is subject to the following conditions:

a.  Buyer's due diligence:
    i.   Within _12_ days of Signing, Buyer shall request in writing any and all information and appointment(s) for access
         to inspect the premises as may reasonably be required to evaluate the Business.
    ii.  Within _12_ days of Buyer's request, Seller shall provide all requested information and access.
    iii. Within _21_ days of Buyer's receipt, Buyer shall review and approve in writing the information requested and
         provided, and the condition of the Assets and premises.

b.  Seller's due diligence:
    i.   Within _3_ days of Signing, Seller shall request in writing any and all information as may reasonably be required
         to evaluate Buyer's qualifications to purchase and operate the Business.
    ii.  Within _3_ days of Seller's request, Buyer shall provide all requested information.
    iii. Within _3_ days of Seller's receipt, Seller shall review and approve in writing information requested and provided.

Should either party not approve in writing, as provided in 5.a.iii or 5.b.iii, as applicable, within _45_ days from Signing,
the other party may terminate this Agreement with written notice and failure to cure within 48 hours of such notice, and the
Buyer's deposit will be returned less any escrow costs.

c.  Lease contingency: Within _n/a_ days from Signing or upon COP if sooner,
    ☐ Written consent of the landlord to assignment of the existing premises lease or
    ☐ The making of a new lease between the landlord and Buyer which is acceptable to Buyer.

d.  Financing contingency:
    i.   Buyer submitting complete loan application(s) to _n/a_ lenders within _n/a_ days from Signing.
    ii.  Buyer receiving a commitment letter for third party financing in the amount of $ n/a _____ within _n/a_
         days from Signing.
    iii. Buyer receiving funding in the amount indicated in 5.d.ii within _n/a_ days after Signing.
    Buyer shall use its best efforts to obtain said financing and Seller shall fully and promptly comply with lender requests
    for information and access to the Business

e.  Licenses: Closing is contingent upon the transfer or issuance of any necessary permits and licenses.

f.  Other contingencies: transfer of the ABC Type 47 license; Lease contingency is removed as assignment is made through
    Court Order. Buyer due diligence begins upon mutual execution of this agreement. Sale is subject to Bankruptcy Court approval.

If Buyer is unable to satisfy conditions 5.c, 5.d, 5.e or 5.f within the specified time limits, either party may terminate this
Agreement by giving written notice to the other party or his or her Broker, and the Buyer's deposit will be returned less any
escrow costs.

6.  ESCROW. The Consideration, closing costs and closing adjustments shall be paid through an escrow to be established
    with Chicago Title, Palm Desert, Ann Lonnie, Escrow Officer _____ the escrow holder. Upon removal of conditions 5.a
    5.b and 5(f) _____, Buyer and Seller agree to sign separate escrow instructions that
    define the duties of the parties and the escrow holder. All parties shall cooperate with the escrow holder in completing
    any documents and performing any acts necessary to complete the transfer of the Business Assets, including compliance
    with the Bulk Sale law if applicable. The Broker(s) is/are a party to the escrow as to the payment of any broker's fees and
    an irrevocable assignee(s) of the sale proceeds to the extent of such fees.

7.  CLOSING. The estimated date for Closing is 8/31 _____, 20_18_ Buyer and Seller shall make their
    best efforts to complete Closing on or before that date. COP shall occur at Closing.

                                                                    SZ AJE  SZ      YY
                                                                      Buyer   Buyer   Seller   Seller

y

Business Gyoro Gyoro Izakaya Japonaise                    Buyer S. Zavala Jr..S2 Cortes, Alfredo O. Franco    Date 6/12/18

g.  Each party shall pay its own accountants, attorneys and other advisors.

h.  Buyer shall pay at Closing any sales taxes assessed on the sale of the Business Assets.

i.  Seller shall obtain and pay for any smog certificates needed and Buyer shall pay DMV fees assessed on registered vehicles included in the sale.

j.  Buyer and Seller shall pay equally all escrow fees and costs and other transfer costs except n/a _____

k.  Warranty obligations on products/services sold prior to COP, if applicable, shall be governed by the attached addendum. In the absence of a signed addendum, there is no warranty reimbursement by Seller.

l.  After COP, Buyer shall remit to Seller upon receipt any refund of overpayments of worker's compensation premiums, taxes, trade payables or the like which relate to the period prior to COP.

m.  Seller shall defend and indemnify Buyer from any liability to the California Employment Development Department, the California Franchise Tax Board or the California State Board of Equalization arising from the operation of the Business until COP. Prior to the receipt by the escrow holder of releases of transferee liability from these agencies, the Buyer shall be protected from the possible imposition of transferee liability by a reserve set by the taxing agencies or approved by the Buyer and retained in escrow until such releases are obtained.

13.  MATERIAL CONTRACTS. Seller shall transfer to Buyer the following contracts used in the operation of the Business, and the Buyer shall assume obligation for them:

☐ Advertising contracts, including yellow pages          ☐ Vehicle agreements
☐ Alarm system agreements                                ☐ Web site agreements
☐ Copier agreements                                      ☐ _____
☐ Telephone agreements                                   ☐ _____
☐ Other equipment leases                                 ☐ _____
☐ Other equipment service agreements                     ☐ _____
☐ Software maintenance agreements                        ☐ _____

14.  BROKER: Buyer acknowledges that Broker has furnished to Buyer financial and other information obtained from Seller and other sources, the accuracy and completeness of which have not been verified by Broker, and that Buyer is relying solely on his own inspection of the Business, its Assets, financial statements, business records, contracts, any assumed liabilities, operational history, future profitability and the representations by the Seller, and not on any representations of the Broker. Seller acknowledges that he is relying solely on his own investigation of the Buyer's creditworthiness and ability to complete this transaction and to successfully operate the Business, and not on any representations of the Broker. Should any such representations of Seller or Buyer be untrue, Buyer and Seller agree to look solely to each other for relief and shall release, hold harmless, indemnify and defend the Broker from any such claims. Buyer and Seller acknowledge and agree that Broker may receive a referral fee from an institutional lender.

15.  AGENCY RELATIONSHIP CONFIRMATION: The following agency relationships are hereby confirmed for this transaction, and supersede any prior agency relationships.

| BUYER'S BROKER Coldwell Banker Commercial Lyle & Assoc. | SELLER'S BROKER Restaurant Realty Company |
|---|---|
| Agent for ☒ Buyer only or ☐ both Buyer and Seller | Agent for ☒ Seller only or ☐ both Buyer and Seller |
| Phone 760-578-9927    Fax 760-772-8499 | Phone 858-997-4565    Fax 415-945-5702 |
| Email SteveLyle@cbclyle.net    CalBRE # 00762911 | Email Craig@restaurantrealty.com    CalBRE # 01970232 |
| Broker's Agent Steve Lyle | Broker's Agent Craig Johnson |

16.  TRAINING: Seller and _____, individually, shall train Buyer in the operation of the Business for a period of n/a consecutive weeks from COP, for n/a hours per week, without additional cost to Buyer.

17.  COVENANT NOT TO COMPETE. Seller and _____, individually, shall not directly or indirectly carry on a similar business ☐ within a radius of n/a miles of the present location of the Business, or ☐ within _____ attempt to hire any existing employees of the Business, solicit any customers of the Business or assist anyone else except the Buyer to do so within these limits, or have any interest, directly or indirectly, in such business, except as an employee of the Buyer, for a period of n/a consecutive years from COP. This covenant shall become an asset of the Business and may be transferred as part of any future transfer of the Business.

18.  MEDIATION OF DISPUTES: Except as reasonably necessary for a party to seek equitable relief from a Court, such as an injunction or other expedited relief (writ of attachment, specific performance, appointment of a receiver or similar remedies), as a condition precedent to initiation of any legal action or arbitration proceeding by either party, Buyer and Seller shall mediate any dispute or claim between them arising out of this Agreement or any resulting relationship or transaction between such parties. Either party may demand mediation by notice to the other party, which notice shall state the nature

S2  AOF    S2    YU
       Buyer    Buyer    Seller    Seller

22

Jun 13 18, 01 08p                                                                    p.5

Case 2:17-bk-24318-BR    Doc 205    Filed 06/26/18    Entered 06/26/18 13:13:17    Desc
                        Main Document        Page 24 of 134
Business Gyoro Gyoro Izakaya Japonaise _____ Buyer S. Zavala Jr.,S.Z. Cortes, Alfredo O. Franco    Date 8/12/18

of the dispute to be resolved. From the date such notice is given, the parties shall agree upon a mediator not later than the tenth business day thereafter. If the parties cannot agree upon a mediator, the matter shall be submitted to the American Arbitration Association ("AAA") for appointment of a mediator and to conduct the mediation. Mediation shall occur in the county in which the Seller's Broker's office is located. The parties shall have 45 days from the selection of the mediator to commence the first mediation session. The parties shall share all mediation costs equally. The parties agree that any mediated settlement agreement may be converted to an arbitration award or judgment (or both) and enforced according to the governing rules of civil procedure. Should either party fail to participate timely and in good faith in the selection process for the mediator, or in the mediation process, such party will be deemed to have refused mediation, and that party shall not be entitled to attorney fees that might be otherwise available to it in any subsequent court action or arbitration.

19. BROKER FEE. The Broker(s) identified in paragraph 15 has/have acted as the only Broker(s) for this sale and earned a broker fee for services as follows:

☒ ___5___ percent of the Consideration to Restaurant Realty _____ Broker, and

☒ ___3___ percent of the Consideration to Colqwell Banker Commercial Lyle & Associates _____ Broker, or

☐ As per representation agreement between Seller and Seller's Broker.

☐ As per agreement between Buyer and Buyer's Broker

Broker's fee shall be payable (a) at Closing, or (b) by Seller, if Closing is prevented by default of Seller, upon Seller's default, with the deposit returned to Buyer.

20. LIQUIDATED DAMAGES: If Buyer fails to complete this purchase because of Buyer's default, Buyer shall relinquish and Seller shall retain, as liquidated damages, the entire sum of deposits paid under 3.a and 3.b, payable first to the Broker Fees and any remaining amount released to Seller. Buyer and Seller agree that this amount is a reasonable sum given that it is impractical or extremely difficult to establish the amount of damages that would actually be suffered by Seller in the event Buyer were to default under this Agreement. In any action, proceeding or arbitration relating to the payment of such a fee, the prevailing party shall be entitled to reasonable attorney's fees and costs.

Buyer Initials: _ADF_ _SZ_ _SZ_    Seller Initials: _YU_ / ____

21. SUMMARY. The entire agreement of the parties relating to the sale of the Business is set forth in this Agreement and can only be modified in writing signed by the parties. There are no other representations, agreements, arrangements or understandings, either oral or written, between or among the parties hereto relating to the subject matter of this Agreement that are not fully expressed herein. This Agreement shall bind and benefit the parties and their legal successors and shall supersede any prior written or oral agreements. Buyer may not assign any rights under this Agreement without prior consent of Seller, except to an entity owned and controlled by the Buyer. Any unauthorized assignment will be void and unenforceable. Any assignment shall not relieve Buyer of Buyer's obligations pursuant to this Agreement. This Agreement may be signed in counterparts and faxed and electronic signatures may be considered as originals. Captions in this Agreement are for convenience only and shall not be considered in construing its meaning. This Agreement shall be governed by the laws of the State of California. In any action, proceeding or arbitration between Buyer and Seller arising out of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs, except as provided in paragraph 18. Venue shall be the county in which the Seller's Broker's office is located.

22. NOTICES: All notices or approvals required or permitted by this Agreement shall be in writing and shall be addressed to the parties at the respective addresses set forth below. Notice shall be sufficiently given for all purposes when: (a) personally delivered to the recipient; (b) delivered by an overnight delivery service, charges prepaid or charged to the sender's account, or (c) delivered by verifiable electronic transmission. Any party or Broker may change its address by giving written notice of the change to the other parties and Brokers in accordance with the provisions of this paragraph

23. ACKNOWLEDGMENT AND PERSONAL GUARANTEE: By signing below, Buyer and Seller each acknowledge that they have carefully read and fully understand this Agreement and have received a copy of it. The undersigned warrant that their signatures are legally sufficient to bind the Buyer and Seller. If the Buyer and/or Seller is a corporation or other entity, the undersigned personally guarantee the performance of this Agreement and any other agreements necessary to complete the purchase.

24. ACCEPTANCE. This offer shall expire unless it is accepted in writing by Seller and that acceptance is delivered to Buyer or Buyer's agent by ___5___ ☐ a.m. ☒ p.m. on 8/13/ _____ 20_18_. Any later acceptance shall constitute a counteroffer. Any offer can be withdrawn or revoked before acceptance is delivered to Buyer or Buyer's agent. The undersigned Seller accepts and agrees to sell the Business on the above terms and conditions.

_SZ_ _ADF_ _SZ_        _YM_
      Buyer    Buyer           Seller    Seller

23

Business Gyoro Gyoro Izakaya Japonaise                    Buyer S. Zavala Jr. S.Z. Cortes, Alfredo O. Franco    Date 6/12/18

THE CALIFORNIA ASSOCIATION OF BUSINESS BROKERS MAKES NO REPRESENTATION AS TO THE LEGAL
VALIDITY OR ADEQUACY OF ANY PROVISION OF THIS FORM IN ANY SPECIFIC TRANSACTION. A BUSINESS
BROKER IS NOT LICENSED OR QUALIFIED TO PROVIDE LEGAL, ACCOUNTING OR TAX ADVICE. SELLER AND
BUYER ARE ADVISED TO CONSULT WITH INDEPENDENT ATTORNEYS, ACCOUNTANTS AND OTHER COMPETENT
PROFESSIONALS WHEN ENTERING INTO AND COMPLETING THE TRANSACTION.

☐ Subject to attached addendum                           ☐ Subject to attached counteroffer

BUYER                                                    SELLER

SALVADOR    ZAVALA   JR                                  Yuji  Ueno
Print Name                                               Print Name

_____ 6/13/18                        _____ 6/14/18
Signature                 Date                           Signature                 Date

Alfredo   Orozco   Franco
Print Name                                               Print Name

Alfredo  orozco Franco 6/13/18                           _____ _____
Signature              Date                              Signature                 Date

                                                         Kamla USA hc
Corporation (or other entity)                            Corporation (or other entity)

by:_____ _____                    by: Yuji Ueno /EO        6/14/18
Print Name and Title         Date                        Print Name and Title     Date

Address_____                             Address_____

City, State Zip_____                             City, State Zip_____


_____ _____                       _____ _____
Signature of Broker's Agent (for Buyer)   Date           Signature of Broker's Agent (for Seller)   Date


LIST OF ATTACHMENTS
☐ Equipment List
☐ Seller's Disclosure Statement
☐ Buyer's Disclosure Statement
☐ Agency Disclosure
☐ _____
☐ _____
☐ _____
☐ _____

SALVADOR   ZAVALA  CORTES   6/13/18
_____

**LEASE AGREEMENT**

**BETWEEN**

**BRANDENBURG-OASIS PLAZA, LLC,**
**A CALIFORNIA LIMITED LIABILITY COMPANY**

**AS "LANDLORD"**

**AND**

**RAMLA USA, INC.,**
**A CALIFORNIA CORPORATION**

**AS "TENANT"**

**EXHIBIT "2"**

TABLE OF CONTENTS AND SCHEDULE OF EXHIBITS

TABLE OF CONTENTS

Page

1.    EFFECTIVE DATE OF THIS LEASE.............................................................................1
2.    ADDENDA. .................................................................................................................1
3.    BACKGROUND. ..........................................................................................................1
4.    REFERENCES. ...........................................................................................................2
5.    ADDITIONAL DEFINED TERMS. .................................................................................4
6.    DEMISE OF PREMISES. .............................................................................................6
7.    DELIVERY OF PREMISES. .........................................................................................6
8.    ACCEPTANCE OF PREMISES....................................................................................6
9.    LEASE COMMENCEMENT DATE / TERM ...................................................................6
10.   RENTAL COMMENCEMENT DATE .............................................................................6
11.   MINIMUM RENT .........................................................................................................6
12.   ADDITIONAL RENT......................................................................................................7
13.   INTENTIONALLY OMITTED. .......................................................................................9
14.   PAYMENT OF RENT. ..................................................................................................9
15.   LATE CHARGES / DEFAULT INTEREST. ...................................................................9
16.   SECURITY DEPOSIT ...............................................................................................11
17.   USE / CONDUCT OF BUSINESS. .............................................................................12
18.   LIMITATIONS ON USE .............................................................................................13
19.   CONTINUOUS USE...................................................................................................13
20.   EXCLUSIVE USE .....................................................................................................14
21.   RADIUS RESTRICTIONS .........................................................................................14
22.   CO-TENANTS............................................................................................................14
23.   SIGNS........................................................................................................................14
24.   TENANT'S APPROVED WORK, ALTERATIONS, ADDITIONS AND IMPROVEMENTS
      TO PREMISES AND TENANT IMPROVEMENT ALLOWANCE....................................14
25.   COMMON AREA........................................................................................................18
26.   PARKING. .................................................................................................................19
27.   PROJECT REMODEL / EXPANSION. ........................................................................20
28.   TAXES AND ASSESSMENTS. ..................................................................................20
29.   TENANT'S INSURANCE............................................................................................21
30.   PROJECT INSURANCE. ...........................................................................................23
31.   RELEASE AND WAIVER OF SUBROGATION ...........................................................24
32.   INDEMNIFICATION ...................................................................................................24
33.   UTILITY SERVICE. ...................................................................................................24
34.   MAINTENANCE AND REPAIRS OF PREMISES. .......................................................26
35.   MAINTENANCE OF PROJECT...................................................................................27
36.   MANAGEMENT OF THE PROJECT. ..........................................................................27
37.   LIMITATION ON LANDLORD'S LIABILITY AND RELEASE.........................................28
38.   DAMAGE OR DESTRUCTION...................................................................................29
39.   ASSIGNMENT AND SUBLETTING............................................................................31
40.   INTENTIONALLY OMITTED. .....................................................................................36
41.   SURRENDER OF PREMISES ...................................................................................36
42.   HOLDING OVER........................................................................................................36
43.   DEFAULT...................................................................................................................37
44.   REMEDIES. ...............................................................................................................38

| 45. | WAIVER | 40 |
|---|---|---|
| 46. | CONDEMNATION | 41 |
| 47. | SUBORDINATION. | 42 |
| 48. | TRANSFER BY LANDLORD; LANDLORD'S LIMITED LIABILITY | 43 |
| 49. | ESTOPPEL CERTIFICATES' FINANCIAL STATEMENTS; GUARANTY. | 44 |
| 50. | LANDLORD'S RIGHT OF ENTRY | 45 |
| 51. | SUCCESSORS | 45 |
| 52. | AUTHORITY TO EXECUTE | 45 |
| 53. | ENTIRE AGREEMENT; LEASE NOT OFFER | 45 |
| 54. | ATTORNEYS' FEES | 45 |
| 55. | NOTICE | 46 |
| 56. | BROKERS | 46 |
| 57. | RELATIONSHIP OF PARTIES | 46 |
| 58. | RECORDING | 46 |
| 59. | SECURITY | 47 |
| 60. | TENANT'S RESPONSIBILITY REGARDING HAZARDOUS MATERIALS | 47 |
| 61. | SPECIFIC PERFORMANCE | 48 |
| 62. | WAIVER OF TRIAL BY JURY | 48 |
| 63. | MODIFICATION | 49 |
| 64. | NONDISCRIMINATION | 49 |
| 65. | FORCE MAJEURE | 49 |
| 66. | "AS IS" AND "WHERE IS" | 49 |
| 67. | SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS LIST | 50 |
| 68. | LIQOUR LICENSE | 50 |
| 69. | TENANT CONTINGENCY | 50 |
| 70. | FF&E CONTINGENCY | 51 |
| 71. | MISCELLANEOUS PROVISIONS | 51 |

## SCHEDULE OF EXHIBITS

| EXHIBIT "A" | PROJECT SITE PLAN |
|---|---|
| EXHIBIT "B" | PROJECT LEGAL DESCRIPTION |
| EXHIBIT "C" | PLAT SHOWING LOCATION OF PREMISES |
| EXHIBIT "D" | LIST OF EXCLUSIVE USES |
| EXHIBIT "E" | LANDLORD'S RULES AND REGULATIONS |
| EXHIBIT "F" | TENANT'S APPROVED WORK |
| EXHIBIT "G" | PARKING LOT PLAN |
| EXHIBIT "H" | FORM OF ESTOPPEL CERTIFICATE |
| EXHIBIT "I" | GUARANTY AGREEMENT |
| EXHIBIT "J" | HISTORICAL INFORMATION |
| EXHIBIT "K" | NON-DISCLOSURE AGREEMENT |

RAMLA Lease Final 8.15.12.doc



# LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") is dated for reference purposes as October ____, 2012, and is made and entered into by and between BRANDENBURG-OASIS PLAZA, LLC, a California limited liability company ("Landlord"), and RAMLA USA, INC., a California corporation ("Tenant") to be effective as of the date described in Section 1 below.

1.      EFFECTIVE DATE OF THIS LEASE.  This Lease shall become effective when, and only when, Landlord and Tenant shall have fully executed this Lease, and (a) and (b) below have occurred (the "Effective Date").

      (a)     Landlord has received from Tenant the Security Deposit described in Section 16 below; and

      (b)     Landlord has received from Tenant evidence of Tenant's Insurance described in Section 29 below.

If the conditions set forth in this Section 1(a) and 1(b) have not occurred within five (5) business days from the date that Landlord and Tenant have executed this Lease, then this Lease shall automatically terminate.

2.      ADDENDA.  Landlord and Tenant have, of even date herewith, executed the following addenda to this Lease, which addenda are by this reference incorporated into this Lease and made a part of this Lease as though fully set forth herein:

      (a)     Addendum No. 1 captioned "Option to Extend the Lease."

3.      BACKGROUND.

      (a)     Landlord is the owner of that certain real property situated in the City of Palm Springs, County of Riverside, State of California, which real property is presently improved with two (2) buildings and certain common area improvements all as shown on the site plan of the property attached hereto as **Exhibit "A"**, with said real property, including all improvements thereon, hereinafter referred to as the "Project."

      (b)     The Project is located in Palm Springs California at the southwest corner of S. Palm Canyon Drive and Tahquitz Canyon Way and commonly called "Oasis Plaza" and is more specifically described in **Exhibit "B"** hereto.

      (c)     Tenant desires to lease ground floor interior space within the Building shown outlined in red on Exhibit "A" (hereinafter the "Building") which ground floor space (consisting of approximately 5,272 square feet of lease space and for purposes upon which Minimum Rent and Additional Rent are computed, the parties agree that the Premises shall be 5,272 square feet) is more particularly delineated on the Plat attached hereto as **Exhibit "C"** (the "Premises").  The Premises is commonly known as 105 South Palm Canyon Drive (inclusive of Suite 109 when incorporated together), Palm Springs, California.  The Premises includes the Tenant's exclusive use of outdoor patio areas owned by Landlord as part of the Project associated with the Premises as well as approximately 400 square feet located within the basement area of the Building at no additional

HOM Lease Final.doc

charge to Tenant.   Tenant may place patio furniture, umbrellas, dividers, planters, awnings, heat lamps, misters and the like ("Patio Furniture") on the outdoor patios associated with the Premises (and additional portions of the associated sidewalks as may be allowed by the City of Palm Springs and/or by other associated governmental jurisdictions) provided Tenant: (a) pays all costs connected with adding Patio Furniture; (b) keeps the outdoor patio areas clean and maintains and repairs the Patio Funiture; (c) obtains all necessary permits and approvals to utilize the outdoor patios and Patio Furniture from the City of Palm Springs, including prior Landlord approval of the Patio Furniture and its placement; and (d) in accordance with the rules and regulations promulgated by Landlord as further defined in this Lease.   Tenant's utilization of associated patio(s) may not interfere with access to adjacent tenant's storefronts.   Tenant shall have the right to place speakers within the associated patio areas for the purpose of piping music to customers in the associated patio areas, provided that such piped music is first approved by the City of Palm Springs and the decibel levels are kept sufficiently low as not to disturb the adjacent tenants. Tenant acknowledges and understands that portions of the Building, including the Premises, have been granted historic designation. Accordingly, as a condition of this Lease, Tenant warrants, represents and covenants that it shall comply with all reasonable and non-discriminatory applicable requirements and criteria applicable to the Building.

(d)     Landlord is willing to lease the Premises to Tenant on a "net, net, net" basis, i.e. on the basis that Tenant will, in addition to Minimum Rent, reimburse to Landlord any Project related taxes, insurances costs, utility charges, maintenance and operating costs, or incurred, paid by Landlord with respect to the Premises and based on Tenant's Proportionate Share as described in Section 12 (c) other than any Special Trash Removal Charges that are chargeable to Tenant pursuant the provisions of Section 33(f).

(e)     Tenant is willing to lease the Premises from Landlord in its now "AS IS" condition.

(f)     Tenant is willing to lease the Premises from Landlord only if Landlord agrees to reimburse Tenant up to One Hundred and Seventy Five Thousand and 00/100 Dollars ($175,000) for costs actually incurred by Tenant in making interior improvements (first approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed) pursuant to the provisions of Section 24(k).

(g)     Tenant intends to use and occupy the Premises for the following use and no other use (the "Permitted Use"):  Asian restaurant with on-premise liquor sales all in accordance with Starbuck's Exclusive Clause, a copy of which is attached as **Exhibit "D"** together with reasonable rules and regulations associated with the Project as promulgated from time to time, referenced in 5h below.

(h)     Tenant intends to do business at the Premises under the trade name of "Oto-Oto Izakaya Japonaise / Bar of Tokyo" (the "Approved Trade Name").

2



4.    REFERENCES.

    (a)    Landlord's Address for Notices. All notices to Landlord shall be addressed and/or delivered, as required by the Lease, to:

          Brandenburg-Oasis Plaza, LLC
          1122 Willow Street, Suite 200
          San Jose, CA 95125
          Attn:  Eric Brandenburg

          With a copy to:
          Lyle Commercial Realty
          121 South Palm Canyon Dr., Suite 216
          Palm Springs, CA  92262
          Attn:  Sue Lyle

    (b)    Landlord's Address for Rental Payments. All rental payments due Landlord shall be delivered to:

          Lyle Commercial Realty
          121 South Palm Canyon Dr., Suite 216
          Palm Springs, CA  92262
          Attn:  Sue Lyle

    (c)    Tenant's Address for Notices. All notices to Tenant shall be addressed and/or delivered, as required by this Lease, to:

          RAMLA USA, Inc.
          939A West Huntington Drive
          Monrovia, CA 91016
          Attn: Yuji Ueno

    (d)    Property Manager.  The Project is currently being managed for Landlord by Lyle Commercial Realty, whose address is as follows:

          121 South Palm Canyon Dr., Suite 216
          Palm Springs, CA  92262
          Attn:  Sue Lyle
          Phone:  (760) 778-8300 Ext. 224

    (e)    Guarantor's Address for Notices.  The following entity(s) and/or individual(s) have, of even date herewith, entered into a Guaranty Agreement attached hereto as **Exhibit "I"** whereby he/she/it/they have guaranteed the performance of Tenant's obligations under this Lease:

          Ramla Co., Ltd; Attn: *Akira Murakawa*
          *10-8 Oodenmacho-Cho Nihonbashi*
          *Chuo-Ku   Tokyo  103-0011*

30

(f)  Landlord's Broker.  Landlord was represented by the following named licensed real estate broker, whose address is as follows, in procuring Tenant and in the negotiation of the this Lease on behalf of Landlord:

> Lee & Associates; Maggie Montez & Dani Alexander
> 73081 Fred Waring Drive, Suite A-1
> Palm Desert, CA 92260

(g)  Tenant's Broker.  Tenant was represented by the following named licensed real estate broker, whose address is as follows, in finding the Premises for Tenant and in the negotiation of this Lease on behalf of Tenant:

> NAI Capital; Dan Bacani
> 225 S. Lake Avenue, Suite 1170
> Pasadena, CA  91101

5.  ADDITIONAL DEFINED TERMS.

As used in this Lease the following terms, in addition to defined terms found elsewhere in this Lease, shall have the following meanings.

(a)  The term "space" shall mean areas within buildings within the Project that are made available for lease, whether such space is presently leased or vacant.

(b)  The term "square feet" or "square footage" shall mean the floor area of the space being measured as measured from the outside of exterior walls to the center line of the interior demising walls, without deduction for openings, ventilation shafts and other such items serving such space or the space of other tenants within the Building.

(c)  The term "Parties" shall mean Landlord and Tenant.

(d)  The term "Landlord Parties" shall mean Landlord, its officers, directors, shareholders, partners, members, managers, property managers, brokers, attorneys, principals, joint venturers, agents, and employees.

(e)  The term "Tenant Parties" shall mean Tenant, its officers, directors, shareholders, partners, members, managers, property managers, brokers, attorneys, principals, joint venturers, agents, and employees.

(f)  The term "Laws" shall mean all applicable currently existing and future zoning, municipal, county, state, federal and other governmental laws, statutes, codes, ordinances, orders, rules and regulations affecting the Premises and/or the Project and/or the use thereof.

(g)  The term "Record Documents" shall mean all currently existing and future covenants, conditions, restrictions, easements, agreements, encumbrances and other matters now or hereafter recorded against the Premises and/or the Project.

4

(h)     The term "Landlord's Rules and Regulations" shall mean those rules and regulations currently adopted by Landlord respecting the use of space and common areas within the Project by tenants of the Project, a copy of which rules and regulations are attached hereto as **Exhibit "E"** together with, and including, any reasonable, non-discriminatory amendments, modifications, additions, revisions or updates of same.  If there is any conflict between the Landlord's Rules and Regulations and this Lease, the terms of this Lease shall prevail.

6.      DEMISE OF PREMISES.

(a)     For and in consideration of Tenant's promise to (i) pay to Landlord, in a timely manner, the Minimum Rent and the Additional Rent (all below described) and (ii) perform, in a timely manner each of Tenant's obligations under this Lease, Landlord hereby leases to Tenant, and in consideration of Landlord's promise to perform, in a timely manner each of Landlord's obligations under this Lease, Tenant hereby leases from Landlord the Premises on the terms and conditions set forth herein.  Tenant understands and agrees that the lease of the Premises is made subject to the Record Documents and all Laws.

(b)     Tenant represents that it has previously made a thorough inspection of the Premises and Tenant agrees that the ground floor interior Premises contain approximately 5,272 square feet (the "Premises Square Footage") and that for purposes of this Lease; Tenant irrevocably agrees that the Premises do contain said number of square feet.

(c)     Tenant further understands and agrees that the Premises do not include any areas above the ceiling, below the floor or outside the exterior walls of the Premises (unless otherwise set forth in this Lease) and that, provided Landlord does not interfere with Tenant's use of the Premises, Landlord has the right to use those areas for purposes of using, maintaining, repairing and replacing pipes, ducts, conduits, wires and other utility systems located in those areas, whether serving the Premises or other areas of the Project.

7.      DELIVERY OF PREMISES. Landlord agrees to deliver the Premises to Tenant in its "AS IS" condition, including the delivery of any and all existing Furniture, Fixtures & Equipment ("FF&E") no later than the next business day following the Effective Date of this Lease (the "Premises Delivery Date").

8.      ACCEPTANCE OF PREMISES.  Tenant agrees to accept the Premises in its "AS IS" condition, including accepting any and all existing FF&E, when delivered by Landlord.

9.      LEASE COMMENCEMENT DATE / TERM.  The term of this Lease (the "Term") shall commence on the Premises Delivery Date (the "Lease Commencement Date") and shall end on the last day of the month ten (10) years (120 months) following the Rental Commencement Date as defined in Section 10 below. Except as provided for in Addendum No. 1 attached hereto, Landlord and Tenant agree that nothing contained herein shall be construed as granting the Tenant an option to extend the term of the Lease or acquire an interest in the Project or the Premises other than as specifically outlined herein.

5

32

10.    RENTAL COMMENCEMENT DATE.  The ("Rental Commencement Date") shall be the sooner of: (a) June 1, 2013 or (b) the date that Tenant opens for business to the public from the Premises.  The parties shall thereupon, or upon a later date demanded by Landlord, execute a memorandum setting forth the Effective Date, the Rental Commencement Date, and such other matters as Landlord shall reasonably require.

11.    MINIMUM RENT.  Commencing on the Rental Commencement Date and continuing thereafter until the last day of the one hundred and twentieth (120th) full month next following the Rental Commencement Date, Tenant shall pay to Landlord, without prior demand, in advance for each month, on the first (1st) day of each month, as base monthly rent (the "Minimum Rent") the following sums:

(a)    Commencing on the Rental Commencement Date and continuing thereafter until the last day of the twelfth (12th) full month next following the Rental Commencement Date (i.e. Year 1 of the Lease), Tenant shall pay to Landlord the amount of Eleven Thousand Eight Hundred and Sixty Two and 00/100 Dollars ($11,862.00).

(b)    Commencing on the first day of the thirteenth (13th) full month next following the Rental Commencement Date and continuing thereafter until the last day of the twenty-fourth (24th) full month next following the Rental Commencement Date (i.e. Year 2 of the Lease), Minimum Rent shall be the sum of Thirteen Thousand Five Hundred and Forty Nine and 00/100 Dollars ($13,549.00).

(c)    Commencing on the first day of the twenty-fifth (25th) full month next following the Rental Commencement Date and continuing thereafter until the last day of the thirty-sixth (36th) full month next following the Rental Commencement Date (i.e., Year 3 of the Lease), Minimum Rent shall be the sum of Thirteen Thousand Nine Hundred and Fifty Five and 00/100 Dollars ($13,955.00).

(d)    Commencing on the first day of the thirty-seventh (37th) full month next following the Rental Commencement Date and continuing thereafter until the last day of the forty-eighth (48th) full month next following the Rental Commencement Date (i.e., Year 4 of the Lease), Minimum Rent shall be the sum of Fourteen Thousand Three Hundred and Seventy Four and 00/100 Dollars ($14,374.00).

(e)    Commencing on the first day of the forty-ninth (49th) full month next following the Rental Commencement Date and continuing thereafter until the last day of the sixtieth (60th) full month next following the Rental Commencement Date (i.e., fifth year of the Lease), Minimum Rent shall be the sum of Fourteen Thousand Eight Hundred and Five and 00/100 ($14,805.00).

(f)    Commencing on the first day of the sixty-first (61st) full month next following the Rental Commencement Date and continuing thereafter until the last day of the seventy second (72nd) full month next following the Rental Commencement Date (i.e., sixth year of the Lease), Minimum Rent shall be the sum of Fifteen Thousand Two Hundred Forty Nine and 00/100 ($15,249.00).

(g)    Commencing on the first day of the seventy-third (73rd) full month next following the Rental Commencement Date and continuing thereafter until the last day of the eighty-fourth (84th) full month next following the Rental Commencement

6

Date (i.e., seventh year of the Lease), Minimum Rent shall be the sum of Fifteen Thousand Seven Hundred and Six and 00/100 ($15,706.00).

(h)    Commencing on the first day of the eighty-fifth (85th) full month next following the Rental Commencement Date and continuing thereafter until the last day of the ninety-sixth (96th) full month next following the Rental Commencement Date (i.e., eighth year of the Lease), Minimum Rent shall be the sum of Sixteen Thousand One Hundred Seventy Seven and 00/100 ($16,177.00).

(i)    Commencing on the first day of the ninety-seventh (97th) full month next following the Rental Commencement Date and continuing thereafter until the last day of the one hundred and eighth (108th) full month next following the Rental Commencement Date (i.e., ninth year of the Lease), Minimum Rent shall be the sum of Sixteen Thousand Six Hundred Sixty Two and 00/100 ($16,662.00).

(j)    Commencing on the first day of the one hundred and nineth (109th) full month next following the Rental Commencement Date and continuing thereafter until the last day of the one hundred and twentieth (120th) full month next following the Rental Commencement Date (i.e., tenth year of the Lease), Minimum Rent shall be the sum of Seventeen Thousand One Hundred Sixty Two and 00/100 ($17,162.00).

12.    ADDITIONAL RENT.  Commencing on the Rental Commencement Date and continuing thereafter throughout the Term, Tenant shall pay to Landlord, in the manner and at the times below described in this Section, as additional rent (the "**Additional Rent**"), an amount equal to Tenant's Proportionate Share (defined below) of the Project Maintenance and Operating Expenses (defined below) allocated to the ground floor space within the Premises, together with an Administrative Fee in the amount described in (i) below.

(a)    As used in this Section, the term "Project Maintenance and Operating Expenses" shall mean and include each of the following expenses incurred by Landlord with respect to the Project:

(i)    Project Taxes as described in Section 28, below; and

(ii)    Project Insurance Costs as described in Section 30 below; and

(iii)    Common Area Utility Service Costs as described in Section 33 below; and

(iv)    Project Trash Removal Costs and Special Removal Charge, both as described in Section 33; and

(v)    Project Maintenance Costs as described in Section 35 below; and

(vi)    the Project Management Fee as described in Section 36 below; and

(vii)    all other sums required to be paid by Tenant pursuant to this Lease.

(b)    Tenant understands and agrees that Landlord shall, in its sole and absolute discretion, reasonably exercised, allocate the Project Maintenance and

Operating Expenses, as paid or incurred by Landlord between the ground floor retail space contained within the Project and the second floor office space contained within the Project. Tenant agrees, at the times below set forth, to pay to Landlord, as Additional Rent, Tenant's Proportionate Share of the Project Maintenance and Operating Expenses so allocated by Landlord to the ground floor space within the Project.

(c)    "Tenant's Proportionate Share" shall mean that percentage obtained by dividing (i) the Premises Square Footage by (ii) the total square footage of retail space contained within the ground floor of the Premises. Landlord and Tenant agree, as of the Effective Date of this Lease, that Tenant's Proportionate Share is **Forty Two and 6/10ths Percent (42.6%)**, calculated as follows: 5,272 divided by 12,375 = 42.6%.

(d)    Intentionally Omitted.

(e)    Tenant additionally agrees to pay to Landlord, as Additional Rent, within ten (10) days from the date that Landlord shall have billed Tenant for same, the followings charges:

(i)    Any Special Trash Charges that are chargeable to Tenant pursuant the provisions of Section 33, and

(ii)    Tenant's equitable share of the Unmetered Space Utility Costs as determined by Landlord in accordance with the provisions of Section 33.

(f)    Landlord reserves the right to adjust Tenant's Proportionate Share of the Project Maintenance and Operating Expenses to conform to the formula set forth in 12(c) above if there is a change in the square footage of the ground floor retail space within the Project or the square footage of the Premises.

(g)    Landlord may invoice Tenant for the payment of Additional Rent in either of the following manners (or combination thereof):

(i)    Landlord may bill to Tenant, on a periodic basis not more frequently than monthly, Tenant's Proportionate Share of such expenses (or group of expenses) as paid or incurred by Landlord, and Tenant shall pay such share of such expenses within ten (10) days after receipt of a written bill therefore from Landlord; and/or;

(ii)    Landlord may deliver to Tenant Landlord's reasonable estimate of any given expense (or group of expenses, such as Landlord's Insurance Costs or Project Taxes) which Landlord anticipates will be paid or incurred for the ensuing calendar or fiscal year, as Landlord may determine, and Tenant shall pay Tenant's Proportionate Share of such expenses for such year in equal monthly installments during such year with the installments of Minimum Rent.

(iii)    Landlord reserves the right to change from time to time the method of billing Tenant its Proportionate Share of such expenses or the periodic basis on which such expenses are billed.

(h)     If Landlord shall have elected to charge Tenant its Proportionate Share of the Project Maintenance and Operating Expenses (or any group of such expenses) on an estimated basis in accordance with the provisions of Paragraph g(ii) above, Landlord shall furnish to Tenant within three months following the end of the applicable calendar or fiscal year, as the case may be, a statement (**"Reconciliation Settlement"**) setting forth (i) the amount of such expenses paid or incurred during the just ended calendar or fiscal year, as appropriate, and (ii) Tenant's Proportionate Share of such expenses for such period and (iii) the applicable administrative fee as defined below. If Tenant shall have paid more than its Proportionate Share of such expenses for the stated period (including the administrative fee), Landlord shall, at its election, either (i) credit the amount of such overpayment toward the next ensuing payment or payments of Additional Rent that would otherwise be due or (ii) refund in cash to Tenant the amount of such overpayment with such Reconciliation Settlement.  If the Reconciliation Statement shall show that Tenant did not pay its Proportionate Share of any such expenses (including the administration fee as defined below) in full, then Tenant shall pay to Landlord the amount of such underpayment within ten days from the date that Tenant shall have received the Reconciliation Statement.  The provisions of this Paragraph shall survive the expiration or sooner termination of this Lease.

(i)     Tenant agrees to pay to Landlord, at such time it pays each installment of Additional Rent, no matter how such Additional Rent is billed to Tenant by Landlord, an amount equal to five percent (5%) of the amount of the Additional Rent, excluding Project Taxes and Landlord's Insurance Costs, due for that period as an administrative fee (the "Administrative Fee").

13.   INTENTIONALLY OMITTED.

14.   PAYMENT OF RENT.

(a)     All rental payments including Minimum Rent and Additional Rent (collectively referred to herein as "Rent") shall be paid in lawful money of the United States, without any abatement, deduction or offset for any reason whatsoever, to Landlord at Landlord's Address for Rental Payments set forth in Section 4 above or such other address as Landlord may designate, from time to time, by giving written notice to Tenant of such change. All checks for the payment of rent shall be made payable to *Brandenburg-Oasis Plaza LLC*.

(b)     The failure by Tenant to pay any Additional Rent as required pursuant to this Lease when due shall be treated the same as a failure by Tenant to pay the monthly Minimum Rent when due, and Landlord shall have the same rights and remedies against Tenant as Landlord would have if Tenant failed to pay the Minimum Rent when due.

(c)     No payment by Tenant or receipt by Landlord of an amount less than the amount of Minimum Rent or Additional Rent herein stipulated to be due or payable shall be deemed to be other than on account of the earliest amounts owing under this Lease.  No endorsement or statement on any check or any letter accompanying any check or payment shall be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's

9

36 Yu

right to recover the balance of any amount owing to Landlord or to pursue any other remedy available to Landlord under this Lease or at law or in equity.

(d)    Tenant shall in no event be entitled to any abatement of or reduction in Minimum Rent or Additional Rent payable under this Lease, except as expressly provided herein.

15.    LATE CHARGES / DEFAULT INTEREST.

(a)    Tenant acknowledges that the late payment by Tenant of any monthly installment of Minimum Rent or Additional Rent will cause Landlord to incur certain costs and expenses not contemplated under this Lease, the exact amounts of which are extremely difficult or impractical to fix.    Such costs and expenses will include, without limitation, administration and collection costs and processing and accounting expenses.    Therefore:

(i)    If any installment of Minimum Rent is not received by Landlord within six (6) calendar days after written notice thereof from Landlord (the "Late Date"), Tenant shall immediately pay to Landlord a late charge (the "Late Charge") in an amount equal to five percent (5%) of the Minimum Rent not so paid, provided, however, that no Late Charge shall be payable for the first late payment in any calendar year.

(ii)    If any installment of Additional Rent is not received by Landlord within six (6) calendar days after written notice thereof from Landlord (the "Late Date"), Tenant shall immediately pay to Landlord a late charge (the "Late Charge") in an amount equal to five percent (5%) of the Additional Rent not so paid, provided, however, that no Late Charge shall be payable for the first late payment in any calendar year.

(b)    In no event shall this provision for a Late Charge be deemed to grant to Tenant a grace period or extension of time within which to pay any rental installment or prevent Landlord from exercising any right or remedy available to Landlord upon Tenant's failure to pay each rental installment due under this Lease when due, including the right to terminate this Lease.

(c)    If any Rent remains delinquent for a period in excess of six (6) calendar days after written notice thereof from Landlord, then, in addition to such late charge, Tenant shall pay to Landlord interest ("Default Interest") on any rent that is not so paid from said sixth (6th) day until paid at the lesser of (i) ten percent per (10%) annum or (ii) then maximum rate of interest not prohibited by Law until paid, provided, however, that no Default Interest shall be payable for the first late payment in any calendar year.

10

37

(d)    **LANDLORD AND TENANT AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE ACTUAL DAMAGES TO BE SUFFERED BY LANDLORD AS A RESULT OF TENANT'S FAILURE TO PAY ANY INSTALLMENT OF RENT ON OR BEFORE THE LATE DATE AND THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS LEASE, THE AMOUNTS SET FORTH, RESPECTIVELY, AS THE APPLICABLE LATE CHARGE(S) AND DEFAULT INTEREST REPRESENTS A REASONABLE ESTIMATE OF THE DAMAGES WHICH LANDLORD WOULD INCUR AS A RESULT OF TENANT'S FAILURE TO PAY ANY INSTALLMENT OF RENT ON OR BEFORE THE LATE DATE. THEREFORE, LANDLORD AND TENANT DO HEREBY AGREE THAT A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT LANDLORD WOULD SUFFER IN THE EVENT THAT TENANT FAILS TO PAY ANY INSTALLMENT OF RENT ON OR BEFORE THE LATE DATE IS AN AMOUNT EQUAL TO THE LIQUIDATED DAMAGES PROVIDED FOR IN THIS SECTION. SUCH AMOUNT SHALL BE THE FULL, AGREED AND LIQUIDATED DAMAGES FOR FAILURE BY TENANT TO PAY ANY INSTALLMENT OF RENT ON OR BEFORE THE LATE DATE. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE REASONABLE LIQUIDATED DAMAGES TO LANDLORD. NOTHING CONTAINED HEREIN SHALL BE CONSTRUED OR INTERPRETED AS LIMITING LANDLORD'S REMEDIES FOLLOWING A BREACH BY UNDER APPLICABLE LAWS INCLUDING, WITHOUT LIMITATION, UNLAWFUL DETAINER, SPECIFIC PERFORMANCE AND INJUNCTION.**

Tenant's Initials_____Landlord's Initials_____

16.    SECURITY DEPOSIT.    Tenant agrees to deposit with Landlord the sum of Sixteen Thousand Four Hundred Forty Nine and 00/100 ($16,449.00) as a Security Deposit.  Said sum shall be held by Landlord as security for the faithful performance by Tenant of all terms, covenants, and conditions of this Lease.  If Tenant defaults in the payment, performance or observance of any of its obligations under this Lease (including, but not limited to, rent payment obligations hereunder), Landlord may (but shall not be required to) use, apply or retain all or any portion of the security deposit for the payment of any rent or sum in default, or for the payment of any amount which Landlord may spend or become obligated to spend by reason of Tenant's default.  If any portion of the security deposit is so used or applied, Tenant shall, within fifteen (15) days after written demand therefore, deposit cash with Landlord in an amount sufficient to restore the security deposit to its original amount, and Tenant's failure to do so shall be a material breach of this Lease.  Landlord shall not be required to keep the security deposit separate from its general funds, and Tenant shall not be entitled to interest on said deposit.  If Tenant shall fully and faithfully perform each of its obligations under this Lease, the security deposit or any balance thereof shall be returned to Tenant (or at Landlord's option, to the last assignee of Tenant's interest hereunder) at the expiration of the Term of this Lease (or any renewal term which Landlord has agreed to in writing).  In the event of the termination of Landlord's interest in this Lease, Landlord shall transfer the security deposit to Landlord's successor in interest, and Landlord shall thereafter have no further liability to Tenant with respect thereto.

17.    USE / CONDUCT OF BUSINESS.

(a)    The Premises shall be used and occupied only for the "Permitted Use" and for no other use or purpose whatsoever, and Tenant shall operate its business at the Premises under the "Approved Trade Name" and under no other trade name whatsoever, provided, however, that Tenant shall have the right, without Landlord's consent, to change the Approved Trade Name.    Tenant acknowledges that Landlord may grant, or may have previously granted, exclusive rights to other tenants at the Project and that Tenant's covenant to limit its use of the Premises to the Permitted Use and to operate its business under the Approved Trade Name, and no other (except as expressly provided herein), was a major consideration and inducement to Landlord in leasing the Premises to Tenant.

(b)    Neither Tenant, nor Tenant's agents, employees, assigns or successors, shall violate the exclusive rights previously or hereafter granted by Landlord to other tenants of the Project, provided that Landlord gives Tenant written notice of such exclusive rights and they do not conflict with Tenant's Permitted Use. Tenant acknowledges that the exclusive uses set forth in Exhibit "D" have been previously granted to other tenants of the Project.  The violation by Tenant of the exclusive use rights granted to other tenant(s) of the Project will result in Landlord suffering irreparable harm and, therefore, in addition to the other rights and remedies available to Landlord under this Lease, Landlord may seek to enjoin Tenant's breach of this Section 17(b), and Tenant shall be fully and unconditionally liable to Landlord for the full amount of any and all liability and/or damages incurred or sustained by Landlord to such other tenant(s) whose exclusive use right(s) is or are breached by Tenant and/or any of the Tenant Parties.

(c)    Tenant shall, at its sole cost and expense, promptly comply and cause the Premises to comply with all Laws and Record Documents applicable to Tenant's alterations to the Premises and/or Tenant's specific use thereof, including, without limitation, the obligation to alter, maintain or restore the Premises in compliance with such Laws, and to promptly comply with all governmental orders or directives for the correction, prevention or abatement of a nuisance in, upon, or connected with the Premises.

(d)    Tenant shall at all times during the Term, fully comply with the Landlord's Rules and Regulations as same are from time to time amended and revised in a reasonable, non-discriminatory manner.

(e)    Tenant shall, at all times during the Term, comply with all reasonable, non-discriminatory requirements of any insurance company issuing policies of insurance to Landlord or Tenant with respect to the Premises or the Project, any insurance industry rating or regulatory associations, and/or Board of Fire Underwriters issuing such regulations guidelines or requirements so as to maintain, at standard rates, all insurance policies carried or maintained by either Tenant or Landlord pursuant to this Lease.

12

39 4 ᵘ

(f)     Tenant acknowledges that Landlord has not made any representation or warranty as to the suitability of the Premises for the conduct of Tenant's business.

18.     LIMITATIONS ON USE.  At all times during the Term:

(a)     Tenant shall use the Premises for operating a full service, restaurant, Quick Service Restaurant (QSR), bar, catering operation with on premise liquor sales, but for no other purpose without the express written consent of Landlord, which consent shall not be unreasonably delayed, withheld, or denied.

(b)     No use shall be made or permitted to be made by Tenant in or from the Premises and no acts shall be done by Tenant or the Tenant Parties in, on or about the Premises or elsewhere in the Project which will in any way increase the existing rate of insurance for the Premises, the Building, the Project or any portion thereof, or cause a cancellation of any insurance policy covering same. Landlord has been informed that Tenant's use of the Premises for the Permitted Use shall not cause any such increase or cancellation.

(c)     No drug paraphernalia, pornographic materials or satanic materials shall be displayed, distributed or sold at or from the Premises.

(d)     Tenant shall not commit, or allow to be committed:

(i)      Any waste upon or about the Premises, associated patios, public sidewalks, the Building or the Project.

(ii)     Any public or private nuisance or;

(iii)    Other act or thing which may disturb the quiet enjoyment or business of any other tenant or other occupant in the Project.

(e)     Tenant shall not, without the prior written consent of Landlord, use any apparatus, machinery or device in or about the Premises or other portions of the Project which shall cause any unreasonable or objectionable noise, vibration or odor that emanates outside of the Premises.

(f)     Tenant shall not place, construct or maintain in, upon or about the Premises any search lights, flashing lights, loudspeakers, phonographs or other visual or audio media except as provided for in Paragraph 3(c) above.

19.     CONTINUOUS USE.  Tenant shall continuously, from and after the date Tenant opens for business, and continuing during the entire Term hereof, carry on Tenant's business in the Premises and shall keep the Premises open for business and cause Tenant's business to be conducted therein.  Tenant may be open as many hours as allowed by the various laws, statutes and ordinances together with any and all permits issued to Tenant by appropriate governmental agencies having jurisdiction.

20.     EXCLUSIVE USE.  Landlord reserves the absolute right to effect such other tenancies in the Project as Landlord shall determine in the exercise of its sole and absolute business judgment and as Landlord deems best to promote the interests of the Project, provided,

13



401

however, that such exclusive uses shall not conflict with Tenant's Permitted Use. Notwithstanding the above and provided that Tenant is not in default under the Lease and is performing all of its obligations and responsibilities under the Lease, Tenant shall have the sole and exclusive right to operate a Japanese themed restaurant, including sushi, teppanyaki, washoku, izakaya (collectively, the "Japanese Themed Restaurant Exclusive Use") in the Project during the Term and any valid extension thereof under Addendum No. 1.

21.    RADIUS RESTRICTIONS.  None

22.    CO-TENANTS.  Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or number or type of tenants shall or shall not during the Term occupy any space in the Project, nor does Tenant rely on any other tenant or tenants operating its or their business and affairs at the Project at any particular time or times.

23.    SIGNS.

(a)    At Tenant's sole cost and expense, Tenant shall have the right to place signage on the front, west side, and back elevation of its Premises, subject to municipal requirements and Landlord's signage guidelines.  Notwithstanding the foregoing, Tenant shall not have the right to place, construct, or maintain on the glass panes or supports of the show windows of the Premises, the doors, exterior walls or the roof of the Building, or anywhere else within the Project outside of the Premises, or on any interior portions of the Premises that may be visible from the exterior of the Premises, any signs, advertisements, names, insignia, trademarks, descriptive material or any other items without first procuring Landlord's written consent.  Landlord shall reasonably designate the size, shape, color, design and location of all exterior sign(s) to be installed by Tenant, and Tenant shall, at Tenant's sole cost and expense, fabricate, construct and install all such sign(s) in full compliance all Laws and with Landlord's designation and in accordance with Landlord's sign criteria as existing from time to time.  Tenant agrees to submit to Landlord copies of plans and specifications for Tenant's sign(s) as a part of Tenant's Plans and Specifications (referenced in Paragraph 24) for Landlord's written approval within thirty (30) days after the Effective Date of this Lease and to install such sign(s) prior to opening for business at the Premises.

(b)    Landlord, at Tenant's cost, may remove any sign placed, constructed or maintained in, upon or about the Premises or the Project by Tenant which does not comply with this Section.

(c)    All signs that are permanently attached to the Premises shall remain the property of Tenant and Tenant shall, at the expiration or sooner termination of this Lease, promptly remove all such signs and promptly repair all damage to the Premises or the Building caused by such removal.

24.    TENANT'S APPROVED WORK, ALTERATIONS, ADDITIONS AND IMPROVEMENTS TO PREMISES AND TENANT IMPROVEMENT ALLOWANCE.  Tenant respresents to Landlord that Tenant desires to complete a significant renovation to the Premises at a cost in excess of $1,000,000.  Tenant has further represented to Landlord that Tenant's Approved Work, as

14



defined below, shall be fully funded by internal cash resources without a need to finance and secure its leasehold or any of its furniture, fixtures and equipment ("Tenant's FF&E").

(a)     Prior to making any improvements to the interior space or patio areas of the Premises, Tenant shall submit to Landlord, for Landlord's approval, not to be unreasonably delayed or withheld, complete plans and specification for the proposed improvements ("Tenant's Plans and Specifications) within forty-five (45) days following execution of this Lease and prior to submitting same to the City of Palm Springs and/or the County of Riverside ("Tenant's Approved Work"). Tenant's Approved Work shall be added to the Lease as **Exhibit "F"** upon completion. Once such Plans and Specifications are approved in writing by Landlord, Tenant shall, within ten (10) days submit Tenant's Approved Work Plans and Specifications, without modifications or amendments, to the requisite governmental agencies (hereinafter "Submittal Date of Tenant's Approved Work Plans") for issuance of the required permits and approvals needed to construct the Tenant's Approved Work Plans within the Premises.

(b)     Tenant shall not make any alterations, additions or improvements to the Premises without Landlord's prior written consent thereto. If Tenant shall desire to make any such alterations, additions or improvements, Tenant shall deliver plans and specifications of the alterations, additions and improvements proposed to be made by Tenant at the Premises, together with any other documents and information reasonably required by Landlord at least thirty (30) days prior to commencement of construction thereof. Tenant shall not commence such alterations, additions or improvements until Landlord has consented thereto in writing.

(c)     All such modifications, alterations or improvements, once so approved, shall be made, constructed or installed by Tenant at Tenant's expense, using a licensed contractor(s) in good standing first approved by Landlord, All work shall commence immediately following issuance of all permits required and other condiions referenced in subparagraph (d) below, all in substantial compliance with the Landlord approved plans and specifications therefore. All work undertaken by Tenant shall be done in accordance with all Laws and in a good and workmanlike manner using new materials of good quality and which are generally acceptable in the industry.

(d)     Tenant shall not commence the making of any such modifications or alterations or the construction of any such improvements until;

(i)     All required governmental approvals and permits shall have been obtained (and such approvals and permits shall have been issued in conjunction with specifications, plans and requirements previously approved by Landlord without modifications or amendments).

(ii)     All requirements regarding insurance imposed by this Lease have been satisfied.

(iii)     Tenant shall have given Landlord at least five (5) business days prior written notice of its intention to commence such work so that Landlord may post and file notices of non-responsibility, and;

15



(iv)   If requested by Landlord, Tenant shall have first obtained contingent liability and broad form builder's risk insurance in an amount satisfactory to Landlord to cover any perils relating to the proposed work not covered by insurance carried by Tenant pursuant to Section 29.

(e)   All alterations, additions or improvements made by Tenant which are permanently affixed to the Premises shall become a part of the real property and the property of Landlord, without compensation of any kind to Tenant.

(f)   Any trade fixtures which are installed and paid for by Tenant shall remain the property of Tenant, but Tenant shall not remove any trade fixtures or personal property from the Premises without Landlord's prior written consent at any time in which Tenant is in default of this Lease or an event has occurred which, with the passage of time or the giving of notice, or both, would become a default by Tenant. If Tenant otherwise has the right to remove trade fixtures installed and paid for by Tenant, such right shall be conditioned upon Tenant repairing any damage to the remaining portions of the Premises or the Building caused by the removal of such trade fixtures.

(g)   Tenant shall keep the Premises, the Building, the Project and Tenant's FF&E free from any and all liens arising out of any work performed, materials furnished or obligations incurred by Tenant, and in the event of any such lien(s) is filed or recorded against the Project or FF&E, Tenant shall, at its sole cost and expense, within thirty (30) days of written demand by Landlord to remove such lien(s), provide Landlord with a bond or other security reasonably acceptable to Landlord to delete and remove such lien(s) of record and to otherwise cause the lien to be released. Tenant's failure to provide such bond or other security to Landlord or otherwise cause the lien to be released, within said thirty (30) day period, shall constitute a default by Tenant under this Lease without requirement of any further notice of default from Landlord. In any legal action that is commenced to foreclose any such lien(s), Tenant shall obtain a prompt dismissal, with prejudice as against Landlord (by posting a bond, other security or otherwise), of such legal action and a prompt release and expungement of any such liens as well as any lis pendens recorded against the Project, or any part thereof, so as to provide title to the Project vested in Landlord free and clear of any such liens. Tenant shall protect, indemnify, hold harmless and defend Landlord, and Landlord Parties from and against all claims, demands, cause of action, losses and liabilities arising from or relating to any such liens or claims of liens and shall, within thirty (30) days of having been billed for same by Landlord, Tenant shall reimburse to Landlord any third party, out-of-pocket costs incurred by Landlord in seeking the release of any such lien(s) or to defend any actions to foreclosure any such lien(s).

(h)   With respect to any alteration, additions or improvements to be made by Tenant to the Premises, Landlord may require, at Landlord's sole option that Tenant, at Tenant's sole cost and expense, provide to Landlord completion, payment and performance bonds each in an amount equal to one hundred percent (100%) the estimated cost of all such alterations, additions and improvements to the Premises, to insure Landlord that the work will be fully completed and fully paid for.

16

(i)    Tenant shall not, under any circumstances, create any openings in the roof or exterior walls of the Premises, Building or the Project, nor shall Tenant make any exterior or structural alterations, additions or improvements to the Premises or other portions of the Building or Project (including, without limitation, the installation of satellite communications antennae, dishes or other equipment on the roof or other exterior portions of the Premises, Building or Project) unless such alterations are approved by Landlord in writing.

(j)    Landlord grants to Tenant a tenant improvement allowance not to exceed One Hundred and Seventy Five Thousand and 00/100 Dollars ($175,000.00) (the "Tenant Improvement Allowance") towards the actual cost of construction of Tenant's Approved Work.

(k)    The Tenant Improvement Allowance shall be paid to Tenant by Landlord subject to the following:

    (i)    Tenant first providing written notice to Landlord that the Tenant's Approved Work has been completed and Tenant has opened the Premises for business to the public and the following conditions have been satisfied ("Tenant's Work Completion Notice"):

        (1)    All of Tenant's Approved Work has been fully completed in accordance with the plans and specifications approved by Landlord and all relevant governmental authorities and finally inspected by applicable governmental authority and a Certificate of Occupancy (if required) has been issued;

        (2)    Receipted (showing that they are fully paid) invoices indicating that the total actual cost of Tenant's Approved Work (excluding Tenant's FF&E) is equal to or exceeds the Tenant Improvement Allowance, and if the total actual cost of Tenant's Approved Work (excluding Tenant's FF&E) is less than the Tenant Improvement Allowance, then the Tenant Improvement Allowance shall be reduced to the total actual cost of Tenant's Approved Work;

        (3)    All lien waivers from suppliers, laborers, material men, contractors and subcontractors have been obtained and provided to Landlord, no liens shall have been filed and remain effective against the Premises or any other portion of the Project, and at least ten (10) days shall have passed after the lapsing of the statutory time period for the filing of mechanic's liens relating to Tenant's Approved Work;

        (4)    Tenant has supplied to Landlord acceptable 'as built' drawings for any and all of Tenant's Approved Work;

        (5)    Tenant has signed all documentation reasonably required by Landlord to accept possession of the Premises and has opened the Premises for business to the public; and

        (6)    Tenant is not in default of the Lease beyond any applicable notice

17



and cure period.

    (7)    In no event shall the Tenant improvement Allowance exceed the actual cost of the Tenant's Approved Work.

    (ii)    Landlord shall pay Tenant the Tenant improvement Allowance within ten (10) days of Landlord's receipt of the Tenant's Work Completion Notice and the satisfaction of those conditions set forth in Section 24(k)(i)(1) through 24(k)(i)(6).

## 25.    COMMON AREA.

(a)    The Common Area of the Project is defined as those areas beyond the exterior walls of all buildings now or hereafter located, within the Project, as from time to time is so designated by Landlord, for such common area use by tenants of the Project. The Common Area does not include the patio areas associated with the Premises to be utilized exclusively by Tenant as shown on the Site Plan attached hereto as **Exhibit "C"**.

(b)    As an appurtenant right to Tenant's right to the use of the Premises, Tenant shall have the non-exclusive right to use the Common Area in conjunction with other tenants of the Project and their invitees and then solely for the purposes for which they were designed and intended. Tenant shall at all times during the Term, in its use of the Common Area, fully comply with Landlord's Rules and Regulations, as same are from time to time amended and revised in a reasonable, non-discriminatory manner. Tenant's right to use the Common Area shall terminate concurrently with any termination of this Lease.

Landlord shall at all times have the right and privilege of determining and changing the nature and extent of the Common Area, and of modifying the layout of the Project as Landlord deems appropriate (provided, however, that no such changes shall unreasonably interfere with access to the Premises), including, without limitation, the rights and privileges, from time to time, to;

    (i)    Close any of the Common Area to whatever extent required in the reasonable opinion of Landlord's counsel to prevent a dedication of any of the Common Area or the accrual of any rights of any person or of the public to the Common Area.

    (ii)    Close temporarily any of the Common Area for maintenance purposes or for purposes of diligently constructing alterations, additions and/or improvements.

    (iii)    Designate other property outside of the boundaries of the Project to become part of the Common Area of the Project or to be entitled to use the Common Area on a reciprocal basis.

    (iv)    Make changes to the Common Area, including, without limitation, changes in the location, size, number and configuration of driveways, entrances, exits, flow of traffic direction or vehicular parking spaces, provided, however, that the number of parking spaces shall not be decreased below the number required by applicable law for the Project

18

and no such changes shall unreasonably interfere with access to the Premises.

(v)    Change the size and/or location and/or elevation and/or nature of the Common Area or any part thereof, including, without limitation, the right to locate thereon carts, kiosks, drive through areas, outdoor seating, tables and patio areas, outdoor sales areas, recycling centers, and/or other Buildings of any type, provided, however, that no such changes shall block visibility of the storefront of the Premises or Tenant's signage from the Common Area; and;

(vi)    To do and perform such other acts (whether similar or dissimilar to the foregoing) in, to and with respect to the Common Area as in the use of good business judgment Landlord shall determine to be appropriate for the Project.  Landlord reserves the right, from time to time, to utilize portions of the Common Area for outdoor shows, displays, product shows, advertising purposes, and other uses which, in Landlord's judgment, tend to attract the public to the Project.

26.    PARKING.

(a)    Tenant and its employees shall have the exclusive right to use eight (8) designated parking spaces.  Tenant shall have the exclusive right to use said specific parking spacesand Landlord reserves the right to reasonably designate from time to time the location of the parking spaces allocated for Tenant's exclusive use; provided, however, that Tenant shall, during the term of this Lease, be allocated at least eight (8) parking spaces for Tenant's exclusive use.  At least twenty (20) parking spaces shall be designated for the non-exclusive use in common with other Project tenant invitees.  Tenant's customers, agents, employees and invitees may use the non-exclusive parking areas located behind the Building as shown on the Parking Plan attached hereto as **Exhibit "G"** on a first-come, first-serve basis along with customers, agents, employees and invitees of other tenant's in Building at no charge to Tenant or Tenant's customers, agents, employees or invitees.

(b)    In the event Landlord is required by any Law to limit or control parking within the Project, whether by validation of parking tickets or any other method, Tenant agrees to participate in such validation or other program as reasonably established by Landlord.  Tenant shall not, at any time, park or permit to be parked any trucks or vehicles adjacent to entryways or loading areas within the Project so as to interfere in any way with the use of such areas, nor shall Tenant, at any time, park or permit the parking of Tenant's trucks or other vehicles, or the trucks and vehicles of Tenant's suppliers or others, in any portion of the Common Areas not designated by Landlord for such use by Tenant.  As used in this Section 26, the term "permit" shall be deemed to mean "knowingly permit" in connection with anything that Tenant permits to be done on or about the Premises or the Project.

(c)    Tenant agrees to assume responsibility for compliance by its employees and invitees with the parking provisions contained herein.  Tenant hereby authorizes Landlord, after two (2) hours prior notice to Tenant's, at the sole expense of

Tenant, Tenant's employees, or Tenant's invitees (whoever is in violation), to cause a 3rd party towing company tow away from the Project and store until redeemed by its owner from the 3rd party towing company any vehicle belonging to Tenant or Tenant's employees parked in violation of these provisions.

(d)     Landlord shall only be allowed to relocate Tenant's designated spaces if (i) a government agency requires Landlord to comply with future ordinances or (ii) utility servicing entities (power, gas, water, sewer, storm sewer, telephone, etc…) requires Landlord to make modifications or (iii) changes occur to the Common Area as provided for under this Lease provided that such circumstance affects Tenant's designated spaces. In the event that Landlord exercises its right to relocate Tenant's designated parking spaces, Landlord shall insure that all eight (8) designated spaces are contiguous and/or across from one another.

27.    PROJECT REMODEL / EXPANSION.

(a)     Landlord shall have the right, at all times during the Term, to remodel and/or expand the Project as Landlord may desire, including, without limitation, the addition of shops and/or the addition of new buildings to the Project or the removal of shops and/or buildings. If Landlord deems it necessary for construction personnel to enter the Premises in order to perform such work, Landlord shall give Tenant no less than fifteen (15) days prior notice, and Tenant shall allow such entry during normal business hours. Landlord shall use commercially reasonable efforts to complete the work affecting the Premises in an efficient manner so as not to interfere unreasonably with Tenant's business.

(b)     Tenant shall not be entitled to any damages or to reduction in Minimum Rent or Additional Rent for any interference or interruption of Tenant's business or for any inconvenience caused by such construction work outside of the Premises, provided that such construction does not interfere with Tenant's business in the Premises.

(c)     Subject to the terms of this Section 27, during the course of construction, Tenant shall continue to pay Minimum Rent and Additional Rent.

28.    TAXES AND ASSESSMENTS.

(a)     Tenant shall pay before delinquency all taxes, assessments, license fees and other charges that accrue during the Term and which are levied or assessed against Tenant's operations, improvements, personal property, fixtures and equipment installed or located in, on or about the Premises. Within fifteen (15) days after written demand by Landlord, Tenant shall furnish Landlord with satisfactory evidence of such payment.

(b)     Landlord shall be responsible for the payment, in a timely manner of all Project Taxes. The term "Project Taxes" shall mean all general, special, ordinary, supplemental and extraordinary real and personal property taxes and assessments, license fees and taxes, rental taxes, levies, charges, penalties, sewer or water charges (hook-up or otherwise), improvement bonds and other



governmental levies imposed by any authority having direct or indirect power to tax, including, but not limited to, any city, county, state or federal government, or any school, agricultural, sanitary, fire, street, lighting, drainage or other improvement district, on, against, or with respect to the Project, any property of Landlord or Landlord's agents used principally in the operation, management, maintenance or repair of the Project, any legal or equitable interest of Landlord in the Project, Landlord's right to rent and other income therefrom or Landlord's business of leasing the Premises or other portions of the Project, together with any taxes or assessments imposed in addition to, in substitution or replacement of or as a supplement to any taxes or assessments previously included within the definition of Project Taxes and including any increases in such taxes as a result of (a) any change of ownership, (b) the making of any alterations, additions or improvement or (c) the completion of any work of improvement to or at the Project, or any portion thereof, by reason of the implementation of Article 13A of the California Constitution and/or California Revenue and Taxation Code Sections 60, et seq.  The term "Project Taxes" shall not include any local, state or federal personal income, estate, franchise or inheritance taxes of Landlord.

29.    TENANT'S INSURANCE.  Tenant shall, at all times during the Term and at Tenant's sole cost and expense, procure and maintain in full force and effect the following policies of insurance and coverage's

(a)    Commercial General Liability policy insuring Tenant against liability for personal injury, bodily injury, death and legal liability for damage to property occurring within the Premises, or resulting from Tenant's use or occupancy of the Premises or the Common Area, or resulting from Tenant's activities in or about the Premises, with combined single limit coverage of not less than ONE MILLION DOLLARS ($1,000,000) which insurance shall contain a "broad form liability" endorsement insuring Tenant's performance of Tenant's obligation to indemnify Landlord as contained in Section 32.

(b)    A so called "special form" perils Property Damage policy of insurance including earthquake sprinkler leakage coverage insuring Tenant against loss from physical damage to Tenant's Approved Work, Tenant's personal property, inventory, trade fixtures and other improvements made by Tenant within the Premises with coverage for one-hundred percent (100%) of the full replacement cost value thereof.  Said property damage insurance may contain a deductible not to exceed TEN THOUSAND DOLLARS ($10,000).

(c)    So called "Liquor Liability" coverage with the same limits as described in (a) above for the general liability coverage, if Tenant's use of the Premises includes the sale of alcohol, beer or wine or liquor.

(d)    Plate-glass insurance at full replacement cost.

(e)    Workers' compensation insurance sufficient to comply with all Laws and Employers' Liability insurance with limits of not less than ONE MILLION DOLLARS ($1,000,000).

21

48

(f)     Business Interruption insurance sufficient to cover the full amount of the Minimum Rent and the Additional Rent for a period of at least twelve (12) months.

(g) Automobile Liability insurance for all owned, non-owned and hired motor vehicles used in the operation of the business conducted by Tenant.

(h) Excess Liability insurance in the amount of TWO MILLION DOLLARS ($2,000,000).

All liability policies obtained by Tenant, except for Automobile Liability insurance, worker's compensation and employer's liability insurance, shall name Landlord as an Additional Insured and shall contain a so-called "severability of interests" endorsement.  Such policies shall also name Landlord's lender and Landlord's property manager, as Additional Insurers, if required to so by Landlord.

All such policies of insurance shall require ten (10) days prior written notice to Landlord and Landlord's property manager(s) and lender(s), if applicable, before the policy or policies can be terminated or coverage reduced for any reason.

All of Tenant's insurance policies shall (i) be issued by insurance companies reasonably acceptable to Landlord authorized to do business in the state in which the Project is located, and having a rating of not less than A:VIII in the current Best's Insurance Guide (or if Best's Insurance Guide is no longer being published, then the largest other publication of similar information then existing); (ii) be in a form reasonably satisfactory to Landlord (if not the form required above); (iii) be non-contributing with, and apply only as primary and not as excess to, any other insurance available to Landlord or Landlord's lender(s), (iv) not be invalidated with respect to the interests of Landlord or any of Landlord's lender(s) by reason of any breach or violation of any warranties, representations, declarations or conditions contained in the policies.

Tenant shall require each insurance company issuing a policy of insurance to Tenant to also issue to Landlord a certificate of such insurance policy together with a copy of each endorsement to such policy.  Failure of Tenant to do so shall be a material default under the terms of the Lease.  Such certificate(s) so indicating such coverage as issued by the insurer(s) shall be delivered to Landlord and Landlord's property manager(s) and lender(s), if applicable, prior to Landlord's delivery of the Premises to Tenant and renewal certificate(s) shall be delivered to Landlord and Landlord's property manager(s) and lender(s), if applicable, at least ten (10) days prior to the expiration of such policy or policies.

Landlord may periodically require (but not more than once during the Term) that Tenant reasonably increase the insurance coverage's required by this Section to amounts required by landlords of projects in Palm Springs, California similar to the Project.

If Landlord does insure anything that Tenant also insures, Tenant's policies shall provide primary coverage.  Tenant agrees to promptly pay all premiums due on insurance to be carried by it under this Lease, and Tenant agrees to promptly and diligently pursue recovery of any and all insurance claims.

30.     PROJECT INSURANCE.

(a)     Landlord shall, at all times during the Term, obtain and maintain, as the minimum coverage required of it by this Lease, so called "special perils" form property

22



damage insurance insuring Landlord (and such others as Landlord may designate) against loss from physical damage to the Building or Project and any other improvements within the Project for one-hundred percent (100%) of the full replacement cost value of the improvements so insured. Landlord shall not be required to cause such insurance to cover any of Tenant's personal property, inventory and trade fixtures, or any modifications, alterations or improvements made or constructed by Tenant to or within the Leased Premises, including Tenant's Approved Work.

(b)    The property damage insurance described in (a) above, at Landlord's election but without any requirement on Landlord's behalf to do so;

    (i)    May be written in so-called "all risk" form, excluding only those perils commonly excluded from such coverage by Landlord's then property damage insurer.

    (ii)    May be endorsed to cover loss or damage caused by any additional perils against which Landlord may elect to insure, including earthquake and/or flood.

    (iii)    May provide coverage for loss of rents for a period of up to twelve months; and

    (iv)    May contain "deductibles" in such amounts as Landlord deems appropriate in its sole and absolute discretion.

(c)    Landlord shall maintain commercial general liability insurance insuring Landlord (and such others as are designated by Landlord) against liability for personal injury, bodily injury, death, and legal liability for damage to property occurring in, on or about, or resulting from the use or occupancy of the Project, or any portion thereof, with combined single limit coverage of at least ONE MILLION DOLLARS ($1,000,000). Landlord may carry such greater or lesser coverage as Landlord or Landlord's Lender, insurance broker or advisor or counsel may from time to time determine is reasonably necessary for the adequate protection of Landlord and the Project.

(d)    Landlord may maintain any other insurance which in the reasonable opinion of Landlord, its insurance broker or advisor or legal counsel is prudent to carry under the given circumstances, provided that such insurance is carried by landlords of projects in Palm Springs, California similar to the Project.

(e)    Tenant acknowledges it will not be an additional insured or loss payee under such Insurance.

(f)    All costs incurred by Landlord in procuring and maintaining the insurance policies agreed to be obtained by Landlord or permitted to be obtained by Landlord pursuant this Section are herein referred to as "Project Insurance Costs."

31.    RELEASE AND WAIVER OF SUBROGATION. Landlord herby releases Tenant and the Tenant Parties and Tenant hereby releases Landlord and the Landlord Parties, from any and all claims for damage to the Premises the Building or any other improvements within the Project

23



that are caused by or result from risks or perils to the extent insured against under any property insurance policies carried by either Landlord or Tenant, at the time of such loss, to the extent of the proceeds from such policies.  Such release does not apply to any deductible, or to any claims not covered by insurance coverage actually in effect.  Landlord and Tenant shall each cause each property insurance policy obtained by it with respect to the Premises or the Project, as the case maybe, to provide that the insurer waives all right to recover by way of subrogation against the other in connection with any loss covered thereby.

32.    INDEMNIFICATION

    (a)    Tenant shall protect and defend, with competent counsel satisfactory to Landlord, any claims made or legal actions filed or threatened by third parties against Landlord with respect to the death, bodily injury, personal injury, damage to property or interference with contractual or other rights suffered by any third party (including other tenants within the Project) which (i) occurred within the Premises or (ii) resulted from Tenant's use or occupancy of the Premises or the Common Areas or (iii) resulted from Tenant's activities in or about the Premises, the Building or the Project, and Tenant shall indemnify and hold Landlord and Landlord Parties harmless from any loss, liability, penalties, damages or expense whatsoever (including any legal fees incurred by Landlord with respect to defending such claims) resulting therefrom, except to the extent proximately caused by the negligence or willful misconduct of Landlord or the Landlord Parties. This indemnity agreement shall survive any termination of this Lease.

    (b)    Landlord shall protect and defend, with competent counsel satisfactory to Tenant, any claims made or legal actions filed or threatened by third parties against Tenant with respect to the death, bodily injury, personal injury, damage to property or interference with contractual or other rights suffered by any third party (including other tenants within the Project) which (i) occurred within the Building (except the Premises) or Common Area or (ii) resulted from management of the  Building (except the Premises) or  the Common Areas or (iii) resulted from Landlord's activities in or about the Building or the Project, and Landlord shall indemnify and hold Tenant and Tenant Parties harmless from any loss, liability, penalties, damages or expense whatsoever (including any legal fees incurred by Tenant with respect to defending such claims) resulting therefrom, except to the extent proximately caused by the negligence or willful misconduct of Tenant or the Tenant Parties. This indemnity agreement shall survive any termination of this Lease.

33.    UTILITY SERVICE.

    (a)    With respect to any natural gas, electricity or domestic water service (a "utility service") that is separately metered to the Premises or separately contracted for by Tenant for delivery to the Premises, Tenant shall be solely responsible for, and shall promptly pay when due, all charges for such utility service(s) so provided to the Premises during the Term.  If Tenant refuses or neglects to pay any such utility charges, Landlord may, at Landlord's option, pay such charges, and Tenant shall pay to Landlord the amount paid by Landlord and all other costs incurred in connection therewith within thirty (30) days of having been billed for same by Landlord.

51

(b)    Landlord shall arrange with the local utility service provider(s) for the on-going and continuous delivery of each of the utility services necessary to properly maintain the Common Area (the "common area utility services"), such as electricity to maintain the Common Area lighting.  All costs paid or incurred in so obtaining and providing such utility services to the Common Area are herein referred to as the "Common Area Utility Service Costs."

(c)    Landlord shall also arrange with the local utility services provider(s) for the on-going and continuous delivery of each of the utility services necessary for the use and occupancy of those spaces (the "unmetered spaces") within the Project which are not separately metered and for which the tenant(s) occupying such space(s) has (have) not arranged for the delivery of such services independently (the "unmetered space utility services"). All costs paid or incurred by Landlord in providing such utility services to the unmetered spaces (the "Unmetered Space Utility Service Costs") shall be equitably allocated by Landlord among the unmetered spaces within the Project, and to the extent the Premises are unmetered with respect to all or any of the unmetered space utility services.

(d)    Intentionally Omitted

(e)    Landlord shall arrange with the local garbage collection service to provide a sufficient number of trash and garbage collection bin(s), located in the designated garbage bin location on the Project, allowing tenants of the Project to dispose of normal amounts of trash and garbage use, and for the bin(s), when full, to be removed and the trash and garbage so collected to be properly disposed.  Landlord shall pay the costs to so provide such collections bin(s) at the Project and for the proper disposal of the trash and garbage collected in such bin(s) ("Project Trash Removal Costs").

(f)    Notwithstanding the above, Tenant shall either (i) arrange, on its own behalf, for the local garbage collection service to provide an extra bin(s) at tenant's sole cost, or (ii) arrange with Landlord to arrange for the provision of the required extra bin(s). If Landlord does provide extra bin(s) for Tenant's use, which Landlord shall have the right to do if Tenant refuses to do so in such a case, then Tenant shall pay to Landlord, as Additional Rent, all costs incurred by Landlord in so providing the extra bin(s) and arranging for the proper disposal of the extra trash and garbage (a "Special Trash Removal Charge") within thirty (30) days of receiving from Landlord an invoice for same.

(g)    Tenant shall be solely responsible for obtaining telephone service, TV cable service and internet connection service, if Tenant chooses to obtain such services, and Tenant shall be solely responsible for the payment of all charges imposed by such service providers for such services.

(h)    Landlord shall not be liable to Tenant for any loss, damage or expense that Tenant may sustain or incur by reason of any change, failure, interference, interruption or defect in the electric and/or other utility services provided to the Project or Premises.  No such change, failure, interference, interruption or defect shall entitle Tenant to terminate this Lease or to abate the payments Tenant is required to make under this Lease.  Notwithstanding the foregoing, in the event the Premises is untenable for more than twenty-four (24) consecutive



hours due to the interruption of a utility service caused by Landlord or the Landlord Parties, then Tenant's Minimum Rent and Additional Rent shall abate from and after the twenty-fifth (25th) hour until such utility service is restored.

34.    MAINTENANCE AND REPAIRS OF PREMISES.

(a)    Tenant shall, at all times during the Term, at its sole cost and expense, maintain all of the Premises including all improvements within (and exclusively serving) the Premises in good and safe order, condition and repair, including, but not limited to, all necessary repairs and replacements of the pipes, electrical systems and outlets, and HVAC handling equipment and ducts, plumbing and plumbing fixtures, lights and lighting fixtures, wiring, cabling, windows, window glass, plate glass, doors, floors and ceilings within Premises (except those areas which are Landlord's obligation to maintain and repair).

(b)    Landlord agrees to maintain, repair and replace the HVAC units exclusively serving the Premises at landlord's sole cost and expense for the first year of the Term.  Commencing at the beginning of the second year of the Term, Tenant shall be solely responsible for all costs and expenses associated with maintenance, repair and replacement of the HVAC units and systems exclusively serving the Premises.  Tenant shall, therefore, contract with a reputable HVAC maintenance firm in order to properly maintain, in a commercially reasonable manner and in conformance to requirements as promulgated by Landlord in its reasonsble discretion, repair and replace as may be required, the HVAC units and systems exclusively serving the Premises.

(c)    Tenant agrees to maintain, repair and replace the Grease Trap and associated systems with all laws and proper operating guidelines that exclusively serve the Premises located in the parking lot of the Project.  Tenant shall, therefore, contract with a reputable grease trap maintenance firm in order to properly maintain, in a commercially reasonable manner and in conformance to requirements as promulgated by Landlord in its reasonsble discretion, repair and replace as may be required, the Grease Trap and associated systems exclusively serving the Premises.

(d)    Tenant shall install and maintain in the Premises fire extinguishers of the size and type reasonably required by any insurance company insuring the Project or the Premises or by any fire prevention authority have jurisdiction over the Premises.

(e)    If Tenant does not maintain the Premises as required herein, Landlord shall have the right (but not the obligation) to enter the Premises and cause such maintenance, repairs, replacements and/or corrections to be made thereto. Tenant shall reimburse to Landlord, as Additional Rent, within thirty (30) days from being billed for same by Landlord, all reasonable, out-of-pocket costs so paid or incurred by Landlord in making such repairs to the Premises on behalf of Tenant. Landlord first shall give ten (10) days written notice to Tenant before any such maintenance, repairs, replacements and/or corrections are made by Landlord, except in the case of an emergency, in which case no prior written notice shall be necessary.

35.    MAINTENANCE OF PROJECT.  Except in the case of damage to or destruction of the Building or the Project, in which case the provisions of Section 38 shall control, Landlord, at all times during the Term, shall:

(a)    Maintain the Building, including without limitation, the roofs, foundations, exterior walls, interior hallways designated for common use, and all structural components.  Such maintenance shall include roof repairs and replacement, exterior and interior painting, repair and replacement of carpets and floor coverings, cleaning and repainting when necessary;

(b)    Maintain the Common Area, including without limitation, sidewalks, parking areas, outdoor lighting, landscaping, walls and fences.  Such maintenance shall include the patching, resurfacing, replacing and repairing of any such items when necessary;

(c)    Maintain in good operating condition and repair all plumbing and electrical systems within the Project that service the Building, including all electrical conduits and lines, sewer lines and water lines. Such maintenance shall include the cleaning, repair and replacement of such lines when necessary.

(d)    All costs paid or incurred by Landlord in performing the maintenance described in (a) through (c) above are herein collectively referred to as the "Project Maintenance Costs."

Landlord shall not be responsible for the maintenance or repair of the interior space within Premises or any improvements within the Premises, including the doors, door casements and plate glass windows. Tenant hereby waives all rights to make repairs to the Building, the Common Area or the Project, at the expense of Landlord, as provided by any Laws now or hereafter in effect, including, but not limited to, California Civil Code Sections 1941 and 1942. Notwithstanding the foregoing, Landlord warrants to Tenant that the plumbing, lighting, heating, ventilation and air conditioning units on the roof serving the Premises (the "Building Systems") shall be in good operating condition on the Premises Delivery Date, and that the roof of the Building shall be in a "weather-tight" condition as of the Premises Delivery Date. Provided that Tenant shall notify Landlord of a non-compliance with the foregoing warranty as to the Building Systems not later than sixty (60) days following the Premises Delivery Date, and/or of a non-compliance with the foregoing warranty as to the roof of the Building not later than one hundred eighty (180) days following the Premises Delivery Date, then Landlord shall promptly after receipt of written notice from Tenant setting forth the nature and extent of such non-compliance, rectify the same at Landlord's cost and expense.

36.    MANAGEMENT OF THE PROJECT.

(a)    Landlord has retained the services of Property Manager to maintain and operate the Project.  The name of the person to contact together with the address and phone number of Property Manager is set forth in Section 4 captioned REFERENCES.

(b)    The current management fee being charged by Property Manager for managing and operating the Project is the greater of (i) five percent (5%) of the "gross receipts collected" from the operations of the Project, including Minimum Rent,

27

54

Percentage Rent and Additional Rent, or (ii) fifteen hundred dollars ($1,500) per month (the "Management Fee").

(c)    Landlord reserves the right, at all times during the Term, to change property managers and/or to renegotiate the amount of the Management Fee and still have the Management Fee recoverable from the tenants of the Project as Additional Rent under the terms of this Lease; provided that any change in the management fee is (i) commercially reasonable in relation to the services rendered and (ii) is competitive in the Palm Springs market for such services.

(d)    Tenant agrees such services are necessary for the proper operation of the Project and that it is in Tenant's financial interests that the Project be managed in a proper and efficient manner and that the current Management Fee is a proper and reasonable fee for such services and that such fee is a proper item to be included in the Additional Rent.

37.    LIMITATION ON LANDLORD'S LIABILITY AND RELEASE.  Landlord shall not be liable to Tenant for, and Tenant hereby releases Landlord and Landlord Parties and the Property Manager from any and all liability, whether in contract, tort or on any other basis, for any injury to or any damage sustained by Tenant, its agents, employees, contractors or invitees; any damage to Tenant's property; or any loss to Tenant's business, loss of Tenant's profits or other financial loss of Tenant resulting from or attributable to the condition of, the management of, the maintenance of, or the protection of the Premises, the Building, the Project or the Common Area, including, without limitation, any such injury, damage or loss resulting from (i) the failure, interruption, rationing or other curtailment or cessation in the supply of electricity, water, gas or other utility service to the Project, the Building or the Premises (except as provided in Section 33(h); (ii) the vandalism or forcible entry into the Building or the Premises; (iii) the penetration of water into or onto any portion of the Premises through roof leaks or otherwise; (iv) the failure to provide security and/or adequate lighting in or about the Project, the Building or the Premises; (v) the existence of any design or construction defects within the Project, the Building or the Premises; (vi) the failure of any mechanical systems to function properly (such as the HVAC systems); or (vii) the blockage of access to any portion of the Project, the Building or the Premises, except, in each case, to the extent such damage, injury, loss, failure, interruption or other event was proximately caused by Landlord's negligence or willful misconduct, or Landlord's willful failure to perform an obligation expressly undertaken pursuant to this Lease but only if Tenant shall have given Landlord prior written notice describing in detail the obligation which Landlord has failed to perform, and Landlord shall have failed to perform such obligation within thirty (30) days from the date of the notice (except in the case of emergency) following receipt of written notice from Tenant to so perform such obligation.  In this regard, Tenant acknowledges that it is fully apprised of the provisions of Law relating to releases, and particularly to those provisions contained in Section 1542 of the California Civil Code which read as follows:

A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

28

Notwithstanding such statutory provision, and for the purpose of implementing a full and complete release and discharge, subject to the exceptions specifically set forth herein, Tenant hereby waives the benefit of such statutory provision.

38.    DAMAGE OR DESTRUCTION.  If, at any time during the Term, the Premises or the Building is totally or partially damaged or destroyed by a peril, Landlord shall restore the Premises and/or the Building in the manner required by this Section unless either Landlord or Tenant shall have terminated this Lease in accordance with the provisions of this Section.

    (a)    Defined Terms.  The following terms, as used in this Section, shall have the following meanings:

        (i)    The term "peril" means all those perils, casualties or risks typically covered or insured against in a standard fire and extended coverage insurance policy together with (i) such other perils as are beyond the control of Landlord; and (ii) Acts of God. The term "peril" shall not include ordinary wear and tear.

        (ii)    The term "Insured Peril" means a peril that is covered (or insured against) by an existing valid, collectible and enforceable policy of insurance then carried by Landlord.

        (iii)    The term "Uninsured Peril" means a peril that is not then covered (or insured against) by a valid, collectible and enforceable policy of insurance then carried by Landlord.

        (iv)    The terms "restoration" or "restore" mean to repair or reconstruct the damaged or destroyed portions(s) of the Premises and/or the Building, as the case may be to substantially the same condition they were in immediately prior to the damage or destruction.

        (v)    The terms "substantial damage" or "substantially damaged" shall mean damage to or destruction of the Premises and/or the Building, the restoration cost of which will exceed forty percent (40%) of the full replacement value of the Building.

    (b)    Landlord's Right to Terminate.  Landlord shall have the right to terminate this Lease under the following circumstances.

        (i)    If the damage or destruction was caused by an Insured Peril involving substantial damage, but the proceeds due Landlord are insufficient to fully pay (excluding the deductible) the cost to complete the restoration.

        (ii)    If the damage or destruction was caused by an Insured Peril and the damage to the Building was substantial; provided, however, Landlord may so terminate this Lease, pursuant to this clause (ii), only if Landlord terminates all leases in the Building (including this Lease) at the same time.

        (iii)    If the damage or destruction was caused by an Uninsured Peril and the restoration cost exceeds twenty-five percent (25%) of the full replacement

29


56

value of the Building and Landlord terminates all leases in the Building (including this Lease) at the same time.

(iv) If the time necessary to complete the restoration of the Building and the Premises, in the reasonable estimation of Landlord, from the date that the damage or destruction occurred, exceeds nine (9) months and Landlord terminates all leases in the Building (including this Lease) at the same time.

(v) If the Building, because of Laws then in effect, (A) cannot be restored at a commercially reasonable cost, or (B) if restored, cannot be used for the same use that the Building was being used for before such damage or destruction and Landlord terminates all leases in the Building (including this Lease) at the same time.

(c) Tenant's Right to Terminate. Tenant shall have the right to terminate this Lease, if as a result of such damage or destruction:

(i) The Premises have been rendered totally or partially inaccessible or unusable and the restoration of the Building and/or the Premises, as the case may require, necessary to give Tenant full access and usability of the Premises cannot be accomplished within nine (9) months from the date that the damage or destruction occurred;

(ii) The complete restoration of the Premises cannot be accomplished within twelve (12) months from the date the damage or destruction occurred; or

(iii) The restoration of the Premises cannot be completed by a date that is more than two (2) years before the expiration date of this Lease.

(d) Tenant Waiver. The Parties agree that the provisions of Paragraph (c) above granting Tenant the right to terminate this Lease under the circumstance specified therein are intended to supersede and replace the provisions contained in California Civil Code Section 1932, Subdivision 2 and California Civil Code Section 1934, and accordingly Tenant hereby waives the provisions of said Civil Code Sections and the provisions of any successor Code Sections or similar laws hereinafter enacted.

(e) Abatement of Rent. There shall be no abatement in Minimum Rent or Additional Rent if the peril causing the damage or destruction was covered by the Business Interruption Insurance required to be carried by Tenant pursuant to Section 29, Paragraph (f) above or would have been so covered under such a policy of insurance if Tenant failed to purchase such insurance. However, if the damage or destruction was caused by a peril not covered by such a policy of insurance (whether carried by Tenant or not), then the Minimum Rent and the Additional Rent shall be equitably abated and reduced during the period of time, and to the extent the damage or destruction interferes with Tenant's use of the Premises.

(f) Notice following Damage. Within thirty (30) days next following the date upon which such damage or destruction occurred, Landlord shall give written notice to

30



57

Tenant stating what Landlord's reasonable estimate of the time period it will take to complete the restoration.

(g)    <u>Election to Terminate</u>.  Within fifteen (15) days next following the date upon which such damage or destruction occurred (the "Election Deadline"), Landlord and Tenant each may, if permitted to do so pursuant to the foregoing  provisions of this Section 38,  elect to terminate this Lease. If either party does elect to terminate this Lease, such Party must do so by giving written notice to the other Party on or before the Election Deadline, in which case, but only if such notice is a valid exercise of such right and is given in timely manner, this Lease shall terminate on the date such notice was properly given in accordance with the Notices provisions of this Lease.

(h)    <u>No Automatic Termination</u>.  This Lease shall not terminate simply by reason of the damage or destruction to the Premises and/or the Building, but rather shall remain in full force and effect following such occurrence. This Lease shall only terminate if a Party to this Lease properly exercises its right to so terminate this Lease in strict accordance with the provisions of this Section.

(i)    <u>Restoration of Damaged Improvements by Landlord</u>.  If this Lease is not terminated by either Landlord or Tenant, then Landlord shall promptly seek all necessary permits and approvals required to do the restoration of the Premises and the Building and promptly, after having obtained same, commence and thereafter continuously prosecute to completion the restoration of the Premises and the Building.  In no event shall Landlord be obligated to restore any improvements made by Tenant to the Premises, including the Tenant's Approved Work, or any of Tenant's personal property, trade fixtures or inventory.

(j)    <u>Restoration of Improvements to Premises by Tenant</u>.  Once the Premises are ready for occupancy by Tenant, Tenant shall fully restore the Premises to substantially the condition the Premises existed immediately prior to the damage or destruction (including all improvements and alterations) and shall forthwith fully repair, replace and restore Tenant's personal property, trade fixtures and inventory as existed immediately prior to the damage and destruction.

(k)    <u>Insurance Proceeds</u>.  All insurance proceeds available from the property damage insurance carried by Landlord shall be paid to and be the property of Landlord.

39.    ASSIGNMENT AND SUBLETTING.

(a)    Except for a Permitted Assignment (as defined in Section 39(j)), Tenant shall not assign, transfer or encumber (collectively "assign") this Lease, or any interest herein, and shall not sublet the Premises, or any part thereof, or permit any other person or entity (except the employees of Tenant) to occupy or use the Premises, or any portion thereof, without first obtaining the written consent of Landlord, which shall not be unreasonably withheld or denied, in accordance with the provisions of this Section.  If Tenant desires to assign this Lease or sublet the Premises, Tenant shall give written notice of its request to do so at least thirty (30) days, but not more than one-hundred fifty (150) days, before the

31



date Tenant seeks to make such assignment or subletting, which notice must include therewith the following information:

(i)     Name and address of the proposed assignee or sub lessee;

(ii)    The date upon which Tenant intends to effectuate such assignment or sublease;

(iii)   The use to which such proposed assignee or sub lessee intends to put the Premises;

(iv)    In the case of a proposed assignment, the consideration to be given to Tenant for such assignment;

(v)     In the case of a subletting, the amount of rent to be paid by the sub lessee to Landlord during the entire term of such subletting; and

(vi)    A current financial statement (including a current balance sheet and profit and loss statement) for such proposed assignee or sub lessee, together with copies of a federal income tax return for each of the three (3) preceding years.

During Landlord's Review Period, Tenant shall fully cooperate with Landlord and provide to Landlord all information that Landlord may reasonably request regarding the proposed assignment or subletting and the proposed assignee or sub lessee, including, without limitation, the proposed form of documents that Tenant proposes to use to implement the assignment or subletting.  Failure of Tenant to so fully cooperate with Landlord and provide such information as Landlord may reasonably request shall be deemed a reasonable reason to refuse to consent to such requested assignment or subletting.

(b)    Except for with respect to a Permitted Assignment, Landlord shall notify Tenant, in writing, on or before the last day of Landlord's Review Period, of its election to either:

(i)     Terminate the Lease,

(ii)    Consent to the requested assignment or subletting, or;

(iii)   Refuse to consent to the requested assignment or subletting, in which case Landlord shall specify the reason(s) for such refusal.  Silence shall be deemed a refusal to consent to such requested assignment or subletting.

(c)    Except for with respect to a Permitted Assignment, if Landlord elects to terminate this Lease, this Lease shall terminate on the date that is thirty (30) days next following the date that Landlord shall have given to Tenant its notice of its election to terminate this Lease, provided, however, Tenant may, within fifteen (15) days after receipt of Landlord's election to terminate, withdraw its request for consent to such assignment or sublease, and this Lease shall continue in full force and effect.  If Landlord does so terminate this Lease, Landlord may, without incurring any liability to Tenant whatsoever, lease the Premises directly

32



to the proposed assignee or the sub lessee, as the case may be, set forth in Tenant's request to assign or sublet.

(d)     Except for with respect to a Permitted Assignment, in determining whether to consent or object to an assignment or sublease, it shall be deemed reasonable for Landlord to object to a proposed assignment or subletting, among other reasons, if any of the following is applicable:

   (i)     If the proposed use by the assignee or sub lessee will conflict with or is incompatible with the existing or proposed uses (whether or not exclusive) of other occupants of the Project;

   (ii)    If the proposed assignee or sub lessee has inadequate financial strength or lacks business or management experience or reputation;

   (iii)   If the proposed use by the assignee or sub lessee would cause a diminution in the reputation of the Project or unfairly burden the use of the Common Area, as determined by Landlord in its reasonable business judgment;

   (iv)   If, in Landlord's reasonable judgment, the proposed assignee or sub lessee would likely violate one or more of the terms, covenants, conditions or restrictions imposed upon Tenant under this Lease or would likely violate the terms and conditions set forth in any other lease, license, occupancy or other agreement for the lease or use of space within the Project). If the proposed assigned or sublease fails to meet such other criteria as Landlord, in its reasonable discretion, may determine.

(e)     Except for with respect to a Permitted Assignment, if Landlord shall have consented to a requested assignment or subletting, such assignment or subletting shall not become effective until each of the following conditions have been fully satisfied.

   (i)     Landlord having approved in form and substance the assignment or sublease agreement, which approval Landlord shall not unreasonably withhold, condition or delay.

   (ii)    Each such sub lessee or assignee having agreed, in writing reasonably satisfactory to Landlord and its counsel and for the benefit of Landlord, to assume, to be bound by, and to perform the obligations of this Lease to be performed by Tenant.

   (iii)   Tenant having fully and completely performed all of its obligations under the terms of this Lease through and including the date of such assignment or subletting.

   (iv)   Tenant having reimbursed to Landlord all reasonable, out-of-pocket costs and attorneys' fees incurred by Landlord in conjunction with the processing and documentation of any such requested subletting or assignment, provided, however, that such costs and fees shall not exceed Two Thousand Five Hundred Dollars ($2,500.00).

33

(v)      Tenant having delivered to Landlord a complete and fully executed duplicate original of such sublease agreement, assignment agreement (as applicable) and all related agreements.

(vi)     Tenant having paid to Landlord, or having agreed in writing to pay to Landlord as to future payments, one hundred (100%) of the net assignment consideration or the net excess rentals to be paid to Tenant for such assignment or subletting at the times and in the manner below set forth:

        (1)    If Landlord shall have consented to an assignment of this Lease by Tenant and if all or a portion of the assignment consideration is to be paid by the assignee at the time of the assignment, that Tenant shall have paid to Landlord and Landlord shall have received an amount equal to one hundred percent (100%) of the net assignment consideration so paid or to be paid (whichever is the greater) at the time of the assignment by the assignee;

        (2)    If Landlord shall have consented to an assignment of this Lease by Tenant and if Tenant is to receive all or a portion of the assignment consideration in future installments, that Tenant and Tenant's assignee shall have entered into a written agreement with and for the benefit of Landlord reasonably satisfactory to Landlord and its counsel whereby Tenant and Tenant's assignee jointly agree to pay to Landlord an amount equal to one hundred percent (100%) of all such future net assignment consideration installments to be paid by such assignee as and when such assignment consideration is so paid; or

        (3)    If Landlord shall have consented to the subleasing of the Premises by Tenant, that Tenant and Tenant's sub lessee shall have entered into a written agreement with and for the benefit of Landlord reasonably satisfactory to Landlord whereby Tenant and Tenant's sub lessee jointly agree to pay to Landlord one hundred percent (100%) of all net excess rentals to be paid by such sub lessee as and when such excess rentals are so paid.

(f)      The term "net assignment consideration" shall mean Fifty Percent (50%) all consideration received by Tenant for such an assignment less only those costs incurred by Tenant directly in making such assignment, such as brokerage commissions and, legal fees and improvements to the Premises. The term "net excess rent" shall mean all rental payments to be received by Tenant from the sub lessee over the entire term of the sublease in excess of the rents due Landlord under the provisions of this Lease, less only those costs incurred by Tenant directly in effectuating such subletting, such as brokerage commissions legal fees and improvements to the Premises.

(g)      Consent by Landlord to any assignment or subletting shall not be deemed to be consent to any subsequent assignment or subletting. Consent by Landlord to an assignment or subletting shall not release the original Tenant or any of Tenant's permitted successors or assigns from liability hereunder. Tenant and all

34

successors and assigns shall be jointly and severally liable, for all obligations of Tenant under this Lease.

(h)    Tenant shall pay Landlord Two Thousand Five Hundred Dollars ($2,500.00), to cover Landlord's administrative costs in reviewing and analyzing Tenant's request to assign or sublet, and shall reimburse Landlord for Landlord's reasonable expenses (including, without limitation, all reasonable attorneys' fees incurred by Landlord, not to exceed Two Thousand Five Hundred Dollars ($2,500.00) relating to any assignment or subletting or the activities of Landlord in considering whether to consent to the same.  Such sums shall be payable whether or not Landlord consents to Tenant's request to assign or sublet and shall be deemed Additional Rent hereunder.

(i)    Any attempted assignment or subleasing without Landlord's consent shall be null and void, and any acceptance of rent from any person other than Tenant shall not be construed as Landlord's consent to any assignment or sublease.

(j)    Notwithstanding the foregoing, Tenant shall have the right, without Landlord's consent, to enter into an assignment or sublease to (a) any parent, subsidiary or affiliated company of Tenant; (b) any company which purchases all or substantially all of the assets or stock of Tenant; (c) any company which purchases all the other restaurants of Tenant in Southern California, or (d) in conjunction with any merger, consolidation or public offering of stock involving Tenant, its parent company or an affiliated company ("Permitted Assignment"), provided that within fifteen (15) days after the effective date of any such transfer the assignee or sublessee executes and delivers to Landlord an instrument containing an express assumption of all of Tenant's obligations under this Lease. In the event of a Permitted Assignment, pay Landlord up to Two Thousand Five Hundred Dollars ($2,500.00), to cover Landlord's administrative costs in reviewing and analyzing Tenant's request to assign or sublet, and shall reimburse Landlord for Landlord's reasonable expenses (including, without limitation, all reasonable attorneys' fees incurred by Landlord, not to exceed Two Thousand Five Hundred Dollars ($2,500.00) relating to any assignment or subletting or the activities of Landlord in considering whether to consent to the same.  Such sums shall be payable whether or not Landlord consents to Tenant's request to assign or sublet and shall be deemed Additional Rent hereunder.

40.    INTENTIONALLY OMITTED.

41.    SURRENDER OF PREMISES.  Immediately upon the expiration or upon the sooner termination of this Lease:

(a)    Tenant shall remove all of Tenant's signs from the exterior of the Building and shall remove all of the Tenant's equipment, trade fixtures, furniture, supplies, wall decorations and other personal property from the Premises.  Additionally, if Landlord requires Tenant to do so at the time Tenant sought Landlord's consent to any improvements made to the Premises by Tenant, Tenant shall remove any or all improvements made to the Premises by Tenant which were permanently affixed to the Premises and thereby became a part of the real property, all as Landlord may designate in its sole and absolute discretion; and

35

62

(b)    Tenant shall vacate and surrender the Premises to Landlord in the same condition, broom clean, as existed at the Premises Delivery Date (except for improvements which Landlord has agreed may remain), reasonable wear and tear and damage due to casualty excepted.  Tenant shall repair all damage to the Premises caused by Tenant's removal of such property and all damage to the exterior of the Building caused by Tenant's removal of Tenant's signs. Tenant shall patch and refinish, to Landlord's reasonable satisfaction, all penetrations made by Tenant or its employees to the floor, walls or ceiling of the Premises, whether such penetrations were made with Landlord's approval or not.

42.    HOLDING OVER.

(a)    Tenant shall surrender and vacate the Premises on or before the sooner to occur of (i) the expiration of the Term (ii) the earlier termination of this Lease in the manner required in Section 41 above. Failure of the Tenant to so surrender and vacate the Premises shall be a material breach of this Lease and an unlawful detainer of the Premises (herein referred to as "holding over").

(b)    Tenant shall pay to Landlord, as liquidated damages, for each day that Tenant holds over an amount equal to one hundred fifty percent (150%) of the sum of (i) monthly Minimum Rent plus (ii) the Additional Rent <u>divided</u> by the number 30. For example, if the monthly Minimum Rent at the time Tenant holds over was seventeen thousand dollars ($17,000) and the Additional Rent for said month was five thousand dollars ($5,000), the liquidated damages payable to Landlord for each day Tenant holds over would be One Thousand One Hundred and 00/100 dollars ($1,100) calculated as follows:  $17,000 plus $5,000 = $22,000. $22,000 x 150% = $33,000.  $33,000 divided by 30 = $1,100.

(c)    Intentionally Omitted.

(d)    Tenant shall, during any such period of holding over, strictly comply with all other obligations of Tenant contained in this Lease.

(e)    The liquidated damages set forth in (b) above are solely for the detriment suffered by Landlord for the loss of the use of the Premises during the period that Tenant holds over and not for any damages that Landlord may suffer by reason of Tenant's failure to surrender and vacate the Premises in the condition required in Section 41 above.

(f)    LANDLORD AND TENANT AGREE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE THE ACTUAL DAMAGES TO BE SUFFERED BY LANDLORD AS A RESULT OF TENANT'S FAILURE TO SURRENDER THE PREMISES WHEN REQUIRED BY THIS SECTION AND THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS LEASE, THE LIQUIDATED AMOUNT ABOVE SET FORTH REPRESENTS A REASONABLE ESTIMATE OF THE DAMAGES WHICH LANDLORD WOULD INCUR AS A RESULT OF TENANT'S FAILURE TO SURRENDER THE PREMISES WHEN REQUIRED BY THIS SECTION.    THEREFORE, LANDLORD AND TENANT DO HEREBY AGREE THAT A REASONABLE ESTIMATE OF THE TOTAL NET DETRIMENT THAT LANDLORD WOULD

SUFFER IN THE EVENT THAT TENANT FAILS TO SURRENDER THE PREMISES WHEN REQUIRED BY THIS SECTION IS AN AMOUNT EQUAL TO THE LIQUIDATED DAMAGES PROVIDED FOR IN THIS SECTION. SUCH AMOUNT SHALL BE THE FULL, AGREED AND LIQUIDATED DAMAGES FOR FAILURE TO SURRENDER THE PREMISES WHEN REQUIRED BY THIS SECTION OF GROSS SALES. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE REASONABLE LIQUIDATED DAMAGES TO LANDLORD.

TENANT'S INITIALS___ΥΝ_____ LANDLORD'S INITIALS_____

43.  DEFAULT.

(a)  The occurrence of any of the following shall constitute a material default by Tenant of this Lease:

(i)  Tenant fails to pay any installment of the Minimum Rent, Additional Rent, or any other fee, cost or charge payable by Tenant hereunder (collectively "Rent"), on the date that same is due, and such failure shall continue for a period of six (6) days after written notice thereof to Tenant.

(ii)  Tenant fails to execute and deliver to Landlord the documents, instruments and other items described in Section 47, Section 49 and Section 63 hereof as and when required thereunder (without the need for further notice thereof except as provided in such Section).

(iii)  Tenant fails to comply with any term, covenant or condition of this Lease, other than the payments described in Section 43(a)(i) above and the obligations described in Section 43(a)(ii) above, and does not cure such failure within thirty (30) days after written courtesy notice thereof to Tenant. If such failure cannot reasonably be cured within thirty (30) days, Tenant shall not be in default hereof if: (A) Tenant commences to cure the failure within such thirty (30) day period and delivers written notice thereof to Landlord within such thirty (30) day period, (B) Tenant diligently and in good faith prosecutes such cure to completion (C) Tenant delivers written notice to Landlord every fourteen (14) days of the progress of Tenant's cure of such failure, and (D) such failure is fully cured by Tenant within sixty (60) days after the original written notice to Tenant of such failure.

(iv)  Without the need for further notice thereof to Tenant: the failure by Tenant to pay its obligations as they become due; the making by Tenant of any general assignment or general arrangement for the benefit of creditors; Tenant becoming insolvent or making a transfer in fraud of creditors; the filing by or against Tenant of a petition to have Tenant adjudged a bankrupt or of a petition for reorganization or arrangement under bankruptcy law or law affecting creditor's rights unless, in the case of a petition filed against Tenant, such petition is dismissed within sixty (60) days; the appointment of a trustee or a receiver to take possession of the Premises, where possession is not restored to Tenant within thirty (30) days; or the attachment, execution or other judicial seizure of

37



substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease, where such seizure is not discharged in thirty (30) days.

(v)     Without the need for further notice thereof to Tenant, the vacation or abandonment of the Premises by Tenant.  It shall be deemed that Tenant has vacated the Premises if Tenant fails to continuously operate from the Premises for fifteen (15) consecutive days, except if due to casualty, condemnation, remodeling diligently pursued or force majeure; however, the foregoing shall not limit the events constituting vacation of the Premises.

To the extent permitted by all applicable Laws, the time periods provided in this Section 43 for the cure of Tenant's failures to perform as and when required under this Lease or for surrender of the Premises (if and only to the extent cure rights are permitted hereunder) shall be in lieu of, and not in addition to, any time periods prescribed by any applicable Laws as a condition precedent to the commencement of any legal action against Tenant for possession of the Premises; provided, however, that to the extent the foregoing is not permitted by any applicable Laws, any notice under this Section 43 shall run concurrently with, and not in addition to, any time periods prescribed by applicable Laws.  Any notice given pursuant to this Section 43 is in lieu of any written notice required by any applicable Laws, including, without limitation, any notice required under California Code of Civil Procedure Section 1161, and Tenant hereby waives, to the fullest extent permitted by all applicable Laws, the giving of any notice other than the notice(s) provided for in this Section 43.

44.     REMEDIES.

Upon the occurrence of a default by Tenant that is not cured (if curable) within the time periods set forth in Section 43 hereof, Landlord shall have the option to pursue any one or more of the following rights and remedies:

(a)     Termination of Lease and Recovery of Damages.  Landlord shall have the right to terminate this Lease and all rights of Tenant hereunder by giving Tenant written notice of the termination. No act of Landlord shall be construed as terminating this Lease except written notice given by Landlord to Tenant advising Tenant that Landlord elects to terminate the Lease. In the event Landlord elects to terminate this Lease, Landlord may recover from Tenant:

(i)     The worth at the time of award of any unpaid Rent that had been earned at the time of termination of the Lease;

(ii)    The worth at the time of award of the amount by which the unpaid Rent that would have been earned after termination of the Lease until the time of award exceeds the amount of rental loss that Tenant proves could have been reasonably avoided;

(iii)   The worth at the time of award of the amount by which the unpaid Rent for the balance of the term of this Lease after the time of award exceeds

38



the amount of rental loss that Tenant proves could be reasonably avoided; and

(iv)    Any other amount necessary to compensate Landlord for all detriment proximately caused by Tenant's failure to perform its obligations under this Lease.

The term "rent" as used in this Lease shall mean the Minimum Rent, Additional Rent and all other sums required to be paid by Tenant pursuant to the terms of this Lease. As used in subsections (a) and (b), above, the "worth at the time of award" is computed by allowing interest at the rate of ten (10%) percent per year. As used in subsection a(iii), the "worth at the time of award" is computed by discounting that amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus two percent (2.00%).

(b)    Landlord's Right to Continue Lease in Effect After Breach

(i)    Landlord may continue this Lease in effect by not terminating Tenant's right to possession of the Premises, in which event Landlord shall be entitled to enforce all its rights and remedies under this Lease, including the right to recover the rent specified in this Lease as it becomes due under this Lease. For as long as Landlord does not terminate this Lease, Tenant shall have the right to assign or sublease the Premises with the Landlord's prior written consent as provided in Section 39 above.

(ii)    No act of Landlord, including but not limited to Landlord's entry on the Premises, efforts to relet the Premises, or maintenance of the Premises, shall be construed as an election to terminate this Lease unless a written notice of that intention is given to Tenant or unless the termination of this Lease is decreed by a court of competent jurisdiction.

(c)    Landlord's Right to Relet.  In the event Tenant is in default of this Lease, Landlord may enter on and relet the Premises or any part of the Premises to a third party or third parties for any term, at any rental, and on any other terms and conditions that Landlord in its sole discretion may deem advisable, and shall have the right to make alterations and repairs to the Premises. Tenant shall be liable for all of Landlord's reasonable costs in reletting, including but not limited to advertising costs, brokerage commissions, legal expenses and attorneys fees, the cost of placing the Premises in good condition and repairing the Premises for reletting and the costs of any alterations made in connection with such reletting. Any such reletting as provided for herein may be for the remainder of the Term of the Lease or for a longer or shorter period.  Landlord may execute any lease made pursuant to the terms hereof either in Landlord's own name or in the name of Tenant, or assume Tenant's interest in and to any existing subleases of the Premises, as Landlord sees fit and Tenant shall have no right or authority to collect any rent from such subtenant. In the event Landlord relets the Premises, Tenant shall pay all rent due under and at the times specified in this Lease, less any amount or amounts actually received by Landlord from the reletting.

39

(d)     Landlord's Right to Cure Tenant Defaults.  Landlord may, but shall not be required to, cure Tenant's breach.  Any reasonable sum expended by Landlord, with the then maximum legal rate of interest, shall be reimbursed by Tenant to Landlord with the next due rent payment under this Lease.

(e)     Security Deposit.  Following the occurrence of an event of default, the Security Deposit, at Landlord's sole option, shall be increased by 100% of the amount otherwise required under this Lease as a Security Deposit, which increased Security Deposit shall be deemed to be the amount of the Security Deposit to be held by Landlord for the remainder of the Term.  If Tenant becomes a debtor under any bankruptcy law or otherwise becomes subject to any bankruptcy law, Landlord shall have the right to apply the Security Deposit first toward the payment of unpaid pre-petition Rent, and the balance of such Security Deposit, if any, shall be applied toward post-petition administrative claims for such amounts owing hereunder.

(f)     Cumulative Remedies.  The remedies granted to Landlord in this Section 44 shall not be exclusive but shall be cumulative and in addition to all remedies now or hereafter allowed by law or provided in this Lease.  Landlord's pursuit of any one of the foregoing remedies shall not preclude pursuit of any of the other remedies provided above or elsewhere in this Lease, or any other remedies currently or hereafter provided by law or equity, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any Rent due to Landlord hereunder, or of any damages accruing to Landlord by reason of the violation of any of the terms, covenants or conditions contained herein.  Nothing contained herein shall constitute a waiver of Landlord's right to recover damages by reason of Landlord's efforts to mitigate the damage to it caused by Tenant's default; nor shall anything in this Section adversely affect Landlord's right, as is set forth elsewhere in this Lease, to indemnification against liability for injury or death of persons or damage to property occurring prior to a termination of this Lease.

45.     WAIVER.  Failure by Landlord to insist upon compliance with any of the provisions of this Lease shall not be deemed a waiver by Landlord of the same or any other provision nor shall any waiver by Landlord of any right or power hereunder at any one or more times be a waiver by Landlord of such rights or powers at any other time(s) or under any other circumstances.   No custom or practice which may develop between the parties in the administration of the terms hereof will be deemed a waiver of or in any way affect the right of Landlord to insist upon performance in strict accordance with said terms.  No waiver by the parties hereto of the default of any term, covenant or condition of this Lease shall be deemed to be a waiver of any subsequent default of the same or any other term, covenant or condition contained herein.   The subsequent acceptance by Landlord of Rent or any other payment hereunder shall not be deemed to be a waiver of any preceding default by Tenant of any term, covenant or condition of this Lease, regardless of Landlord's knowledge of such preceding default at the time of acceptance of such Rent or other payment.

46.     CONDEMNATION.

(a)     If all or any part of the Project or any interest therein is taken by condemnation, or is sold to the condemning authority under threat of condemnation (collectively a "taking"), the rights and obligations of Landlord and Tenant shall be 

67

determined pursuant to this Section 46, and the parties hereby waive the provisions of all Laws now or hereafter in effect (including without limitation California Code of Civil Procedure ("CP Code" Section 1265.130) that would provide Tenant with any rights or remedies (including without limitation any right to terminate this Lease) in conflict with the provisions of this Section 46. The term "condemnation" as used herein shall include, without limitation, an inverse condemnation or regulatory taking. If there is a total taking of the Project or the Premises, this Lease shall terminate on the date of such taking as determined under CP Code Section 1265.140. If there is a partial total taking of the Project or the Premises, Landlord may, in its sole and absolute discretion, either

(i)    restore the remaining portion of the Project to the extent of severance damages actually received by Landlord relating to the restoration (excluding the amount applied to the outstanding amounts owing to a lien holder with an encumbrance upon all or any portion of the Project), in which case this Lease shall remain in full force and effect, or

(ii)    if the taking is of 25% or more of the Project or the Premises, terminate this Lease thereafter upon thirty (30) days written notice to Tenant.

(b)    If any portion of the Premises is taken which substantially interferes with Tenant's reasonable use of the Premises as contemplated by this Lease, and this Lease remains in full force and effect, the Minimum Rent shall be abated in proportion to the degree to which such use by Tenant is impaired, as reasonably determined by Landlord. Except for such abatement, if any, Tenant shall have no claim against Landlord in the event of any taking, and Tenant hereby assigns to Landlord all awards and other consideration paid with respect to any taking of all or any portion of the Project, except any award, or portion thereof, relating to the unamortized value of improvements (including trade fixtures) that Tenant has a right to remove at the expiration or earlier termination of this Lease, but elects not to remove at the time of the taking, Tenant's relocation costs and loss of goodwill, if any portion of the Premises is taken which substantially interferes with Tenant's reasonable use of the Premises as contemplated by this Lease, Tenant may terminate this Lease by thirty (30) days written notice to Landlord.

(c)    In the event of a taking of the Premises or any part thereof for temporary use, (i) this Lease will remain unaffected thereby and rent will abate for the duration of the taking in proportion to the extent Tenant's use of the Premises is materially and substantially interfered with, and (ii) Landlord will be entitled to receive such portion or portions of the award made for such use provided that if such taking remains in force at the expiration or earlier termination of this Lease, Tenant will then pay to Landlord a sum equal to the reasonable cost of performing Tenant's obligations under Section 41 with respect to surrender of the Premises and upon such payment, Tenant will be excused from such obligations. For purpose of this Section 46(c), a temporary taking shall be defined as a taking for a period of ninety (90) days or less.

47.    SUBORDINATION.

(a)    Tenant accepts this Lease subject to and, without the necessity of any additional document being executed by Tenant, subordinate to any recorded mortgage,

41



68

deed of trust, ground or master lease, or other lien encumbering the Project, or any part thereof, now or in the future (collectively for purposes of this Section 47(a) "Liens"). Landlord agrees that, so long as Tenant shall continue to duly perform all of its obligations hereunder, Tenant's right of possession of the Premises shall not be disturbed unless this Lease is otherwise terminated pursuant to its terms. In the event any proceedings are brought for foreclosure or in the event of the exercise of the power of sale under any mortgage or deed of trust made by Landlord covering the Premises, Tenant shall attorn to the purchaser upon any such foreclosure or sale, and recognize such purchaser, as Landlord under this Lease, provided that such purchaser recognizes this Lease. Tenant agrees to execute and deliver, within fifteen (15) days after written demand by Landlord and in the commercially reasonable form required by Landlord, any additional instruments evidencing the priority or subordination and non-disturbance of this Lease and Tenant's attornment agreement with respect any such Liens. Tenant's failure to sign and return any such instruments within fifteen (15) days of receipt shall be a material default by Tenant hereunder without the need for any further notice to Tenant and without the availability of any additional period to cure same, and Tenant does hereby make, constitute and irrevocably appoint Landlord as Tenant's attorney-in-fact and in Tenant's name, place and stead to execute such instruments; provided, however, that such appointment shall not relieve Tenant of its obligation to provide such instruments or avoid Tenant's default of this Lease for failure to timely deliver such instruments. Moreover, in the event of such failure, then Tenant shall pay to Landlord one-thirtieth (1/30) of the Minimum Rent for each day or portion thereof thereafter that Tenant fails to execute and deliver any and all such instruments to Landlord. Such sum shall be in addition to, and not a part of, Minimum Rent otherwise due under this Lease.

(b)     Tenant shall not cause or allow to be filed or recorded any Uniform Commercial Code ("UCC") or other financing statements which encumber Tenant's removable personal property, fixtures or other property in the Premises. Tenant represents and warrants that Tenant has not, prior to the date of this Lease, entered into, caused to be filed or recorded, or allowed to be filed or recorded, any such UCC or other financing statement. In the event any such UCC or other financing statement is filed or recorded against the Project or any portion thereof or against any of Landlord's property or any property in which Landlord may have an interest, Tenant shall, within fifteen (15) days after a written request from Landlord, cause such financing statement to be released from Landlord's property and from the Project.

(c)     In no event shall this Lease, or any of Landlord's rights and remedies hereunder, be subject or subordinate to any lien, leasehold deed of trust, chattel mortgage or other encumbrance against Tenant's interest in the leasehold created by this Lease or encumbering any property of Tenant located in or about the Premises, it being expressly understood and agreed that nothing contained in this Lease shall expressly or impliedly obligate Landlord to subordinate or waive any of Landlord's rights under this Lease or under the laws of the State of California.

48.     TRANSFER BY LANDLORD; LANDLORD'S LIMITED LIABILITY.



42

69

(a)   If Landlord sells or transfers its interest in the Premises or the Project, Landlord on consummation of the sale or transfer shall be released from any and all Liabilities thereafter accruing hereunder. If any Security Deposit, prepaid rent or other sums have been paid by Tenant, Landlord may transfer the Security Deposit, prepaid rent or other sums to Landlord's successor and on such transfer Landlord shall be discharged from any further liability relating to such Security Deposit, prepaid rent or other sums.

(b)   In consideration of the benefits accruing hereunder, Tenant on behalf of itself, all successors and assigns of Tenant, and all Tenant Parties, covenants and agrees that, in the event of any actual or alleged failure, breach or default hereunder by Landlord:

   (i)    Tenant's recourse against Landlord for monetary damages will be limited to Landlord's interest in the Project and the net rents, issues, profits and other income actually received from the operation of the Project;

   (ii)   Except as may be necessary to secure jurisdiction of the Landlord, no shareholder, officer, director, member, partner (whether general or limited), trustee, beneficiary or joint venture thereof (each, for purposes of this Section 48(b), a "Principal") shall be sued or named as a party in any suit or action and no service of process shall be made against any Principal unless such Principal is the duly appointed registered agent of Tenant for service of process;

   (iii)  No Principal shall be required to answer or otherwise plead to any claim, cause of action or complaint;

   (iv)   No judgment will be taken against any Principal and any judgment taken against any Principal may be vacated and set aside at any time after the fact;

   (v)    No writ of execution or attachment will be levied against the assets of any Principal;

   (vi)   The obligations under this Lease do not constitute personal obligations of the individual Principals or any of their personal assets for satisfaction of any liability in respect to this Lease;

   (vii)  These covenants and agreements are enforceable both by Landlord and also by any Principal.

49.   ESTOPPEL CERTIFICATES FINANCIAL STATEMENTS; GUARANTY.

(a)   Tenant shall upon fifteen (15) days written notice (but not more than twice per calendar year) from Landlord execute, acknowledge before a notary public and deliver to Landlord or any then existing or potential lessor, purchaser or encumbrancer of the Project a Tenant's Estoppel Certificate in the form of or containing the information certifications, representations and covenants set forth in **Exhibit "H"** attached hereto and incorporated herein by this reference, together with such other information, certifications, representations and

43



70

covenants as reasonably requested by Landlord or any then existing or prospective lessor, purchaser or encumbrancer of the Project. Any such statement may be relied upon by a then existing or prospective lessor, purchaser or encumbrancer of all or any portion of the Project. Tenant's failure to deliver such statement within such time period shall be a material default of this Lease, without the need for any further notice to Tenant and without the availability of any additional period to cure same, and such failure shall also be conclusive upon Tenant that: (a) this Lease is in full force and effect, without modification except as may be represented by Landlord, (b) there are no uncured defaults in Landlord's performance under this Lease or otherwise, and (c) not more than one month's installment of Rent due hereunder has been paid in advance. If Tenant fails to deliver such a statement within such fifteen (15) day period, then Tenant does hereby make, constitute and irrevocably appoint Landlord as Tenant's attorney-in-fact and in Tenant's name, place and stead to execute such a statement; provided, however, such appointment shall not relieve Tenant of its obligation to provide such a statement or avoid Tenant's default of this Lease for failure to timely provide such statement. Moreover, in the event Tenant fails to execute and deliver to Landlord the Tenant's Estoppel Certificate within such fifteen (15) day period, then Tenant shall pay to Landlord one-thirtieth (1/30) of the Minimum Rent for each day or portion thereof thereafter that Tenant fails to execute and deliver such Tenant's Estoppel Certificate to Landlord. Such sum shall be in addition to, and not a part of, Minimum Rent otherwise due under this Lease.

(b)    At any time during the Term of this Lease, but not more than once every two (2) years *and only in connection with the proposed financing, refinancing or sale of the Project*, Tenant (and Guarantor during the time which the Lease is subject to Guaranty) shall, upon fifteen (15) days prior written notice from Landlord, provide Landlord with a current financial statement of Tenant, which financial statement shall be certified in writing by Tenant to be true and correct. Such financial statements shall be prepared in accordance with generally accepted accounting principles, consistently applied. Any information that Landlord obtains from Tenant's financial statements shall be confidential and shall not be disclosed other than to carry out the purposes of this Lease, and Landlord shall not disclose such information other than to its employees, attorneys, accountants and lender in connection with any financing arrangement or sale of Landlord's interest in the Project or in connection with any administrative or judicial proceedings. Landlord shall execute a commercially reasonable Non-Disclosure Agreement (NDA) generated by Tenant as a condition of and prior to receiving any financial statements.

50.    LANDLORD'S RIGHT OF ENTRY. Landlord, or its authorized agents, shall have the right, upon at least twenty-four (24) hours prior notice, to enter the Premises during normal working hours (or at any time in the case of an emergency situation of imminent material property damage or injury to persons) for the following purposes: (a) inspecting the general condition and state of repair of the Premises, (b) making repairs required by Landlord, and (c) showing the Premises to any prospective purchaser, lender or (solely during the last six (6) months of the Term), lessee. During the final ninety (90) days of the Term, Landlord, or its authorized agents, shall have the right to erect on or about the Premises a customary sign advertising the Premises for lease or for sale. At all times Landlord shall have a key or keys with which to unlock the doors on the Premises, excluding Tenant's vaults and safes.

51.    SUCCESSORS.   The terms, covenants and conditions contained in this Lease shall apply to, inure to the benefit of, and be binding upon the parties hereto and their respective successors, assigns and personal representatives, except as otherwise expressly provided herein.  All rights, powers, privileges and duties of Landlord under this Lease, including, but not limited to, any notice required or permitted to be delivered by Landlord to Tenant hereunder may, at Landlord's option, be exercised or performed by Landlord's agent or attorney.

52.    AUTHORITY TO EXECUTE.   Landlord and Tenant each represent and warrant that the individual executing this Lease on behalf of such Party is duly authorized to execute and deliver this Lease on behalf of such Party.

53.    ENTIRE AGREEMENT; LEASE NOT OFFER.   This Lease, together with any exhibits, attachments or addenda, contains all of the agreements of the parties with respect to the subject matter hereof.   No prior agreement, understanding or negotiations pertaining to the subject matter hereof shall be effective unless set forth herein.   Statements, agreements, negotiations, representations or warranties, if any, by any agents or brokers of Landlord shall have no effect whatsoever and shall not be binding upon Landlord unless expressly contained in this Lease. This Lease may be amended in writing only, signed by the parties in interest at the time of such amendment.  Preparation of this Lease by Landlord and the submission of same to Tenant shall not be deemed an offer to lease the Premises or any other premises to Tenant. This Lease shall become binding upon Landlord and Tenant only when fully executed and delivered by both parties.

54.    ATTORNEYS' FEES.   In the event of any action or proceeding brought by either Party against the other under this Lease, the prevailing Party (as determined by final judgment or settlement) shall be entitled to recover all costs and expenses including without limitation the fees of its attorneys, accountants and appraisers, fees in such action or proceeding.   The prevailing Party shall be determined by the court in such action or proceeding based upon an assessment of which Party's major arguments made or positions taken in the proceedings could fairly be said to have prevailed over the other Party's major arguments or positions on major disputed issues in the court's decision, and in such amount as the court may adjudge reasonable.   If the Party who commenced or instituted the action, suit or proceeding shall dismiss or discontinue it without the concurrence of the other Party, such other Party shall be deemed the prevailing Party.  Any such amount owing by Tenant to Landlord under this Section 54 shall be "Additional Rent" within the meaning of Section 12 of this Lease.   In the event Landlord is made a party to any litigation between Tenant and a third party as a result of a breach of Tenant under this Lease, then Tenant shall pay all reasonable costs and attorneys' fees incurred by or imposed upon Landlord in connection with such litigation; provided, however, if Landlord is ultimately held to be liable, then Landlord shall promptly reimburse Tenant for all attorneys' fees and reasonable costs paid by Tenant on behalf of Landlord.

55.    NOTICE.   Except as otherwise required by law, any notice or document required or permitted to be delivered hereunder shall be in writing and delivered (i) personally, (ii) by certified or registered mail, postage prepaid, return receipt requested, or (iii) by recognized overnight delivery service, or (iv) facsimile.  If notice is sent by mail it shall be deemed to be delivered, whether actually received or not, two (2) business days after deposited in the United States mail, certified or registered, postage prepaid, addressed to the parties hereto at the respective addresses set forth in Section 4 above, or at such other addresses as they have theretofore specified by written notice delivered in accordance herewith.   Rejection or other refusal to accept notice or the inability to deliver notice because of a changed address (of which no notice was given as required hereunder) shall be deemed to be receipt of the notice when

sent.  Notation of telephone numbers in Section 4 are for use in sending notices by overnight courier and should not imply notice may be delivered orally.

56.    BROKERS.

    (a)    Tenant represents and warrants to Landlord that it has not had dealings with any broker, finder, or other person in locating the Premises or negotiating this Lease except as identified in Section 4(f), and that it knows of no other person who is or might be entitled to a commission, finder's fee or other like payment in connection herewith.  Tenant agrees to indemnify, defend Landlord against, and hold Landlord harmless for, from and against all such liabilities or claims (including without limitation attorneys' fees) arising out of or in connection with the inaccuracy of Tenant's representation and warranty described above, which agreement shall survive the expiration or earlier termination of this Lease.

    (b)    Landlord represents and warrants to Tenant that it has not had dealings with any broker, finder, or other person in leasing the Premises or negotiating this Lease except as identified in Section 4(g), and that it knows of no other person who is or might be entitled to a commission, finder's fee or other like payment in connection herewith.  Landlord agrees to indemnify, defend Tenant against, and hold Tenant harmless for, from and against all such liabilities or claims (including without limitation attorneys' fees) arising out of or in connection with the inaccuracy of Landlord's representation and warranty described above, which agreement shall survive the expiration or earlier termination of this Lease.

57.    RELATIONSHIP OF PARTIES.  Neither the method of computation of rent nor any other provisions contained in this Lease nor any acts of the parties shall be deemed or construed by the parties or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant, other than the relationship of landlord and tenant.

58.    RECORDING.  Tenant shall not record this Lease or a short form memorandum hereof; provided, however, upon request of Landlord, Tenant shall execute, acknowledge and deliver to Landlord, within fifteen (15) days following written request thereof by Landlord, a short form memorandum of this Lease for recording purposes; provided, however, that the legal description of the "Project" on such memorandum shall be only that portion of the Project owned by Landlord from time to time, and not any portion owned by any other party.  On termination of this Lease, Tenant shall execute and deliver to Landlord within fifteen (15) days following written request by Landlord a quitclaim deed in recordable form transferring to Landlord all interest, if any, of Tenant in the Premises and the Project.

59.    SECURITY.  While Landlord does not assume any responsibility to provide any security measures, or any liability for failure to provide same or for any inadequacy thereof, Landlord shall have the authority to institute or continue such security measures, devices, programs, restrictions and combinations thereof as Landlord in its reasonable discretion deems necessary or appropriate from time to time, taking into account the protection of persons and property of Landlord, Tenant and employees, agents and invitees of each of them and taking into account the business interests of the Project.  To the degree directed by Landlord, Tenant shall



73

coordinate the security measures at the Premises with the reasonable measures, devices and restrictions instituted by Landlord, if any.

60.    TENANT'S RESPONSIBILITY REGARDING HAZARDOUS MATERIALS.  Tenant shall not (either with or without negligence) cause or permit the escape, disposal or release of any biologically or chemically active or other hazardous substances or materials or substances or materials now or subsequently found to have an adverse effect on the environment or the health or safety of persons (collectively "Hazardous Materials").    Without limitation, the term "Hazardous Materials" shall include those materials and substances described in or regulated by any federal, state or local law, rule or regulation (whether now existing or hereafter enacted or promulgated, as they may be amended from time to time) pertaining to environmental regulations, contamination, clean-up or disclosures, and any judicial or administrative interpretation thereof, including any judicial or administrative orders or judgments, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 6901, et seq., the Federal Resource Conservation and Recovery Act, 42 U.S.C. Section 6901 et seq., the Superfund Amendments and Reauthorization Act of 1986, Public Law No. 99-499, the Toxic Substances Control Act, 49 U.S.C. Section 1801 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801 et seq., and any other state super lien or environmental clean-up or disclosure statutes.  The term "Hazardous Materials" as used herein shall also include, without limitation, any form of (i) multicellular fungi that live on plant or animal matter and/or in an indoor environment (including, without limitation, Cladosporium, Penicillium, Alternaria, Aspergillus, Fusarium, Trichoderma, Memnoniella, Mucor, and Stachybotrys chartarum (SC) often found in water damaged building materials), (ii) spores, scents or byproducts produced or released by fungi, including mycotoxins, and (iii) microbial matter which reproduces through mold, mildew and viruses, whether or not such microbial matter is living (collectively "Mold").  Tenant shall at least once a month inspect the Premises to determine whether any Mold exists at or about the Premises and/or whether there are any conditions that might lead to Mold at or about the Premises.  If any Mold or conditions that might lead to Mold at or about the Premises is/are discovered by Tenant, then Tenant shall immediately notify Landlord thereof in writing.  Tenant shall not bring or allow to be brought into or stored or used at the Premises and/or other portions of the Project any Hazardous Materials, except such Hazardous Materials as are approved of in writing by Landlord, and if Tenant obtains Landlord's consent to bring in, store and/or use Hazardous Materials, Tenant shall not allow the storage or use of Hazardous Materials in any manner not sanctioned by all Laws and by the highest standards prevailing in the industry for the storage and use of such substances or materials.  Landlord's approval shall not be required for ordinary cleaning products which are not regulated by governmental authorities and are used in the ordinary course of Tenant's business.  If Tenant or the Tenant Parties cause any Hazardous Materials contamination (including, without limitation, Mold or any conditions that might lead to Mold) at or about the Premises or other portions of the Project, Tenant shall, at its sole cost and expense, remove such Hazardous Materials, remedy the conditions that might lead to Mold and remediate, repair and restore the Premises and other affected portion(s) of the Project (the "Remediation Work") in compliance with all Record Documents and Laws, pursuant to remediation, repair and restoration plans approved in writing by Landlord, using a licensed contractor reasonably approved in writing by Landlord; provided, however, if the Remediation Work affects areas other than solely the interior, nonstructural portions of the Premises, then Landlord shall have the right, in its sole and absolute discretion, to perform some or all of the Remediation Work and all costs therefore incurred by Landlord shall be immediately due and payable by Tenant to Landlord.  If any lender or governmental agency shall ever require testing to ascertain whether or not any Hazardous Materials exist or have been released at or about the Project, then the reasonable costs thereof shall be reimbursed by Tenant to Landlord upon demand as additional

rent if such requirement is as a result of the acts or omissions of Tenant or the Tenant Parties. In addition, not more than once per calendar year, Tenant shall execute commercially reasonable affidavits, representations and the like from time to time at Landlord's request concerning Tenant's best knowledge and belief regarding the presence of Hazardous Materials at the Premises.  In all events, Tenant shall indemnify, defend and hold Landlord and the Landlord Parties harmless from and against any and all Liabilities arising out of or relating to Hazardous Materials (including, without limitation, diminution in value of the Premises or other portions of the Project, damages arising from any adverse impact on marketing of space in the Premises or other portions of the Project and sums paid in settlement of claims, attorneys' fees, consultants' fees and experts' fees) if caused by Tenant, the Tenant Parties or persons acting under Tenant.  The foregoing covenants shall survive the expiration or earlier termination of the Term of this Lease.  As used in this Section 60, the term "permit" shall be deemed to mean "knowingly permit" in connection with anything that Tenant permits to be done on or about the Premises or the Project.

In the event Hazardous Materials are contained within the Premises as of the Premises Delivery Date, then Landlord, at Landlord's sole cost and expense, shall remediate such Hazardous Materials within a reasonable period of time after receipt of written notice from Tenant.  In all events, Landlord shall indemnify, defend and hold Tenant and the Tenant's Parties harmless from and against any and all liabilities arising out of or relating to Hazardous Materials caused by Landlord, the Landlord Parties or persons acting under Landlord, or any Hazardous Materials in the Common Area or the Project (but outside of the Premises), not caused by Tenant or the Tenant Parties or persons acting under Tenant.

61.    SPECIFIC PERFORMANCE.  With respect to any provision of this Lease which provides, in effect, that Landlord shall not unreasonably withhold or unreasonably delay any consent or any approval, Tenant, in no event, shall be entitled to make, nor shall Tenant make, any claim for, and Tenant hereby waives any claim for, money damages; nor shall Tenant claim any money damages by way of setoff, rent abatement, counterclaim or defense, based upon any claim or assertion by Tenant that Landlord has unreasonably withheld or unreasonably delayed any consent or approval; Tenant's sole remedy shall be an action or proceeding for specific performance, injunction or declaratory relief to enforce such provision.

62.    WAIVER OF TRIAL BY JURY.  TO THE EXTENT ALLOWED BY APPLICABLE LAWS, LANDLORD AND TENANT EACH WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY OF ANY CONTRACT OR TORT CLAIM, COUNTERCLAIM, CROSS COMPLAINT OR CAUSE OF ACTION IN ANY ACTION, PROCEEDING OR HEARING BROUGHT BY EITHER LANDLORD OR TENANT AGAINST THE OTHER ON ANY MATTER ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT OR TENANT'S USE OR OCCUPANCY OF THE PREMISES, INCLUDING, WITHOUT LIMITATION, ANY CLAIM OF INJURY OR DAMAGE OR THE ENFORCEMENT OF ANY REMEDY UNDER ANY CURRENT OR FUTURE LAW, STATUTE, REGULATION, CODE OR ORDINANCE.

63.    MODIFICATION.  If, in connection with obtaining construction, interim or permanent financing, the lender shall request reasonable modifications to this Lease as a condition to such financing, Tenant shall execute such modifications hereto within thirty (30) days following written request therefore, but not more than once per calendar year, provided that such modifications do not increase the financial burdens of Tenant, or decrease any of its rights or remedies hereunder.  Tenant's failure to so execute such modifications hereto shall be a noncurable

default hereof and provide grounds for Landlord's termination of this Lease, among all other rights and remedies of Landlord.

64.    NONDISCRIMINATION.  Tenant herein covenants by and for itself, its heirs, executors, administrators and assigns, and all persons claiming under or through it, and this Lease is made and accepted upon and subject to the following conditions:  There shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, religion, sex, marital status, handicap, ancestry or national origin in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the Premises herein leased nor shall Tenant itself, or any person claiming under or through it, establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, lessees, sub lessees, subtenants or vendees in the Premises herein leased.

65.    FORCE MAJEURE.  A Party shall not be chargeable with, liable for, or responsible to the other Party for anything or in any amount for any delay caused by fire or other casualty, earthquake, flood, inclement weather, explosion, acts of God or the public enemy, any action, inaction, delay or interference by governmental authorities (including, without limitation, delays in promptly issuing the permits and approvals required for any construction), war, invasion, insurrection, rebellion, terrorism, riots, strikes or lockouts, acts or omissions of the other Party or any other cause, whether similar or dissimilar to the foregoing, which is beyond the reasonable control of such Party (excluding financial inability) (collectively "Force Majeure Delays").  Any delay in a Party's performance under this Lease arising out of or in connection with Force Majeure Delays shall not be deemed to be a breach by such Party under this Lease, and any time period within which such Party is obligated to perform under the Lease shall be extended for a period of time which is reasonable in light of such Force Majeure Delays (which extension shall in no event be less than the duration of the events causing such delay".

66.    "AS IS" AND "WHERE IS".  No representations, inducements, understanding or anything of any nature whatsoever, made, stated or represented by Landlord or anyone acting for or on Landlord's behalf, either orally or in writing, other than in this Lease, have induced Tenant to enter into this Lease, and Tenant acknowledges, represents and warrants that Tenant has entered into this Lease under and by virtue of Tenant's own prior independent investigation and due diligence.  Tenant is not relying upon any statements, representations, warranties or negotiations of the Landlord or its agents or brokers in executing this Lease, unless same are expressly contained in this Lease.  Tenant hereby accepts the Premises in its "as"is", "where"is" condition, with all faults, without warranty of any kind, express or implied, including, without limitation, any warranty as to title, certificates of occupancy, zoning, physical condition or the presence or absence of Hazardous Materials, and if the Premises are not in all respects entirely suitable for the use or uses to which the Premises or any part thereof will be put, then it is the sole responsibility and obligation of Tenant to take such action as may be necessary to place the Premises in a condition entirely suitable for such use or uses.  IN CONNECTION WITH THE ABOVE, TENANT HEREBY ACKNOWLEDGES, AGREES, REPRESENTS AND WARRANTS TO LANDLORD THAT TENANT HAS HAD AMPLE OPPORTUNITY TO INSPECT AND EVALUATE THE PREMISES AND THE FEASIBILITY OF THE USES AND ACTIVITIES TENANT IS ENTITLED TO CONDUCT THEREON; THAT TENANT IS EXPERIENCED; THAT TENANT WILL RELY ENTIRELY ON TENANT'S EXPERIENCE, EXPERTISE AND ITS OWN INSPECTION OF THE PREMISES IN ITS CURRENT STATE IN PROCEEDING WITH THIS LEASE; THAT TENANT ACCEPTS THE PREMISES IN ITS PRESENT CONDITION, AND THAT, TO THE EXTENT THAT TENANT'S OWN EXPERIENCE WITH RESPECT TO ANY OF THE FOREGOING IS INSUFFICIENT TO ENABLE TENANT TO REACH AND FORM A



49

76

CONCLUSION, TENANT HAS ENGAGED THE SERVICES OF PERSONS QUALIFIED TO ADVISE TENANT WITH RESPECT TO SUCH MATTERS.  TENANT IS NOT RELYING ON ANY EXPRESS OR IMPLIED, ORAL OR WRITTEN REPRESENTATIONS OR WARRANTIES MADE BY LANDLORD OR THE LANDLORD PARTIES, OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS LEASE.

67.    SPECIALLY DESIGNATED NATIONALS AND BLOCKED PERSONS LIST.  Tenant represents and warrants to Landlord that neither Tenant nor any Affiliate or Tenant Party (i) is listed on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasure ("OFAC") pursuant to Executive Order number 13224, 66 Federal Register 49079 (September 25, 2001) (the "Order"); (ii) is listed on any other list of terrorists or terrorist organizations maintained pursuant to the Order, the rules and regulations of the OFAC or any other applicable requirements contained in any enabling legislation or other executive orders in respect of the Order (the Order and such other rules, regulations, legislation or orders are collectively in this Section 51 called the "Orders"); (iii) is engaged in activities prohibited in the Orders; or (iv) has been convicted, pleaded nolo contendere, indicted, arraigned or custodial detained on charges involving money laundering or predicate crimes to money laundering.

Landlord represents and warrants to Tenant that neither Landlord nor any Affiliate or Landlord Party (i) is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order; (ii) is listed on any other list of terrorists or terrorist organizations maintained pursuant to the Orders; (iii) is engaged in activities prohibited in the Orders; or (iv) has been convicted, pleaded nolo contendere, indicted, arraigned or custodial detained on charges involving money laundering or predicate crimes to money laundering.

68.    LIQUOR LICENSE.  To the extent that Landlord controls the liquior license currently known as ABC License #455191 (or as may be numbered in the future) which only applied to a portion of the Premises (the former Okura restauarant suite of 3,553 square feet), Landlord wishes to sell and Tenant wishes to purchase the Type 47 (and if available Type 58) liquor license.  In the event that neither Tenant or Landlord terminate the Lease as provided for below, Tenant shall be required to purchase the Liquor License #455191 from Landlord (or its assigns) for the amount of $15,000.  Landlord makes no representation to Tenant regarding the applicability of Liquior License #455191 to the Premises.  Such purchase and assignment shall be effective upon the Rental Commencement Date.  In the event that the ABC License #455191 (or as may be numbered in the future) is not available for purchase by Tenant, then Tenant shall acquire a liquor license in the open market or through other means.

69.    LEASE CONTINGENCY.  This Lease is contingent upon Tenant receiving, on or before ninety (90) days from the Submittal Date of Tenant's Approved Work Plan's (as defined in this Lease): (i) all necessary governmental approvals and associated permits required to commence Tenant's Approved Work described herein; and (ii) to obtain preliminary approval from the ABC for the issuance of a  Type 47 liquor license for the entire Premises (and if avaialble, Type 58) (collectively items (i) and (ii) above hereinafter "Lease Contingency Term").  In the event that Tenant does not obtain: (i) all necessary governmental approvals and associated permits required to commence Tenant's Approved Work; and (ii) preliminary approval from the ABC for the issuance of a Type 47 liquor license within the Lease Contingency Term,,then either Tenant or Landlord can terminate the Lease by providing written notice to the other party commencing on the 91st day and lasting through the 100th day following the Submittal Date of Tenant's Approved Work Plans (the "Termination Window").  In the event neither party terminates the Lease during the Termination Window, then this Lease shall remain in full force and effect and



Tenant shall continue to diligently pursue securing its required approvals and permits referenced herein.

70.    FORMER TENANT'S FF&E & FF&E CONTINGENCY.  Notwithstanding anything to the contrary herein, the former tenant's furniture, fixtures and equipment (the "Former Tenant's FF&E) presently located within part of the Premises together with the liquor license #455191 associated with a portion of the Premises referred to herein are contemplated to be conveyed to the Landlord subject to a mutual and master settlement agreement pending before the United States Bankruptcy Court.  The delivery of or lack of deliver of the Former Tenant's FF&E and liquor license to Landlord shall not be a contingency of this Lease as Tenant has represented to Landlord that the former Tenant's FF&E and/or the former tenants liquor license is not material to its entering into this Lease.  Further Landlord makes no representation or provides no warranty of any kind respecting the Former Tenant's FF&E or the liquor licence.

Notwithstanding the above, Landlord shall provide written notice (hereinafter "Landlord's FF&E Notice") on or before October 24, 2012 that the Former Tenant's FF&E has either been: (i) transferred lien free to Owner or (ii) has not been transferred lien free to Owner.  In the event that Landlord's FF&E Notice incorporates the aforementioned item (i), then this Lease shall continue in full force and effect with no further actions.

In the event that Landlord's FF&E Notice incorporates the aforementioned item (ii), then Tenant may, within 48 hours of its receipt of Landlord's FF&E Notice either: (a) provide written notice to Landlord terminating this Lease (hereinafter the "FF&E Termination Notice") and in such event, the parties shall no longer have any obligation to one another and this Lease and all rights of Tenant in this Lease shall immediately terminate; or (b) provide written notice to Landlord requesting Landlord to continue its efforts to either seucre or remove part or all of the Former Tenant's FF&E (hereinafter the "FF&E Continuance Notice").   In the event Tenant provides the FF&E Continuance Notice, then Landlord shall, at Landlord's sole and absolute discretion and at its sole cost and expense, immediately commence and within ninety (90) days from Landlord's receipt of the FF&E Continuance Notice (the "FF&E Work Period"), to either: (i) have some or all of the Former Tenant's FF&E removed from the Premises with any Former Tenant's FF&E remaining in the Premises transferred to Tenant in lien free condition; or (ii) transfer all of Former Tenant's FF&E to Tenant in lien free condition.

To the extent that Tenant provides Landlord with the "FF&E Continuance Notice", then Landlord shall provide to Tenant a one time credit of Ten Thousand Dollars ($10,000.00) against its second month Minimum Rent after the Rental Commencement Date.

Tenant hereby understands and accepts that none, some or all of former Tenant's FF&E may remain in the Premises at the end of the FF&E Work Period.  Further, Tenant understands and acknowledges that to the extent that any of Former Tenant's FF&E is removed from the Premises, cosmetic damage can occur to the existing "AS IS" Condition of the Premises, including but not limited to damage to walls, ceilings, floors and other elements of the Premises.

Tenant agrees to reasonably cooperate with Landlord in its efforts associated with Former Tenant's FF&E.

71.    MISCELLANEOUS PROVISIONS.  The invalidity, illegality, or unenforceability of any provision of this Lease shall in no way affect the validity, legality or enforceability of any other provision hereof.  If more than one person or entity is Tenant, the obligations imposed on each such person or entity shall be joint and several.  This Lease shall be construed and interpreted

78

in accordance with the laws of the State of California in force from time to time. Time is of the essence in this Lease. The captions of the Paragraphs of this Lease are for convenience only and are not a part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease. The voluntary or other surrender of this Lease by Tenant, or a mutual cancellation thereof, shall not work a merger, and shall, at the option of Landlord, terminate all or any existing subtenancies or may, at the option of Landlord, operate as an assignment to Landlord of any or all of such subtenancies. Any uncertainty or ambiguity existing herein shall not be interpreted against either party because such party prepared any portion of this Lease, but shall be interpreted according to the application of rules of interpretation of contracts generally. The parties hereto acknowledge and agree that no provision in this Lease may be enforced by any third party. Each party acknowledges that it has been represented by counsel of its own choosing, or has had adequate opportunity to consult with counsel of its own choosing, in connection with the negotiation, preparation and execution of this Lease. Where the context so indicates, references to the singular includes the plural; references to the masculine includes the feminine and neuter, and references to the neuter includes the masculine and feminine. Each term and provision of this Lease performable by Tenant shall be deemed both a covenant and a condition to Landlord's performance hereunder. Landlord and Tenant agree that (i) any words and/or numerals with lines through them shall be deleted from this Lease, (ii) deletions within this Lease shall be ignored as though the deleted provisions were never originally written, and the deletions were never made and did not have to be made, and (iii) the act of deleting such provisions shall not be used to interpret this Lease.

      IN WITNESS WHEREOF, the parties hereto have executed this Lease on the date set forth beneath each party's respective signature hereon. In the absence of such date being so set forth, the Lease shall be deemed executed by such party as of the reference date of this Lease first mentioned above.

SIGNATURES ON NEXT PAGE

LANDLORD:

BRANDENBURG-OASIS PLAZA, LLC, a

a California limited liability company

By: _____

Name: Eric Brandenburg
Title:  Manager


TENANT:

RAMLA USA, INC.
a California corporation

By: _____
Name: _____
Title: _____

53

80

EXHIBIT"A"

SITE PLAN

SEE ATTACHED, WHICH IS SUBJECT TO THE FOLLOWING DISCLAIMER:

The attached drawing(s) is/are for general information purposes only. Any and all features, matters and other information depicted thereon or contained therein are for illustrative marketing purposes only, are subject to modification without notice, are not intended to be relied upon by any party and are not intended to constitute representations and warranties as to the size and nature of improvements to be constructed (or that any improvements will be constructed) or as to the identity or nature of any occupants thereof.  Said drawing(s) is/are intended to depict the approximate location of the Premises in the Project; however, the actual location of the boundary of the Premises will be controlled by the physical location of the Premises as actually constructed.

DOCSOC/1477424v12/014525-0000

## Exhibit "A"



Description: Riverside, CA Assessor Map 513.14 Page: 1 of 1
Order: Linh Nguyen Comment:

## EXHIBIT "B"

## LEGAL DESCRIPTION OF PROJECT

LOTS 1-12, BOTH INCLUSIVE, AND LOT 37, IN BLOCK 20 OF MAP OF PALM SPRINGS, IN THE CITY OF PALM SPRINGS, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY MAP ON FILE IN BOOK 9 PAGE 434 OF MAPS, SAN DIEGO COUNTY RECORDS.

TOGETHER WITH, THE EAST 16 FEET OF THE PALM AVENUE (NOW BELARDO ROAD) ADJOINING SAID LOTS 1 AND 37, ON THE WEST, AS SHOWN BY SAID MAP.

APN:  513-143-008-9; 513-143-009-0

DOCSOC/1477424v12/014525-0000

83

<u>EXHIBIT "C"</u>

<u>PLAT SHOWING LOCATION OF PREMISES</u>

56

84

**EXHIBIT C**



## EXHIBIT "D"

## LIST OF EXCLUSIVE USES

DOCSOC/1477424v12/014525-0000

86

# Exhibit "D"

### Starbuck's Exclusive Language

Landlord agrees that for the duration of the Term of the Lease, it shall not enter into a lease for any other portion of the Property which permits the sale of whole bean coffee, espresso, or other coffee related drinks, except for the existing sit-down restaurant on the Property and upon expiration or termination of said existing restaurant lease to subsequent tenants for use of such space as a restaurant, which may serve coffee beverages (including but not limited to brewed coffee, espresso, café latte and cappuccino) primarily for on-premises and incidentally for take-out consumption.

**Exclusivity.** Landlord agrees that for the duration of the Term of the Lease, it shall not enter into a lease for any other portion of the Property which permits the sale of whole bean coffee, espresso or other coffee-related drinks (the "Coffee Exclusion"). Notwithstanding the foregoing:

1. Full service, sit-down restaurants with a wait staff or table service may sell brewed coffee or tea, and hot espresso drinks for on-premises consumption.

2. Tenants whose primary business is the sale of juice, ice cream or yogurt, may sell coffee-flavored blended beverages as an incidental portion of the store's total sales, not to exceed ten percent (10%).

3. Tenants who sell brewed coffee that is not "gourmet" or "brand-identified", so long as such sale of brewed coffee that is not "gourmet" or "brand-identified" is primarily for on-premises consumption (not more than 5% of sales). "Gourmet" shall be defined as a) arabica bean-based, or b) sourced from a gourmet coffee brand like Coffee Bean & Tea Leaf, Intelligentsia, Peets, Caribou, Seattle's Best, or similar. "Brand-identified" shall mean advertised or marketed within the premises by its brand name."

**EXHIBIT "E"**

**THE OASIS PLAZA**

**RULES AND REGULATIONS**

1.   No awning or other projection shall be attached to the outside walls of the Leased Premises or the Property.  No floor covering or carpeting or any other type of surface covering shall be placed on or attached to the floor or ground surface of any common areas, patios or any exterior areas of the Leased Premises or the Property without prior written consent of Landlord.  No curtains, blinds, shades or screens visible from the exterior of the Property shall be attached to or hung in, or used in connection with the Leased Premises without the prior written consent of Landlord.  Such curtains, blinds, shades, screens, floor coverings or carpeting or other fixtures must be of a quality, type, design and color, and attached in the manner approved by Landlord.

2.   Tenant, its servants, employees, agents, representatives, customers, invitees and guests shall not obstruct sidewalks, driveways, entrances, passages, corridors, vestibules, halls, elevators and stairways in and about the Property which are used in common with other tenants and their servants, employees, agents, representatives, customers, guests and invitees, and which are not a part of the Leased Premises.  Tenant shall not place objects against partitions or doors or windows which would be unsightly from the Property corridors or from the exterior of the Property, and must promptly remove any such objects upon notice from Landlord.  Tenant, its servants, employees, agents, representatives, customers, invitees and guests shall not go upon the roof or enter any attic or basement, or any area where there is mechanical, heating or air conditioning equipment of the Property, nor shall they tamper or interfere with any equipment of the Property of any kind whatsoever without the permission and approval of the Landlord.

3.   Tenant shall not make noises, cause disturbances or vibrations or use or operate any electrical or electronic devices that emit sound or other waves or disturbances or create odors, any of which may be offensive to the other tenants and occupants of the Property, or that would interfere with the operating of any device, equipment, radio, television broadcasting or reception from or within the Property or elsewhere, and shall not place or install any projections, antennas, aerials or similar devices inside or outside of the Leased Premises or on the Property.  Tenant shall not bring or allow animals to be brought onto the Leased Premises (other than seeing eye dogs or other dogs specifically trained and licensed to assist physically impaired persons) nor shall Tenant encourage domestic or wild animals or birds to reside about the Property (by feeding, etc.) without prior written consent of Landlord.

4.   Tenant shall not use any person or contractor not employed by the Landlord to perform janitorial work, window washing, cleaning, maintenance, repair or similar work in the common areas of the Property nor shall Tenant perform any painting of any kind whatsoever of the exterior walls, poles, pillars, fences, awnings, patios or common areas of the Property without the prior written consent of the Landlord.

1



Initial Here

**EXHIBIT E**           **RULES AND REGULATIONS**           **THE OASIS PLAZA**

5.   Landlord shall have the right to prohibit any advertising by Tenant which in Landlord's reasonable opinion tends to impair the reputation of the Property or its desirability for office, retail, commercial and hotel use, and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

6.   The Leased Premises shall not be used for cooking (unless specifically leased for the purpose of preparing and/or serving food), except that the preparation of coffee, tea, hot chocolate and similar items for Tenant and its employees shall be permitted provided that preparation of same does not cause any unusual or objectionable odors to be produced or permeate the Premises.  The Leased Premises shall not be used for lodging or sleeping (unless specifically leased for this purpose, as in the case of the hotel)

7.   Entrances to the Leased Premises shall be Landlord's standard entrance, or such expanded entrance as may be approved and installed by Landlord at Tenant's sole cost and expense, payable upon commencement of the term.

8.   Tenant, its servants, employees, agents, representatives, customers, invitees and guests shall not park in Property driveways, publicly dedicated streets and alleys or areas directly adjacent to Property entrances where prohibited, nor in portions of the Property parking lot marked "Reserved" unless such reserved parking space has been expressly assigned to Tenant in writing, nor in any portions of the Property parking lot marked "No Parking", nor shall they double park, or park in striped areas,  or areas otherwise marked as and for pedestrian walkways.

9.   In order to conserve energy, avoid temperature fluctuations and to maintain a steady flow of heat and air conditioning throughout the Property, Tenant is required to ensure that the exterior door(s) of the Leased Premises are kept closed at all times other than for immediate ingress and egress.  All doors opening onto public corridors shall be kept closed except when in use for ingress and egress.  Depending upon weather conditions, Tenant shall use its best judgment regarding the opening of windows within its Leased Premises, and shall ensure that upon the conclusion of business each day the windows are closed and secured prior to vacating the Premises.

10.  For the security and safety of all Tenants, the doors to the Property utilized as business offices are locked nightly at approximately seven o'clock p.m.  In the event Tenant enters or exits Premises subsequent to doors being locked, Tenant is required to firmly close doors and ensure that they are secure.

11.  No sign, placard, picture, photocopy, advertisement, name or notice shall be inscribed, displayed, printed, painted, attached or affixed by any Tenant on or to any part of the interior or exterior of the Premises without the prior written consent of the Landlord.  In the event of the violation of the foregoing by any Tenant, Landlord shall have the right to remove same without any liability, and may charge the expense incurred in such removal to the Tenant violating this regulation.  All approved signs or lettering on the interior or

2




Initial Here

**EXHIBIT E**          **RULES AND REGULATIONS**          **THE OASIS PLAZA**

exterior of the building shall be printed, painted, affixed or inscribed at the expense of Tenant by a person approved by Landlord, and Landlord reserves the right to approve all such signs and lettering.

12.   No existing locks shall be changed, nor shall any additional locks or bolts of any kind be placed upon any door or window by Lessee, without prior written consent of the Landlord. At the termination of the lease, Tenant shall deliver to Landlord all keys for any portion of the Premises on the Property.

13.   Before leaving the Premises at any time, Tenant shall close all windows, close and lock all doors, and extinguish all lights other than those required for safety and security purposes.  Tenant shall also turn off all electrical equipment and machinery unless said equipment and machinery must operate 24 hours a day in order to serve the purposes of Tenant's business.

14.   Landlord reserves the right to exclude or expel from the Premises any person who, in the judgment of Landlord or its duly recognized representative, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of the rules and regulations of the Premises.

3



Initial Here

### EXHIBIT "F"

### TENANT'S APPROVED WORK

Pursuant to Paragraph 24 herein.

DOCSOC/1477424v12/014525-0000

91

# Exhibit "G"



## EXHIBIT "H"

## TENANT'S ESTOPPEL CERTIFICATE

The undersigned, as "Tenant" under that certain lease, dated _____, (herein "Lease") for the property located at

_____
____, made with _____, as "Landlord," holds all of the interest of the Tenant under the Lease and understands that (1) Landlord has entered into an agreement to [sell] [encumber] to _____ _____, (collectively "Buyer"), certain real property ("Subject Property") located in the City of Palm Springs, County of Riverside, State of California, including, among other property, the premises described in such Lease; and (2) Landlord and Buyer are relying upon this certificate in connection with the transactions contemplated by such agreement. With such understanding, Tenant agrees, on behalf of himself or itself and his or its successors and assigns, for the benefit of Landlord, Buyer and their respective successors and assigns, that:

1.      That the undersigned has entered into occupancy of the premises described in said Lease;

2.      That the Lease is in full force and effect and has not been assigned, modified, supplemented or amended in any way, except

_____
_____
_____
_____
_____

3.      That the Lease represents the entire agreement between the parties as to said leasing;

4.      That the commencement date of the Lease is _____, _____;

93

5.    That the Lease expires on _____,
20_____, and there are no options to extend the term thereof except as follows:

_____
_____
_____

6.    That all conditions of said Lease to be performed by Landlord and necessary to the enforceability of said Lease have been satisfied;

7.    That there are no defaults by either Tenant or Landlord under the Lease, nor has any event occurred or failed to have occurred which, with the passage of time or the giving of notice, or both, would ripen into such default;

8.    Minimum Rent and other monthly obligations of Tenant under the Lease have commenced and are currently due and payable in full on the _____ day of each month in the following amounts:

(a)    Minimum Rent:      $_____

(b)    Building Expenses, Operating Expenses, Taxes and Insurance Charges:      $_____

(c)    Other (explain):      $_____

_____
_____
_____

9.    Minimum Rent and other monthly obligations of Tenant under the Lease have been paid in full through _____, 20_____, and no Minimum Rent or other sums have been prepaid;

10.    Tenant has delivered to Landlord the sum of $_____, as a Security Deposit or other similar deposit under the Lease;

11.    That on this date there are no existing defenses or offsets which the undersigned has against the enforcement of said Lease by Landlord;

12.    There are no rights of first refusal held by Tenant under the Lease.



94

      13.    No interest in the Lease has been assigned and no portion of the premises described in the Lease has been sublet except:

_____

_____.

      14.    All improvements to the premises described in the Lease that pursuant to the Lease are required to be constructed by Landlord have been completed, and any amount required to be paid to or on behalf of Tenant in connection with the construction and installation of any improvements to the premises described in the Lease has been fully paid.

      The undersigned hereby:

      1.    Disclaims all right, title or interest in said premises except the rights granted by said Lease;

      2.    Agrees to send a copy of any notice or demand given or made to the Landlord pursuant to the provisions of said Lease, by registered mail to the holder of a first mortgage on the demised premises, or its assignee, upon being notified in writing of such holder's or assignee's name and address;

      3.    Agrees to give to the holder of said mortgage or its assignee the same right as the Landlord has to cure any default complained of in said notice or demand;

      4.    Agrees that Buyer shall have no obligation or liability for, and Tenant shall not have the right to offset or withhold Minimum Rent or any other sums as a result of, any defaults of Landlord under the Lease accruing prior to the date Buyer acquires an interest in the Subject Property;

      5.    Agrees that Buyer shall have no obligation to credit Tenant with any prepaid Minimum Rent or other sums in excess of the current month or return any Security Deposit unless Buyer shall have actually received the benefit of such prepaid Minimum Rent or other sums or shall have received such Security Deposit or credit therefore from Landlord; and

      6.    Agrees that no modification or amendment to the Lease (except as herein disclosed to Buyer) shall be valid, unless agreed to in writing by the Buyer.

Signature on Next Page

95

EXECUTED this _____ day of _____,
20_____.


Tenant:

_____


By: _____

Name: _____

Title: _____

Dated: _____

96

EXHIBIT "I"

GUARANTY AGREEMENT

**GUARANTY**

THIS GUARANTY (this "**Guaranty**") is made as of the _____ day of October, 2012 by RAMLA CO., LTD., an entity organized under the laws of Japan (hereinafter "**Guarantor**"), for the benefit of BRANDENBURG-OASIS PLAZA, LLC, a California limited liability company (hereinafter "**Landlord**").

RECITALS

This Guaranty is made upon the basis of the following facts, understanding and intentions of the parties:

A.      Landlord is the owner of that certain real property situated in the City of Palm Springs, County of Riverside, State of California commonly known as Oasis Plaza, which real property is presently improved with two (2) buildings and certain common area improvements and is located at the southwest corner of S. Palm Canyon Drive and Tahquitz Canyon Way (the "**Project**").

B.      Landlord, as landlord, and Ramla USA, Inc., a California corporation, as tenant, are parties to that certain Lease Agreement of even date herewith (the "**Lease**") pursuant to which Tenant leases from Landlord Five Thousand Two Hundred Seventy-Two (5,272) rentable square feet (the "**Premises**") in the building on the Project located at 109 S. Palm Canyon, Palm Springs, all as more fully set forth in the Lease.

C.      Guarantor has agreed to provide this Guaranty in support of Tenant's obligations and commitments as made pursuant to the Lease in order to induce Landlord to enter into the Lease.  Landlord is not willing to enter into the Lease based solely upon the credit of Tenant. Guarantor owns a direct or indirect interest in Tenant and will derive a substantial benefit from the Lease.

NOW, THEREFORE, to induce Landlord to enter into the Lease, Guarantor agrees as follows:

1.      **Definitions**.  Words and phrases which are capitalized in this Guaranty, but which are not expressly defined herein, shall have the meaning or meanings given them in the Lease.

2.      **Absolute, Unconditional Guaranty**.  Guarantor unconditionally, absolutely and irrevocably guarantees to Landlord the prompt payment when due of the Rent under the Lease, whether such sums are payable to Landlord or to any third party for the direct or indirect benefit of Landlord, and the full and faithful performance and observance of any and all covenants, whether present or future, contained in the Lease to be performed and observed by Tenant. Guarantor further unconditionally, absolutely and irrevocably guarantees to Landlord the correctness of any warranties and/or representations of Tenant given to Landlord in, or in connection with, the Lease.  Guarantor unconditionally covenants to, and agrees with, Landlord that, if any failure shall have occurred in the timely payment by Tenant of any Rent or in the full and faithful performance and/or discharge of any of the other duties, obligations or covenants contained in the Lease to be performed by Tenant, Guarantor will immediately and unconditionally pay to Landlord such Rent, will perform and/or discharge such duties, obligations and covenants, and shall reimburse Landlord for any and all damages that may arise



98 

as a result of Tenant's non-payment or non-performance (including, without limitation, application to damages due from Tenant pursuant to Section 1951.2 of the California Civil Code). Guarantor further agrees that Guarantor shall pay to Landlord on demand, all expenses (including, without limitation, reasonable attorneys' fees and court costs) arising out of or relating to the enforcement or protection of Landlord's rights hereunder.

3. **Guaranty of Payment and Performance**. This Guaranty is a guaranty of payment and performance and not merely of collection. The obligations of Guarantor hereunder are absolute, primary, unconditional and irrevocable obligations, which shall be enforceable by Landlord at Landlord's election, simultaneously with or after proceeding against Tenant or without the necessity of any suit or proceedings against Tenant, and in any event, without the necessity of any notice of non-payment, non-performance or non-observance, or of any notice of acceptance of the Guaranty contained herein or any other notice or demand to which a guarantor might otherwise be entitled or which may be required to preserve any rights against a guarantor, all of which Guarantor hereby expressly waives.

4. **Waivers of Defenses**. Guarantor expressly agrees that the liability of Guarantor hereunder shall not be impaired, released, modified, stayed, limited, terminated or discharged, in whole or in part, by any of the following, notwithstanding that the same are made with or without notice to Guarantor, and Guarantor hereby freely and voluntarily waives any defense based upon any of the following:

A. Any amendment or modification of the provisions of the Lease, whether or not consented to by Guarantor;

B. Any extensions of time for performance of the covenants under the Lease to be performed by Tenant, whether given prior to or after the occurrence of a default by Tenant under the Lease;

C. Any delay by Landlord in asserting any claim, right or cause of action arising under or in connection with the Lease or this Guaranty, whether or not Guarantor changes its position in reliance on such delay or the expectation of the continuance of such delay;

D. Any exchange, surrender or release, in whole or in part, of any security (including, without limitation, the Security Deposit) which may be held by Landlord at any time for or under the Lease;

E. Any application, drawing, encashment or any other use of any security (including, without limitation, the Security Deposit) which may be held by Landlord at any time for or under the Lease;

F. Any other guaranty now or hereafter executed by Guarantor or anyone else;

G. The release, whether partial or full, of any other guarantor from liability for the performance or observance of any of the covenants under the Lease to be performed by Tenant, whether by operation of law or otherwise;

H. Landlord's consent to any assignment or successive assignments of the Lease by Tenant, or to any subletting or sublettings of the Leased Premises;

99

I.    Any failure of performance on the part of Landlord under the Lease, whether or not such failure then constitutes a default by Landlord under the Lease;

J.    Any lien, charge or encumbrance on or affecting any of the respective assets and properties of Tenant or Guarantor;

K.    Any rejection or disaffirmance of the Lease pursuant to the Bankruptcy Code of the United States or other statute or from the decision of any court interpreting any of the same;

L.    Any tender of performance by or on behalf of Tenant after the expiration of any period for performance described in Section 1161 of the Code of Civil Procedure of the State of California, if, in the sole opinion of Landlord, the acceptance of such tender would in any manner impair the right of Landlord to terminate the Lease or to evict Tenant by reason of the non-performance by Tenant;

M.    Any other agreement which may now or hereafter exist between Landlord and Tenant, whether in respect of the Lease or any other subject matter and whether or not consented to by Guarantor;

N.    Any defense arising under or in connection with Section 1950.7 of the California Civil Code, which pertains to the return of security deposits and other related matters;

O.    Any assumption by Guarantor of primary liability under the Lease, whether by merger or consolidation with Tenant or its successors, by becoming a constituent partner of Tenant or by assignment of the Lease; or,

P.    Any matter or thing whatsoever other than (i) full and timely performance of all obligations guaranteed hereby, or (ii) Landlord's specific written waiver of any obligation of Tenant made expressly for the benefit of Guarantor, and then only to the extent of the specific waiver.

5.    **Waivers as Election of Remedies and Suretyship Rights**.  Although it is not the intention of Landlord, Tenant or Guarantor that the leasehold interest of Tenant under the Lease be deemed a security interest, rather than a Lease, Guarantor waives all of the rights which may be waived by a guarantor pursuant to the provisions of Section 2856 of the Civil Code of the State of California.  Guarantor further waives: (i) all rights and defenses arising out of an election of remedies by Landlord, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has impaired or destroyed Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 726 of the Code of Civil Procedure or otherwise; (ii) all suretyship rights or defenses described in Sections 2787 to 2855, inclusive, of the Civil Code of the State of California; and, (iii) all rights or defenses under Sections 2899 and 3433 of the Civil Code of the State of California.  Guarantor understands and acknowledges the statutes referred to in this Paragraph 5 might have provided (had Guarantor not agreed in this Paragraph 5 to waive them) rights against the enforcement of, defenses to, or exculpation from, the obligations guaranteed herein by Guarantor.

6.    **Assumption of Obligations and Waivers as to Financial Condition**. Guarantor is fully aware of the financial condition of Tenant.  Guarantor delivers this Guaranty based solely upon Guarantor's own independent investigation and in no part based upon any



100

representation or statement of Landlord with respect thereto. Guarantor is in a position to and hereby assumes full responsibility for obtaining any additional information concerning Tenant's financial condition as Guarantor may deem material to Guarantor's obligations hereunder and Guarantor is not relying upon, nor expecting Landlord to furnish Guarantor, any information in Landlord's possession concerning Tenant's financial condition. By acceptance hereof, Landlord and Guarantor agree that Guarantor hereby knowingly accepts jointly and severally the full range of risk encompassed within a guaranty contract (such as this Guaranty) that includes a "Continuing Guaranty," which risk includes, without limitation, the possibility that Tenant will incur additional indebtedness for which Guarantor may be liable hereunder after Tenant's financial condition or ability to pay its lawful debts when they fall due has deteriorated or ceased. The obligations of Guarantor hereunder shall not be affected by any failure on the part of Landlord to inform Guarantor concerning Tenant's financial condition or notify Guarantor of any adverse change in Tenant's financial condition of which Landlord becomes aware.

7.    **Rights and Waivers as to Modifications of Lease or Other Obligations**. At any time and from time to time, without terminating, affecting or impairing the validity of this Guaranty or the obligations of Guarantor hereunder, Landlord may deal with Tenant in the same manner and as fully as if this Guaranty did not exist and shall be entitled (but not obligated), among other things, to grant Tenant, without notice or demand and without affecting Guarantor's liability hereunder, such extension or extensions of time to perform, renew, compromise, accelerate or otherwise change the time for payment of or otherwise change the terms of payment or any part thereof contained in or arising under the Lease, or to waive any obligation of Tenant to perform, any act or acts as the Landlord may deem advisable. In the event that any agreement or stipulation between Landlord and Tenant shall extend the time of performance or modify any of the covenants of the Lease to be performed by Tenant, Guarantor shall continue to be liable under this Guaranty to the fullest extent.

8.    **Effect of Termination of the Lease; Guaranty of Payment of Damages**. The obligations guaranteed hereunder shall not be limited or terminated by the termination of the Lease, by Landlord or otherwise, in accordance with law following a default by Tenant under the Lease. The obligations guaranteed hereunder expressly include any obligations of Tenant which are accelerated in accordance with the provisions of Section 1951.2 of the Civil Code of the State of California or any similar or related provision of law, and Guarantor expressly hereby guarantees the prompt payment of any damages or other sums to which Landlord may become entitled in accordance with the provisions of Section 1951.2.

9.    **Waivers as to Litigation**. Landlord shall have the right to enforce this Guaranty without pursuing any rights or remedies of Landlord against Tenant or any other guarantor or any other party, or any security Landlord may hold (including, without limitation, the Security Deposit). Landlord may commence any action or proceeding based upon this Guaranty: (i) directly against Guarantor without making Tenant or anyone else a party defendant in such action or proceeding; or, (ii) jointly against Guarantor and Tenant. Any one or more successive and/or concurrent actions may be brought hereon against Guarantor and/or against Guarantor and Tenant, with or without such action being brought against other parties, as often as Landlord, in its sole discretion, may deem advisable. The obligations of Guarantor under this Guaranty are joint and several with those of any other party who may also bear such obligations, including, without limitation, Tenant.

10.    **Waivers of Rights and Remedies of Guarantor Against Tenant**. Until all the covenants and conditions in the Lease to be performed and observed by Tenant are fully performed and observed:



101

A.    Guarantor shall have no right of subrogation against Tenant by reason of any payments or acts of performance by Guarantor, in compliance with the obligations of Guarantor hereunder;

B.    Guarantor waives any right to enforce any remedy which Guarantor now or hereafter shall have against Tenant by reason of any one or more payments or acts of performance in compliance with the obligations of Guarantor hereunder; and,

C.    Guarantor subordinates any liability or indebtedness of Tenant now or hereafter held by Guarantor to the obligations of Tenant to the Landlord under the Lease.

11.    **Successors and Assigns**.  This Guaranty shall be binding upon Guarantor and its successors and assigns, and shall inure to the benefit of and may be enforced by the successors and assigns of Landlord or by any person to whom Landlord's interest in the Lease or any part thereof (including, without limitation, all or any part of the Rent) may be assigned. Wherever in this Guaranty reference is made to either Landlord or Tenant, the same shall be deemed to refer also to the then successor or assign of Landlord or Tenant.

12.    **Waiver of Defenses Pertaining to Bankruptcy, Disability or Cessation of Liability of Tenant**.  Neither Guarantor's obligation to make payment or render performance in accordance with the terms of this Guaranty nor any remedy for the enforcement thereof shall be impaired, modified, stayed, released, limited, terminated or discharged in any manner whatsoever by any impairment, modification, change, release, limitation or stay of the liability of Tenant or its estate in bankruptcy or any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the Bankruptcy Code of the United States or other statute or from the decision of any court interpreting any of the same, and Guarantor shall remain obligated under this Guaranty as if no such impairment, stay, modification, change, release or limitation had occurred.  Guarantor waives any defense arising by reason of any disability or other defense of Tenant, or by reason of the cessation from any cause whatsoever of the liability, either in whole or in part, of Tenant to Landlord, except, and to the extent, that such cessation shall be the result of payment or performance of the obligation as to which the liability pertains.  Guarantor hereby acknowledges that the obligations of Guarantor hereunder are independent of, and may exceed, the obligations of Tenant under the Lease.

13.    **Repayments and Reinstatement**.    Should Landlord be obligated by any bankruptcy or other law to repay to Tenant or Guarantor or to any trustee, receiver or other representative of either of them any amounts previously paid, then this Guaranty shall be reinstated in the amount of such repayment.   Landlord shall not be required to litigate or otherwise dispute its obligation to make such repayments, if it is in good faith and on the advice of counsel believes that such obligation exists.

14.    **Estoppel Certificates**.

A.    Within ten (10) days of the receipt by Guarantor of a written request from Landlord, which may be given at any time and from time to time, Guarantor shall execute and deliver to Landlord an estoppel certificate addressed to such party (the "**Reliance Party**") as Landlord may specify, which estoppel certificate shall state that: (i) this Guaranty and all of the obligations of Guarantor hereunder are in full force and effect and unmodified; (ii) Guarantor is not entitled to assert any defense to the enforcement of the obligations of Guarantor under this Guaranty, except such payment or performance of the obligations of the Tenant under the Lease as has actually then occurred; (iii) to the best of the knowledge of Guarantor, the Lease is

in full force and effect and binding upon the tenant thereunder; (iv) a copy of this Guaranty attached to such certificate is true, correct and complete; and, (v) the Reliance Party and its successors and assigns may rely upon, and act in reliance upon, the statements set forth in such certificate and that Guarantor shall be bound by such statements for all purposes. Guarantor shall also deliver to Landlord reasonable evidence of the authority of the person executing such certificate on behalf of Guarantor to so execute such certificate.

        B.      In the event that Guarantor fails or refuses to deliver to Landlord an estoppel certificate in the form required by this Paragraph 14 within ten (10) days of the receipt by Guarantor of a written request from Landlord, Landlord may give to Guarantor a second request.  In the event that Guarantor fails or refuses to deliver to Landlord an estoppel certificate in the form required by this Paragraph 14 within ten (10) days of the receipt by Guarantor of such second request, such failure or refusal will, without further act of Landlord, constitute a default by Guarantor under this Guaranty and, at the election of Landlord, a default by Tenant or its successors under the Lease.

        C.      No execution and delivery by Guarantor to Landlord of an estoppel certificate or other document which does not contain, without qualification or equivocation, each of the statements set forth in Paragraph 14.A shall be effective to satisfy the obligations of Guarantor pursuant to this Paragraph 14, save and except only that if, to the best of the knowledge of Guarantor, the Lease is not then in full force and effect and binding upon the tenant thereunder, then such estoppel certificate shall so state and shall nevertheless be effective to satisfy the obligations of Guarantor pursuant to this Paragraph 14.

     15.    **Financial Records and Reporting**.  For so long as there are any obligations of Guarantor to Landlord under this Guaranty, Guarantor covenants that, unless otherwise consented to by Landlord in writing, it shall keep adequate records and books of account with respect to its business activities in which proper entries are made in accordance with generally accepted accounting principles in the United States of America, consistently applied ("**GAAP**"), reflecting all its financial transactions.  At any time during the Term of this Guaranty, but not more than once every two (2) years *and only in connection with the proposed financing, refinancing or sale of the Project*, Guarantor shall, upon fifteen (15) days prior written notice from Landlord, provide Landlord with a current financial statement of Guarantor, which financial statement shall be certified in writing by Tenant to be true and correct.  Any information that Landlord obtains from Guarantor's financial statement(s) shall be confidential and shall not be disclosed other than to carry out the purposes of this Guaranty and the associated Lease. Landlord shall not disclose such information other than to its employees, attorneys, accountants, lender and/or buyer in connection with any financing arrangement or sale of Landlord's interest in the Project or in connection with any administrative or judicial proceedings. Landlord shall execute a commercially reasonable Non-Disclosure Agreement (NDA) generated by Guarantor as a condition of and prior to receiving any financial statements..

     16.    **Guarantor as Tenant**.  In the event that this Guaranty shall be held ineffective or unenforceable, in whole or in part, by any court of competent jurisdiction, Guarantor shall be deemed to be a tenant under the Lease with the same effect as if Guarantor were expressly named as a joint tenant therein having joint and several liability with Tenant.

     17.    **Remedies Separate and Cumulative**.  All remedies of Landlord by reason of this Guaranty are separate and cumulative remedies.  Neither the existence nor the exercise of any such remedy shall be deemed to preclude or prevent the exercise of any other legal or equitable remedy available to Landlord hereunder.



18.   **Notices**.  Any notices required or permitted to be given hereunder shall be given in writing and shall be delivered (a) in person, (b) by certified mail, postage prepaid, return receipt requested, (c) by facsimile, but only if a machine generated confirmation of completed transmission is obtained and retained by the sender and only if a copy is mailed to the recipient by first-class mail, postage prepaid, or (d) by a commercial overnight courier that guarantees next day delivery and provides a receipt, addressed as provided directly below, or to such other address or facsimile number as either party may from time to time specify by at least fifteen (15) days notice in writing to the other party.  Notices shall be effective only upon delivery or refusal to accept delivery upon tender of delivery.

> If to Landlord:
>
> Brandenburg-Oasis Plaza, LLC
> 1122 Willow Street, Suite 200
> San Jose, CA 95125
> Attn:  Eric Brandenburg and Bill Baron
>
> With a copy to:
>
> Lyle Commercial Realty
> 121 South Palm Canyon Dr., Suite 216
> Palm Springs, CA  92262
> Attn:  Sue Lyle
>
> If to Guarantor:
>
> Ramla Co., Ltd; Attn: _Akira Murakawa_
> _10-8 Oodenmacho-Cho Nihonbashi_
> _Chuo-Ku Tokyo 103-001_

19.   **Severability of Provisions**.  If any provision of this Guaranty or the application thereof to any person or circumstance shall to any extent be held void, unenforceable or invalid, then the remainder of this Guaranty shall not be affected thereby, and each provision of this Guaranty shall be valid and enforced to the fullest extent permitted by law.  It is the intention of Guarantor and Landlord that each provision of this Guaranty be fully enforceable, and that all of the provisions hereof shall be interpreted so as to avoid being found void, unenforceable or invalid.

20.   **Representation by Counsel in Connection with this Guaranty**.  Guarantor acknowledges and agrees that it has been represented in connection with the drafting and negotiation of this Guaranty by competent counsel of its choice licensed to practice law in the State of California and that such counsel has thoroughly explained in detail, and advised Guarantor as to, the legal effect and possible practical consequences of each of the agreements and waivers set forth in this Guaranty, and that Guarantor makes and enters into such agreements and waivers after having received and considered such explanation and advice. Guarantor further acknowledges and agrees that this Guaranty has been fully negotiated between the parties and the provisions of this Guaranty shall not be strictly construed against either Landlord or Guarantor because one or the other of them may have drafted a particular provision.



104

21.    **Counterclaims, Setoff and Deduction**.  The rights of Landlord pursuant to this Guaranty shall not be subject to any counterclaim, set off or deduction now held or hereafter arising in favor of Guarantor or Tenant, and Guarantor hereby waives the right to assert any such counterclaim, set off or deduction in any action by Landlord based on or in connection with this Guaranty.

22.    **No Waiver**.  No waiver or modification of any provision of this Guaranty nor any termination of this Guaranty shall be effective unless expressly stated in writing and signed by Landlord, and then only to the extent so expressly stated, and no such waiver shall be applicable to any circumstance other than the specific instance for which it is given.  In no event shall a waiver of any provision of this Guaranty be implied from any course of conduct on the part of Guarantor and/or Landlord and/or any third party.

23.    **Representations and Warranties of Guarantor**.  Guarantor represents and warrants to the Landlord that:

A.    Guarantor: (i) is duly organized, validly existing and in good standing under the laws of Japan, (ii) has the corporate or company power, authority and legal right to conduct the business in which it is currently engaged, and (iii) is duly qualified as a foreign entity and in good standing under the laws of each jurisdiction where the conduct of its business requires such qualification and where the failure to so qualify would have a material adverse effect upon its business.

B.    Guarantor has the power, authority and legal right to make, deliver and perform this Guaranty and has taken all necessary action to authorize the execution, delivery and performance of this Guaranty.  No consent of any other person (including, without limitation, stockholders, members, partners and creditors of Guarantor), and no authorization of, notice to, or other act by or in respect of Guarantor by or with any governmental authority, agency or instrumentality is required in connection with the execution, delivery, performance, validity or enforceability of this Guaranty that has not already been taken or obtained.  This Guaranty has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms.

C.    The execution, delivery and performance by Guarantor of this Guaranty will not violate any provision of any existing law or regulation applicable to Guarantor or of any award, order or decree applicable to Guarantor of any court, arbitrator or governmental authority, or of any security issued by Guarantor or of any mortgage, indenture, lease, contract or other agreement or undertaking to which Guarantor is a party or by which Guarantor or any of its properties or assets is bound.

D.    Guarantor's financial statements, which have heretofor been made available, are true and correct and fairly present the financial condition of Guarantor for the period covered thereby.  Since the date of said financial statements, there has been no material adverse change in Guarantor's financial condition, Guarantor has no knowledge of any material liabilities, contingent or otherwise, as of the date of said financial statements which are not reflected in said financial statements; and, other than in the ordinary course of its business, Guarantor has not entered into any commitments or contracts which are not reflected in said financial statements or which may have a materially adverse effect upon its financial condition, operations or business as now conducted.

105

E.     The execution and delivery of this Guaranty will not: (i) render Guarantor insolvent under GAAP or render it Insolvent (as defined below); (ii) leave Guarantor with remaining assets which constitute unreasonably small capital given the nature of Guarantor's business; or, (iii) result in the incurrence of Debts (as defined below) beyond Guarantor's ability to pay them when and as they mature.  For the purposes of this Paragraph 23.E: (i) "**Insolvent**" means that the present fair salable value of assets is less than the amount that will be required to pay the probable liability on existing Debts as they become absolute and matured; and, (ii) "**Debts**" includes any legal liability for indebtedness, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.

F.     Guarantor has derived or expects to derive a financial or other benefit or advantage from the Lease (by reason of, among other things, Guarantor's direct or indirect interest in Tenant).

G.     Guarantor has full and complete access to the financial records of Tenant and has fully satisfied itself with regard to those records prior to entering into this Guaranty.

H.     Landlord has received the following documents:

(i)     An official certificate of seal of the representative of Guarantor who affixes his/her name and seal to this Guaranty (issued within one month prior to the date of this Guaranty and valid as of the date of execution of this Guaranty);

(ii)     A certified copy of the approval of the board of directors of Guarantor approving this Guaranty in accordance with its terms;

(iii)     A certified copy of the commercial registration of Guarantor (issued within one month prior to the date of this Guaranty and valid as of the date of execution of this Guaranty);

(iv)     A certified copy of the articles of incorporation of Guarantor (issued within one month prior to the date of this Guaranty and valid as of the date of execution of this Guaranty); and

(v)     A certified copy of the rules of the board of directors of Guarantor.

24.     **Waiver of Trial by Jury**. BECAUSE DISPUTES ARISING IN CONNECTION WITH COMMERCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT TRIER OF FACT AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAW TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. EACH OF THE PARTIES HERETO SPECIFICALLY WAIVES SUCH PARTY'S RIGHT TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, CROSS-CLAIM, COUNTERCLAIM, THIRD PARTY CLAIM OR ANY OTHER CLAIM (COLLECTIVELY "**CLAIMS**") ASSERTED BY LANDLORD AGAINST TENANT OR GUARANTOR, OR BY TENANT OR GUARANTOR AGAINST LANDLORD, LANDLORD'S WAIVER HEREUNDER BEING EVIDENCED BY ITS ACCEPTANCE OF THIS GUARANTY. THIS WAIVER EXTENDS TO ALL SUCH CLAIMS, INCLUDING, WITHOUT LIMITATION, CLAIMS WHICH INVOLVE PERSONS OR ENTITIES OTHER THAN LANDLORD, TENANT, AND GUARANTOR, CLAIMS WHICH ARISE OUT OF OR ARE IN ANY WAY CONNECTED TO THE RELATIONSHIP BETWEEN LANDLORD AND TENANT OR GUARANTOR; AND ANY



106

CLAIMS FOR DAMAGES, BREACH OF CONTRACT ARISING OUT OF THE GUARANTEED OBLIGATIONS OR THIS GUARANTY, SPECIFIC PERFORMANCE, OR ANY EQUITABLE OR LEGAL RELIEF OF ANY KIND. WITH REFERENCE TO THE FOREGOING WAIVER, GUARANTOR ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION THEREFOR AND THAT SUCH WAIVER BY GUARANTOR IS A MATERIAL INDUCEMENT FOR LANDLORD ENTERING INTO THE TRANSACTIONS COVERED BY THE LEASE AND THIS GUARANTY. IN THE EVENT THAT THE WAIVER SET FORTH IN THIS PARAGRAPH 24 IS HELD NOT TO BE EFFECTIVE, WHETHER BECAUSE IT WAS EXECUTED PRIOR TO THE COMMENCEMENT OF LITIGATION OR FOR ANY OTHER REASON, THEN, UPON WRITTEN REQUEST FROM LANDLORD, GUARANTOR SHALL EXECUTE SUCH OTHER AND FURTHER DOCUMENTS OR INSTRUMENTS AS MAY BE REQUIRED IN THE CIRCUMSTANCES TO ACCOMPLISH THE SAME WAIVERS AS THOSE SET FORTH IN THIS PARAGRAPH 24, AND GUARANTOR HEREBY FURTHER AGREES THAT SUCH OBLIGATION SHALL BE SPECIFICALLY ENFORCEABLE.

25.     **Jurisdiction, Venue and Choice of Law**.  Because, among other things, the Lease pertains to property located in the State of California and because the Lease is to be performed in the State of California, Guarantor and Landlord agree that this Guaranty and all rights, obligations and liabilities arising hereunder shall be construed according to the laws of the State of California, including, without limitation, the laws of the State of California regarding remedies for the breach of the obligations of Guarantor under this Guaranty, all without giving effect to any conflict of law principles applicable under the laws of the State of California. Guarantor hereby expressly consents to the exercise of personal jurisdiction by the courts of the State of California over Guarantor, and hereby agrees that any action to enforce the provisions of this Guaranty may be brought in the Superior or Municipal Courts in and for the County of San Francisco, or in any other court which may lawfully exercise jurisdiction over Guarantor and such action.

26.     **Attorney Fees**.

A.     In the event Landlord retains counsel with respect to the rights of Landlord under this Guaranty, including, without limitation, in connection with any bankruptcy or other insolvency proceedings of Guarantor or Tenant, Guarantor shall reimburse Landlord upon demand for the reasonable amount of all attorney fees and other professional fees incurred by Landlord in connection therewith.

B.     In the event of any litigation between Landlord and Guarantor seeking a declaration of rights hereunder, damages for breach or any other remedy pertaining to this Guaranty, the prevailing party shall recover its reasonable attorneys' fees and court costs, including, without limitation, all such fees and costs incurred through any appeal. "**Prevailing party**" for purposes of this Paragraph 26.B shall mean a party who dismisses an action for recovery hereunder in exchange for payment of the sums allegedly due, performance of covenants allegedly breached or consideration substantially equal to the relief sought in the action.

27.     **Sublessees and Other Occupants**.  For purposes of this Guaranty and the obligations and liabilities of Guarantor hereunder, the term "Tenant" shall include any and all concessionaires, licensees, franchisees, department operators, assignees, subtenants or others directly or indirectly leasing or occupying the Leased Premises or operating or conducting a business in or from the Leased Premises.



- 10 -

107

## EXHIBIT "J"

## HISTORICAL INFORMATION

RESOLUTION NO. 22699

A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF
PALM SPRINGS, CALIFORNIA, DESIGNATING SPECIFIC
PORTIONS OF 101-121 SOUTH PALM CANYON DRIVE,
THE OASIS COMMERCIAL BUILDING, A CLASS 1
HISTORIC SITE.

WHEREAS, Chapter 8.05 of the Palm Springs Municipal Code allows for the designation of historic sites; and

WHEREAS, on January 8, 2007, the Historic Site Preservation Board (Board) filed an application for Historic Site Designation of the Oasis Commercial Building; and

WHEREAS, notice of a public hearing of the Board of the City of Palm Springs to consider designation of the Oasis Commercial Building as a Class 1 historic site was issued in accordance with applicable law; and

WHEREAS, on July 10, 2007 and August 21, 2007, the Board conducted a public hearing in accordance with applicable law, following which hearing the Board adopted a recommendation to the City Council that the Oasis Commercial Building be designated a Class 1 Historic Site; and

WHEREAS, on July 22, 2009, the City Council conducted a public hearing, following notification in the manner prescribed by law, at which hearing the Council received a staff report, associated exhibits and historical research, and written and oral testimony; and

WHEREAS, following closure of the public hearing on July 22, 2009 the City Council continued the matter to September 2, then to October 7 and November 4, 2009 at which meetings the Council reviewed and considered all of the evidence in connection with the proposed designation, including but not limited to the staff report, application and historical research, and all written and oral testimony presented.

THE CITY COUNCIL OF THE CITY OF PALM SPRINGS DOES HEREBY RESOLVE AS FOLLOWS:

SECTION 1. That the proposed designation is Categorically Exempt from environmental review, in accordance with Section 15331 (Historical Resources Restoration/Rehabilitation) of the California Environmental Quality Act (CEQA), as the proposed designation meets the conditions outlined for preservation of a historic resource.

SECTION 2. That the proposed designation conforms to the criteria for Class 1 historic designation, as contained in Section 8.05.020.a of the Palm Springs Municipal Code, as follows:



Resolution No. 22699
Page 2

Criterion 1:  That the property is associated with lives of persons who made meaningful contribution to national, state or local history as follows:
Milton F. Kreis was an active merchant and business man, owning and/or operating five drug stores or restaurants along Palm Canyon Drive, in Los Angeles, San Francisco and in other cities.  He was active in civic affairs and chaired the city's Parking and Traffic Commission.  His MFK Drug Store was the anchor retail space in the Oasis Commercial Building and in its day, the store was referred to as a "Palm Springs Landmark."

Criterion 2:  That the property reflects or exemplifies a particular period of the national, state or local history as follows:
The Oasis Commercial Building is an outstanding example of the bold modern architecture that became a trademark of Palm Springs from the 1940's through the 1960's.  The optimism and "confidence in the future" that was prevalent in the United States during the post-war period was enthusiastically expressed in commercial and residential architecture in Palm Springs.  The Oasis Commercial Buildings is one of a number of buildings in Palm Springs where the Modern architectural movement can be seen.  Because of this, the Oasis Commercial Building exemplifies the post-war period in Palm Springs and nation-wide.

Criterion 3:  That the property embodies the distinctive characteristics of a type, period or method of construction:
The Oasis Commercial Building is an outstanding example of using a light steel frame construction system to free the design from the heavy "grounded" appearance of more traditional load-bearing wall construction.  The thin free-standing columns supporting the solid mass of the second floor give the building a dramatic and unusual appearance when compared to the heavier revival style masonry buildings nearby.  The integration of maintenance-free and technologically-advanced materials such as the "free-standing" stainless steel door frames, mill-finished anodized aluminum railings and panels, and the use of very large, butt-glazed "frameless" glass panels all reflect a refinement and quality of construction that was uncommon for its age and even rare by current standards of most retail and commercial buildings. These construction methods and technologies allowed the architect to create a powerful example of International Style Modernism and make the Oasis Commercial Building a distinctive and very important building in Palm Springs.

Criterion 4:  That the property represents the work of a master builder...or architect whose individual genius influenced his age; or that possesses high artistic value:
E. Stewart Williams was a master architect, and has been recognized for greatness in his field.  Upon his death, an editorial in "The Desert Sun" stated: "If any single man can be cited for giving Palm Springs its place in architectural history, it's E. Stewart Williams."    Williams' Oasis Commercial Building possesses high artistic value as expressed in its design, proportions, details and



110/u

Resolution No. 22699
Page 3

engineering.  The Oasis Commercial Building is among the finest examples of E. Stewart Williams' mastery as an architect and designer.

SECTION 3. That those portions of the Oasis Commercial Building identified herein at 101-121 South Palm Canyon Drive, Palm Springs, California are hereby designated a Historic Site, Class One subject to the conditions below:

1. No modifications to the following Class One portions of the building may be allowed, except by the HSPB in accordance with Palm Springs Municipal Code 8.05.180 et seq:
   a. The upper story, defined by the lower edge of the first level exterior soffit,
   b. The window cases on the south and west elevations,
   c. The staircase on the rear (west) elevation, and
   d. The columns supporting the second store fronting S. Palm Canyon Drive.

2. The display cases on the north and east elevations and the original door handles may be removed, but shall be securely stored and protected for future re-use. Re-use of these materials shall be in the same or nearly the same location as originally installed.  Re-use of these materials in other locations on site or removal from the site shall be reviewed by the HSPB through a Certificate of Approval.

3. Within 45 days of approval of this designation and prior to issuance of any building permits, the property owner shall submit a proposed sign program for review and recommendation by the HSPB and the AAC, and approval by the Planning Commission.  No signs shall be permitted except in conformance with the approved sign program.

4. The property owner may permit the City to place a historic marker on the Oasis Commercial Building of the City's choosing.

5. All future exterior modifications including but not limited to building, site, landscaping, lighting, walls, and fences shall require Architectural Approval pursuant to Section 94.04.00 of the Palm Springs Zoning Ordinance and HSPB review pursuant Municipal Code Ordinance 8.05.180.

6. No permit shall be issued for the alteration of any and all of the defining elements and characteristics without prior approval by the Historic Site Preservation Board.

7. That the City Clerk shall submit the Council Resolution to the County recorder for recordation within 90 days of the effective date of this resolution.

8. Any alterations or modifications to the exterior approved prior to the designation of this site by the City Council shall be deemed acceptable.

112/v

Resolution No. 22699
Page 4

ADOPTED THIS 21ST DAY OF APRIL, 2010.

ADOPTED THIS 21ST DAY OF APRIL, 2010.

David H. Ready, City Manager

ATTEST:

James Thompson, City Clerk

## CERTIFICATION

STATE OF CALIFORNIA    )
COUNTY OF RIVERSIDE )        ss.
CITY OF PALM SPRINGS )

I, JAMES THOMPSON, City Clerk of the City of Palm Springs, hereby certify that
Resolution No. 22699 is a full, true and correct copy, and was duly adopted at a regular
meeting of the City Council of the City of Palm Springs on the 21st day of April, 2010, by
the following vote:

AYES:        Councilmember Mills, Councilmember Weigel, and Mayor Pro Tem
             Hutcheson.
NOES:        None.
ABSENT:      Councilmember Foat, and Mayor Pougnet.
ABSTAIN:     None.

James Thompson, City Clerk
City of Palm Springs, California    05/17/2010

DOC # 2004-0099263
02/11/2004 08:00A Fee:37.00
Page 1 of 11
Recorded in Official Records
County of Riverside
Gary L. Orso
Assessor, County Clerk & Recorder

RECORDING REQUESTED BY AND
AFTER RECORDING, RETURN TO:

Oasis Plaza, LLC c/o Hill Walker, Attorneys at Law
1111 Tahquitz Canyon Way, Suite 117
Palm Springs CA 92262

| M | S | U | PAGE | SIZE | DA | PCOR | NOCOR | SMF | MISC |
|---|---|---|---|---|---|---|---|---|---|
| A | R | L | | | | COPY | LONG | REFUND | NCHG | EXAM |

Documentary Transfer Tax:
$0.00 (No Consideration)

**C**
**TC**

### PRESERVATION AGREEMENT

(This Document Creates Obligations and Duties That Run
With The Land)

This Preservation Agreement ("Agreement") is made on the 6th day of February, 2004 by
VERBENA EQUITY EXCHANGE, INC., a California corporation, as to an undivided 90% interest, and
STEVEN D. LYLE AND KATHRYN S. LYLE AS COMMUNITY PROPERTY, as to an undivided
10% interest, as Tenants in Common (collectively, "**Owner**") and OASIS PLAZA, LLC, a California
limited liability company ("**Oasis**"), with reference to the following recitals:

### Recitals

A.    Owner is the owner of, or is about to acquire from Oasis, certain real property located in
the City of Palm Springs, County of Riverside, State of California, commonly known as the Oasis Plaza
and Hotel situated at 101 - 139 South Palm Canyon Drive and 177 West Tahquitz Canyon Way, Palm
Springs CA 92262, as more particularly described on **Exhibit "A"** attached hereto, together with all
improvements thereon and appurtenances thereto ("**Property**").

B.    As a condition to the sale of the Property, the parties have agreed that Owner and all future
owners of the Property will observe and maintain certain covenants and restrictions pertaining to the
bronze Historical Society (H.S.P.B.-10) plaque that designates the Property as an historic building, the
automated bells on the Property, and the South African shade tree in the center courtyard and the stone
plaque at the base of that tree. All references in this Agreement to the "Owner" shall mean VERBENA
EQUITY EXCHANGE, INC., a California corporation, as to an undivided 90% interest, and STEVEN
D. LYLE AND KATHRYN S. LYLE AS COMMUNITY PROPERTY, as to an undivided 10% interest,
as Tenants in Common, and all its/their successors and assigns.

Page -1-

INSTRUMENT DELIVERED TO RECORDER BY OLD
REPUBLIC TITLE COMPANY AS AN ACCOMMODATION
ONLY IT HAS NOT BEEN EXAMINED FOR REGULARITY,
SUFFICIENCY, OR AS TO ITS EFFECT UPON THE
TITLE TO THE PROPERTY HEREIN DESCRIBED.

NOW, THEREFORE, the parties hereto declare, covenant and agree, by and for themselves, their successors and assigns, and all persons claiming under or through them, that the Property shall be held, transferred, encumbered, used, sold, conveyed, leased and occupied subject to the covenants, conditions and restrictions hereinafter set forth, which are made for the direct benefit of the Property.

1.    **Preservation and Maintenance of Bronze Historical Society Plaque.**  Unless destroyed by an act of God or other cause beyond the control of Owner, during the fifty (50)-year period after the date this Agreement is recorded ("**Recording Date**"), at all times other than when there are active construction activities occurring on the Property, the bronze Historical Society (H.S.P.B.-10) plaque designating the Property as an historic building ("**Historical Plaque**") shall continue to be attached to the Property in a location that is visible to the public and shall be maintained (and replaced, if necessary) in good condition.

2.    **Playing of Bells.**  During the fifty (50)-year period after the Recording Date, the automated bells presently on the Property ("**Automated Bells**") will remain on the Property and will continue to be played on a regular basis (provided that it complies with applicable ordinances and other laws).

3.    **Preservation of South African Shade Tree.**  During the fifty (50)-year period after the Recording Date, Owner shall maintain in good condition the South African shade tree in the center courtyard and the stone plaque at the base of the tree ("**Shade Tree and Stone Plaque**").

4.    **Possible Future Relocation of Preserved Items.**  Owner shall have the right to relocate the Historical Plaque and/or the Automated Bells to a location within the Property that is visible to the public if reasonably necessary to effect Owner's re-development of the Property.  Owner shall have the right to relocate the Shade Tree and Stone Plaque to a location within the Property or to the Palm Springs Mausoleum or some other location that is reasonably acceptable to Bernadette K. Cohen (who is the current manager of Oasis, and can be contacted in care of Hill Walker, Attorneys at Law, 1111 Tahquitz Canyon Way, Suite 117, Palm Springs CA 92262, phone 760-864-9800).  If Bernadette K. Cohen is unavailable or cannot be located, then the re-location shall be reasonably acceptable to The Honorable Robert Donfeld (3851 North Avenida La Vallita, Tucson AZ 85750, phone 520-721-3119) and if The Honorable Robert Donfeld is not available or cannot be located, then the re-location shall be reasonably acceptable to to Sharyl Walker, Esq. (1111 Tahquitz Canyon Way, Suite 117, Palm Springs CA 92262, phone 760-864-9800).

5.    **Remedies if Default by Owner.**  The failure by Owner to satisfy any of the terms, conditions or covenants of this Agreement shall not cause a reversion of title to the Property to Oasis or to Oasis's assigns or successors in interest, and Oasis's (or Oasis's assigns and successors-in-interest) remedies shall be limited to an action for damages or specific performance.

Page -2-

6.    **Covenants to Run With the Land.**  All of the terms, provisions, rights, powers, conditions, covenants and restrictions contained herein shall be binding upon all owners, tenants, occupants and users of the Property or any portion thereof (individually and collectively) and their respective successors-in-interest, heirs, assignees, devisees, trustees, administrators, lessees and all other persons or entities who may acquire any interest in any portion of the Property, whether by operation of law or in any other manner whatsoever, and shall inure to the benefit of the Property as well as to Oasis and its successors-in-interest, heirs, assignees, devisees, trustees and administrators.

All of the provisions of this instrument shall be enforceable as equitable servitudes, and constitute covenants running with the land pursuant to applicable law, including but not limited to Section 1468 of the Civil Code of the State of California.

The parties hereto declare that the Property shall be held, sold, conveyed, encumbered, hypothecated, leased, used, occupied and improved subject to the terms and provisions of this instrument and the covenants, conditions and restrictions contained herein.

7.    **General.**

7.1.    **Integration.**  All Recital paragraphs and all Exhibits to this instrument shall be and are hereby made a part of this instrument.  This instrument (including all Recitals herein, Exhibits hereto, and documents incorporated herein by reference) contains the entire agreement between the parties relating to the subject matter of this instrument and supersedes all prior or contemporaneous oral or written agreements, except the terms of the Grant Deed executed by Oasis conveying the Property.  Any oral representations or modifications concerning this instrument shall be of no force and effect excepting a subsequent modification in writing signed by each party.

7.2.    **Governing Law.**  This instrument, and the rights and obligations of the parties hereunder, shall be interpreted and enforced in accordance with the laws of the State of California.

7.3.    **Severability.**  In the event that any provision of this instrument shall be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect in any respect whatsoever the validity or enforceability of the remainder of this instrument.

7.4.    **Enforcement.**  The terms and provisions of this instrument may be enforced by specific performance, injunction, and all other remedies available under applicable law (except for reversion of the Property to Oasis or its successors), and the enforcing party, if it prevails, shall be awarded all of its legal costs and attorneys' fees incurred in any enforcement action.

7.5.    **Counterparts.**  This instrument may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

Page -3-

EXECUTED on the first date herein above written.

Owner:
**VERBENA EQUITY EXCHANGE, INC.,**
corporation (as to an undivided 90% interest)

By: _____
A. Duncan King, President


STEVEN D. LYLE AND KATHRYN S.
COMMUNITY PROPERTY (as to an undivided

_____
**STEVEN D. LYLE**


_____
**KATHRYN S. LYLE**

Oasis:
**OASIS PLAZA, LLC,** a California limited liabilit


By: _____
Bernadette K. Cohen, Manager


Page -4-

EXECUTED on the first date herein above written.

*Owner:*

**VERBENA EQUITY EXCHANGE, INC., a** California
corporation (as to an undivided 90% interest)

By:_____
      A. Duncan King, President

STEVEN D. LYLE AND KATHRYN S. LYLE AS
COMMUNITY PROPERTY (as to an undivided 10% interest)

_____
STEVEN D. LYLE

_____
KATHRYN S. LYLE

*Oasis:*

**OASIS PLAZA, LLC, a** California limited liability company

By:_____
      Bernadette K. Cohen, Manager

Page -4-

STATE OF CALIFORNIA )
)ss.
COUNTY OF *Santa Clara* )

On *February 6, 2004* before me, *Linda F. Vegas*, a notary public, personally appeared A. DUNCAN KING, known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the persons or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature *Linda F. Vegas*

> LINDA F. VEGAS
> Commission # 1384371
> Notary Public - California
> Santa Clara County
> My Comm. Expires Dec 9, 2006

STATE OF CALIFORNIA )
)ss.
COUNTY OF RIVERSIDE )

On_____, before me_____, a notary public, personally appeared STEVEN D. LYLE, known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the persons or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

Page -5-

Government Code 27361.7

I certify under penalty of perjury that the Notary Seal on the document to which this statement is
attached, reads as follows:

Name of Notary: _____ Linda F. Vegas

Vendor No.: _____ NNA1

Commission No.: _____ 1384371

Date Commission Expires: _____ 12-9-06

County: _____ Santa Clara

Place of Execution: _____ Santa Clara

By Old Republic Title Company: _____ Susan Maloney

Date: _____ 2-11-04

*6 3*

STATE OF CALIFORNIA            )
                               )ss.
COUNTY OF _____             )

On_____, before me,_____, a notary
public, personally appeared A. DUNCAN KING, known to me (or proved to me on the basis of satisfactory
evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that
he executed the same in his authorized capacity, and that by his signature on the instrument the persons or
the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

STATE OF CALIFORNIA            )
                               )ss.
COUNTY OF RIVERSIDE            )

On 2/9/04 , before me, JARomero , a notary
public, personally appeared STEVEN D. LYLE, known to me (or proved to me on the basis of satisfactory
evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that
he executed the same in his authorized capacity, and that by his signature on the instrument the persons or
the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature JaRomero

> J. A. ROMERO
> Commission # 1320365
> Notary Public - California
> Riverside County
> My Comm. Expires Sep 8, 2008

Page -5-

STATE OF CALIFORNIA            )
                               )ss.
COUNTY OF RIVERSIDE            )

On _2/9/04_____, before me,___JARomero_____, a notary
public, personally appeared KATHRYN S. LYLE, known to me (or proved to me on the basis of satisfactory
evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that
she executed the same in her authorized capacity, and that by her signature on the instrument the persons or
the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____JaRomero_____

J. A. ROMERO
Commission # 1320365
Notary Public - California
Riverside County
My Comm. Expires Sep 8, 2005

STATE OF CALIFORNIA            )
                               )ss.
COUNTY OF RIVERSIDE            )

On _2/9/04_____, before me,___JARomero_____, a notary
public, personally appeared BERNADETTE K. COHEN, known to me (or proved to me on the basis of
satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged
to me that she executed the same in her authorized capacity, and that by her signature on the instrument the
persons or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____JaRomero_____

J. A. ROMERO
Commission # 1320365
Notary Public - California
Riverside County
My C:    Expires Sep 8, 2005

Page -6-

Government Code 27361.7

I certify under penalty of perjury that the Notary Seal on the document to which this statement is
attached, reads as follows:

Name of Notary: _____ J.A. Romero _____

Vendor No.: _____ NNAI _____

Commission No.: _____ 1320365 _____

Date Commission Expires: _____ 9-8-05 _____

County: _____ Riverside _____

Place of Execution: _____ Riverside _____

By Old Republic Title Company: _____ Susan Maloney _____

Date: _____ 2-11-04 _____

66

## EXHIBIT "A"

### Legal Description of Property

LOTS 1 THROUGH 12, INCLUSIVE, AND LOT 37, IN BLOCK 20 OF MAPS OF PALM SPRINGS, IN THE CITY OF PALM SPRINGS, COUNTY OF RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY MAP ON FILE IN BOOK 9, PAGE 424 OF MAPS, SAN DIEGO COUNTY RECORDS,

TOGETHER WITH THE EAST 16 FEET OF PALM AVENUE (NOW BELARDO ROAD) ADJOINING SAID LOTS 1 AND 37, ON THE WEST, AS SHOWN BY SAID MAP.

## EXHIBIT "K"

## NON-DISCLOSURE AGREEMENT

# MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Confidentiality Agreement (this "Agreement") is made and entered into as of October *11*, 2012, by and between Brandenburg-Oasis Plaza, LLC (the "Landlord"), and Ramla USA, Inc. ("Tenant").

In consideration of the mutual promises exchanged herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that the following terms and conditions shall apply when one of the parties (the "Discloser") discloses "Confidential Information" to the other (the "Recipient") in connection with or during the course of their business negotiations and dealings:

1. **DEFINITION OF "CONFIDENTIAL INFORMATION".** As used in this Agreement, the term "Confidential Information" means all information relating to or used in the Discloser's business, namely business plans and analyses, financial information and projections, information about marketing and sales, products or pricing, and any information supplied to the Discloser by a third-party and marked "confidential" or "proprietary." The foregoing notwithstanding, the term "Confidential Information" does not include and neither party shall have any obligation of confidentiality with respect to information that

   a) was publicly available at the time it was disclosed to the Recipient or which, through no act or omission of the Recipient, becomes publicly available before the Recipient discloses it to a third-party;

   b) the Recipient already rightfully possessed, without obligation of confidentiality, before the Discloser disclosed it to the Recipient;

   c) the Recipient rightfully receives without obligation of confidentiality from any unrelated third-party; or

   d) the Recipient develops independently without reliance upon or use of the Confidential Information.

2. **OBLIGATION OF CONFIDENTIALITY.** The Recipient shall not disclose Confidential Information to any of its contractors or agents or to any third-party buyer or lender without the Discloser's written consent, which consent shall not be unreasonably withheld, except that the Recipient may disclose such information to its officers, directors, employees, contractors, agents, buyer or lender:

   a) whose duties justify their need to know such Confidential Information;
   b) who have been clearly informed of their obligation to maintain the confidential status of such Confidential Information; and
   c) in the case of those who are not officers, directors or employees of the Recipient, who have signed a non-disclosure agreement containing restrictions, terms and conditions that are at least as restrictive as those set forth herein.

The foregoing notwithstanding, the Recipient may disclose Confidential Information to the extent required by applicable federal, state or local law, regulation, court order, or other legal process, provided the Recipient has given the Discloser prior written notice of such required disclosure, unless prohibited by law or regulation, and, to the extent reasonably possible, has given the Discloser an opportunity to contest such required disclosure at the Discloser's expense.

3. **PROTECTION OF CONFIDENTIAL INFORMATION.** The Recipient shall use the same care to prevent disclosure of the Discloser's Confidential Information as the Recipient uses with respect to its own Confidential Information of a similar nature, which shall not in any case be less than the care a reasonable business person would use under similar circumstances.

4. **PERMITTED USE OF CONFIDENTIAL INFORMATION.** The Recipient may only use Confidential Information for the purposes for which it was originally disclosed and only as expressly permitted by the terms and conditions of this Agreement.

5. **RETURN OF CONFIDENTIAL INFORMATION.** Upon the written request of the Discloser, the Recipient shall cease using and promptly return to the Discloser all copies of any Confidential Information then in the Recipient's possession or under the Recipient's control. Upon the written request of the Discloser, the Recipient shall certify in writing that the Recipient has complied with the obligations set forth in this paragraph.

6. **CONFIDENTIALITY PERIOD.** Confidential Information disclosed pursuant to this Agreement shall continue to be subject to the terms of this Agreement for the term hereof and thereafter (the "Confidentiality Period") following its disclosure to the Recipient.

7. **OWNERSHIP OF CONFIDENTIAL INFORMATION.** Each party shall retain all right, title and interest in and to its own Confidential Information. Neither this Agreement nor any disclosure of Confidential Information shall be deemed to grant the Recipient any license or other intellectual property right.

8. **DISCLAIMERS.** The Discloser provides Confidential Information disclosed hereunder and on a basis consistent with that provided for under Paragraph 49(b) of the Lease between RAMLA USA, INC., and BRANDENBURG-OASIS PLAZA LLC dated *10.11.12*. The Discloser represents and warrants that such Confidential Information is accurate, complete and correct. The disclosure of Confidential Information containing business plans is for planning purposes only. The Discloser may change or cancel its plans at any time at the Discloser's sole discretion.

9. **INJUNCTIVE RELIEF.** Each party acknowledges that the Confidential Information of the other constitutes the valuable trade secrets of that party and that any use or disclosure by the Recipient of such Confidential Information in a manner not authorized by this Agreement would cause irreparable harm to the Discloser that could not be fully remedied by monetary damages. Each party therefore agrees that the other party may specifically enforce this Agreement and shall be entitled, in addition to any other remedies available to it at law or in equity, to such injunctive or other equitable relief as may be necessary or appropriate to prevent such unauthorized use or disclosure without the necessity of proving actual or irreparable damage by reason of any such unauthorized use or disclosure.

10. **GENERAL.** No amendment to this Agreement shall be binding upon the parties unless it is in writing and executed by both parties. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and lawful assigns. The laws of the State of California shall govern this Agreement. The failure of either party at any time to require performance of any provision of this Agreement or to exercise any right provided for herein shall not be deemed a waiver of such provision or such right. All waivers must be in writing. Unless the written waiver contains an express statement to the contrary, no waiver by either party of any breach of any provision of this Agreement or of any right provided for herein shall be construed as a waiver of any continuing or succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right under this Agreement. All remedies provided for in this Agreement shall be cumulative and in addition to and not in lieu of any other remedies available to either party at law, in equity or otherwise. This Agreement contains the entire understanding and agreement between the parties with respect to the subject matter hereof and supersedes all previous communications, negotiations and agreements, whether oral or written, between the parties with respect to such subject matter.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

By: *Eric Brandenburg*
Brandenburg-Oasis Plaza, LLC
Name: *ERIC BRANDENBURG*
Title: *MANAGER*

By: _____
Ramla USA, Inc.
Name: *YUJI UENO*
Title: *CEO*

**ADDENDUM NO. 1**
**TO**
**LEASE AGREEMENT**

**Option to Extend**

THIS ADDENDUM TO LEASE AGREEMENT ("Addendum") is attached to and made a part of that certain Lease between BRANDENBURG-OASIS PLAZA, LLC, a California limited liability company ("Landlord"), and RAMLA USA, Inc., a California Corporation ("Tenant"), which is dated _10.11.12_ ("Lease"). Landlord and Tenant desire to modify the Lease in the following particulars only. As such, Landlord and Tenant hereby agree that the following shall be included as part of said Lease:

1.    GRANT OF OPTION(S). Tenant is hereby granted six (6) option(s) to extend the term of this Lease (each an "Extension Term") upon all of the provisions contained in the Lease, except for Minimum Rent, for a period of five (5) years per option. Such options shall be exercised, if at all, by Tenant giving written notice to Landlord of the exercise of each of such options ("Option Notice") at least two hundred seventy (270) days but not more than three hundred sixty (360) days before the expiration of the initial Term or previously exercised extension period (if any), as the case may be. Tenant cannot exercise more than one option at a time, and Tenant can only exercise the option for the extension period arising immediately following the end of the existing Term. The Option Notice shall, upon delivery to Landlord, be irrevocable and shall bind Tenant to the Extension Term. Reference to the "Term" of the Lease as used in the Lease shall include all Extension Term(s) for which options to extend are exercised in accordance herewith. Tenant shall have no other right to extend the Term except as set forth in this Addendum. Time is of the essence in this Addendum. The failure of Tenant to deliver to Landlord the Option Notice within such time period shall cause the option to extend and all subsequent option(s) to extend, if any, to be cancelled, void and of no further force or effect, regardless of the reason for Tenant's failure to deliver the Option Notice to Landlord (including, without limitation, inadvertence, discussions or negotiations with Landlord pertaining to the Minimum Rent or other terms of the Lease during the Extension Term, or otherwise).

2.    MINIMUM RENT DURING EXTENSION PERIOD(S). In the event Tenant exercises its option(s) to extend the Term of the Lease, then the Minimum Rent for each year within each Extension Term shall increase by three percent (3%) from the immediately preceding year. (For example, if Tenant exercises its first of six five year options to extend the Term of the Lease and Minimum Rent in the final year of the base Term was $205,944 [payable as $17,162 monthly], then the Minimum Rent will increase by three percent (3%)

126

each year during the five year extension payable in monthly installments. So, Minimum Rent during year one of the first Extension Term would equal $212,122.00, payable in monthly installments of $17,677.00. Year two Minimum Rent of the Extension Term would increase by three percent (3%) over the immediately preceding year to $218,566.00 payable in monthly installments of $18,214.00 and so on). Equally, in the event that Tenant exercises its second of six five year options to extend the Term of the Lease, the then Minimum Rent will increase by three percent (3%) each year over the preceding year so that the increases are cumulative over each and every year during any and all of the Extension Term(s).

3.    OPTIONS. Each option granted to Tenant in this Lease may be assigned pursuant to and in accordance with Paragraph 39 of the Lease entitled "Assignment and Subletting". In any event, the option(s) herein granted to the original Tenant are not assignable separate and apart from the Lease.

4.    MULTIPLE OPTIONS. In the event that Tenant has multiple options to extend the Term of the Lease, a later option cannot be exercised unless the prior option to extend has been so exercised.

5.    EFFECT OF DEFAULT ON OPTIONS.

(a)    Tenant shall have no right to exercise any option, notwithstanding any provision herein to the contrary, (i) during the time commencing from the date Tenant is in breach or default of the Lease (without any necessity for notice thereof to Tenant) and continuing until the default is cured, (ii) during the period of time commencing on the date after a monetary obligation to Landlord is due from Tenant and unpaid (without any necessity for notice thereof to Tenant) and continuing until the obligation is paid, or (iii) in the event that Landlord has given to Tenant three or more notices of default under Section 43 of the Lease, during the twelve (12) month period prior to the time that Tenant exercises the subject option(s), whether or not such defaults are cured.

(b)    The period of time within which an option may be exercised shall not be extended or enlarged by reason of Tenant's inability to exercise an option because of the provisions of this Section 5.

(c)    All rights of Tenant under the provisions of an option shall terminate and be of no further force or effect, notwithstanding Tenant's due and timely exercise of the option, if, after such exercise, (i) Tenant fails to pay to Landlord a monetary obligation of Tenant for a period of thirty (30) days after such obligation becomes due (without any necessity for notice thereof to Tenant), (ii) Tenant fails to commence to cure a default specified in Section 43 of the Lease within 10 days after the date that Landlord gives notice to Tenant of such default and/or Tenant fails thereafter to diligently prosecute said cure to

127

completion, or (iii) Landlord gives to Tenant three or more notices of default under Section 43 of the Lease whether or not the defaults are cured.

7.     MISCELLANEOUS.  All terms used herein shall have the same meanings as used in the Lease.  In the event of a conflict between the terms of the Lease and those of this Addendum, the terms of this Addendum will control. Except as hereinabove provided, said Lease shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum, as of the date of the Lease.

LANDLORD
BRANDENBURG-OASIS PLAZA, LLC, a
California limited liability company

By: _____     :

Name: <u>Eric Brandenburg</u>

Title:  <u>Manager</u>


TENANT
RAMLA USA, INC, a California Corporation


By: _____

Name: _____

Title: _____



128

## ADDENDUM NUMBER 2 TO LEASE AGREEMENT

This Addendum Number 2 to Lease Agreement (Addendum No. 2) effective the _____
day of December, 2012, amends, adds to and is incorporated into that Lease Agreement
dated October 11, 2012 (Lease), by and between BRANDENBURG-OASIS PLAZA, LLC, a
California limited liability company (Landlord) and RAMLA USA, INC., a California Corporation
(Tenant) for a portion of the premises located at 105 South Palm Canyon Drive, in the City of
Palm Springs, County of Riverside, State of California.

The Lease is amended as follows:

"68. LIQUOR LICENSE    Landlord has obtained, by order of the United States
Bankruptcy Court for the Central District of California in case no. 6:11-bk-303520WJ,
the right to designate the recipient of the transfer of Liquor License number 455191
("License") (as designated by the California Department of Alcoholic Beverage Control
("ABC") from the Trustee in that bankruptcy case, which License currently applies to a
portion of the Premises.  Landlord wishes to make Tenant the designee to receive
transfer of the License and Tenant wishes to be the designee to receive transfer of the
License.  In consideration for Landlord's immediate designation of Tenant to receive
transfer of the License and Landlord's obtaining the requisite transfer "Sign off" form
executed by the Trustee (ABC form 211A), Tenant is required to pay the sum of
$15,000.00 to Landlord.  Tenant is further required to prepare and execute all other
forms and documents necessary and required by ABC to apply for approval of the
transfer of the License from the Trustee to Tenant for use at the Property.  In the
unlikely event that Tenant is unable to secure approval of ABC for transfer of the
License to Tenant, Tenant shall take all action necessary and within its power to
secure transfer of the License to a different designee of Landlord's choosing.

In the event that Tenant or Landlord elect to terminate the Lease pursuant to

129

their rights under section 69 of the Lease, or should the Lease otherwise be terminated by default under any other term of the Lease, Tenant shall remain the licensee of the License after approval from ABC and shall hold the License for the benefit of Landlord at the Premises until such time as Landlord designates a new and different entity to hold the License at which time Tenant shall prepare and execute all forms necessary to transfer the License to the new and different entity of Landlord's choosing, in consideration of which, Landlord shall return the sum of $15,000.00 to Tenant. After return of said sum, Tenant will have no further claim or right to the License.

Landlord and Tenant shall cooperate and take all timely action necessary to effectuate this section 68 of the Lease. Failure by Tenant or Landlord to diligently execute the obligations stated herein shall, in and of itself, constitute a breach of the Lease. Tenant and Landlord agree and acknowledge that the designation of the License to Tenant and the payment of the sum of $15,000.00 to Landlord constitute sufficient and valuable independent consideration for this section of the Lease."

All other provisions of the Lease remain unchanged and in full force and effect. Nothing in this Addendum No. 2 shall constitute a waiver by Landlord of any other rights Landlord has pursuant to the Lease.

DATED as first set forth above.

LANDLORD:                              TENANT:

| BRANDENBURG-OASIS PLAZA, LLC, | RAMLA USA, INC., |
| a California limited liability company | A California corporation |

By: _____          By: _____
        Eric Brandenburg                        Yuji Ueno

Its:    Manager                         Its:    President and CEO

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**21650 Oxnard Street, Suite 500, Woodland Hills, California 91367.**

A true and correct copy of the foregoing document entitled (*specify*)**: DEBTOR'S MOTION FOR ENTRY OF AN ORDER: (1) AUTHORIZING THE SALE OF THE GYORO GYORO IZAKAYA JAPONAISE LOCATED IN PALM SPRINGS, CALIFORNIA; (2)  APPROVING OVERBID PROCEDURES; (3) FINDING THAT BUYER IS ENTITLED TO A GOOD FAITH DETERMINATION PURSUANT TO 11 U.S.C. § 363(m); AND (4) AUTHORING THE ASSUMPTION  AND ASSIGNMENT OF THE UNEXPIRED NON-RESIDENTIAL REAL PROPERTY LEASE PURSUANT TO 11 U.S.C. § 365 AS PART OF THE SALE; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF YUJI UENO IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On **June 26, 2018,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Douglas D Alani    dalani@alanilaw.com, mmurray@alanilaw.com
- Sara Chenetz    schenetz@perkinscoie.com,
  dlax@perkinscoie.com;cmallahi@perkinscoie.com;etherrien@perkinscoie.com
- Michael W Davis    mdavis@bg.law, ecf@bg.law
- Amir Gamliel    agamliel@perkinscoie.com, cmallahi@perkinscoie.com;DocketLA@perkinscoie.com
- Yale K Kim    ykim@allenmatkins.com, lpanderson@allenmatkins.com
- Ron Maroko    ron.maroko@usdoj.gov
- Sabari Mukherjee    notices@becket-lee.com
- Mary H Rose    mrose@buchalter.com, salarcon@buchalter.com
- Robyn B Sokol    ecf@bg.law, rsokol@bg.law
- Prince Altee Thomas    pthomas@foxrothschild.com
- David A Tilem    davidtilem@tilemlaw.com,
  DavidTilem@ecf.inforuptcy.com;malissamurguia@tilemlaw.com;joanfidelson@tilemlaw.com;JoanFidelson@ecf.inforuptcy.com;MalissaMurguia@ecf.inforuptcy.com;DianaChau@tilemlaw.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Eric R Wilson    kdwbankruptcydepartment@kelleydrye.com, MVicinanza@ecf.inforuptcy.com

☐    Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On **June 26, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒    Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 26, 2018 | NIKOLA A. FIELDS | /s/Nikola A. Fields |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                    **F 9013-3.1.PROOF.SERVICE**

**2. SERVED BY UNITED STATES MAIL**:

Honorable Barry Russell
Edward R. Roybal Federal Building
255 E. Temple Street
Ste 1660 / Ctrm 1668
Los Angeles, CA 90012

<u>Buyers</u>
Salvador Zavala Cortes
32370 Desert Vista Rd.
Cathedral City, CA 92234

Salvador Zavala
68612 Durango Rd.
Cathedral City, CA 92234

Alfredo Orozco Franco
13605 Caliente St.
Desert Hot Springs, CA 92240

<u>Landlord</u>
Brandenburg-Oasis Plaza, LLC
1122 Willow Street, Suite 200
San Jose, CA 95125

Lyle Commercial Realty
121 South Palm Canyon Dr., Suite 216
Palm Springs, CA 92262
Attn:  Sue Lyle

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**